**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CIVIL ACTION NO.  04-11360-DPW

```
                          )
SUTRA, INC.,              )
                          )
        Plaintiff,        )
                          )
v.                        )
                          )
ICELAND EXPRESS, EHF,     )
                          )
        Defendant.        )
                          )
```

**DEFENDANT ICELAND EXPRESS, EHF'S MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

The Defendant Iceland Express hereby submits this Memorandum of Law in

Support of Motion for Summary Judgment.

## I.  INTRODUCTION

In Count I of its Complaint in this action, Sutra asserts a claim for breach of

contract, alleging that Iceland Express breached the Agreement by failing to maintain

staff and agent authorization and sign-in level security; by failing to ensure that the

Airkiosk System was operated only by properly trained and qualified staff in Iceland; by

failing to protect and keep confidential the trade secrets of Sutra in Iceland; and by using,

transmitting, modifying or reproducing for the benefit of third parties information which

was stored in the documentation, programs or databases of the Airkiosk System, in

Iceland.  Complaint, at ¶¶ 21-24.  In Count II of its Complaint, Sutra alleges that Iceland

Express misappropriated trade secrets relative to the Airkiosk System.  Id., at ¶ 27.

## II.  STATEMENT OF UNDISPUTED FACTS

1.    The Defendant, Iceland Express, ehf ("Iceland Express"), is in the business of operating an airline, offering flights originating in Iceland, flying to Copenhagen Denmark, London England and Hahn Germany. <u>Nielsson Declaration</u>, at ¶ 5.

2.    On or about December 10, 2002, the Plaintiff, Sutra, Inc. ("Sutra"), and Iceland Express, entered into an Airkiosk System Application Service Provider Agreement (the "Agreement"), pursuant to which Sutra agreed to grant Iceland Express access to Sutra's computerized airlines reservations system known as the "AirKiosk System." <u>Complaint</u>, Exh. A.

3.    The term of the Agreement was twelve months, which could be extended by mutual agreement of the parties. <u>Complaint</u>, Exh. A, at 11.

4.    Pursuant to the AirKiosk Agreement, the total cost of implement and training Iceland Express on how to use the AirKiosk System was $20,000. Additionally, Iceland Express agreed to pay Sutra a monthly user fee of $1,500 US, covering the processing of up to 9,000 revenue passengers boarded per month, but no more than a total of 100,000 revenue passengers boarded in any consecutive 12 month period. In excess of these limits, Iceland Express would pay an additional sum of $.20 USD per additional revenue passenger boarded. <u>Complaint</u>, Exh. A, at 9.

5.    The AirKiosk System software was and is located on servers in the offices of Sutra. <u>Zayotti Affidavit</u>, Exh. A, at 42-43. (S.Niketic)

6.    Pursuant to its agreement with Iceland Express, Sutra provided Iceland Express access via the Internet to the AirKiosk System. <u>Zayotti Affidavit</u>, Exh. A, at 42-43, 46 (S. Niketic).

7.      Sutra did not provide Iceland Express a copy of the AirKiosk System software or source code. <u>Zayotti Affidavit</u>, Exh. A, at 42-43, 46 (S. Niketic).

8.      In January, 2003, Iceland Express started up its operations in Iceland, and Sutra trained two Iceland Express employees, Gunnar Karl Nielsson and Bryndis Jonsdottir, in the use of the AirKiosk System at Sutra's offices in Massachusetts. <u>Zayotti Affidavit</u>, Exh. B, at 8 (G.Nielsson).

9.      In using the AirKiosk System, Iceland Express experienced problems extracting accurate ticket sales data for use with its accounting software system. Specifically, "[t]he information that [Iceland Express] got from the AirKiosk system didn't add up to what the information from [Iceland Express's] credit card companies told [Iceland Express]. So there was not match between the two systems." <u>Zayotti Affidavit</u>, Exh. B, at 24 (G.Nielsson). In that regard, "[t]here was always a discrepancy between the number of airline tickets sold . . . and the amounts that [Iceland Express] [was] getting into [its] accounts." <u>Zayotti Affidavit</u>, Exh. B, at 30 (G.Nielsson).

10.     The AirKiosk System was supposed to be able to produce various reports of financial data intended be used by Sutra customers, like Iceland Express, in connection with third-party accounting software systems. <u>Zayotti Affidavit</u>, Exh. A, at 95 (S. Niketic).

11.     One of the reports the AirKiosk System is supposed to be able to produce is a ticket sales report ("TSR"), the purpose of which is to "feed airline accounting systems." <u>Zayotti Affidavit</u>, Exh. A, at 97 (S. Niketic).

12.    Unfortunately, the TSR generated by the AirKiosk System for Iceland Express's use did not add up to the sums that Iceland Express was getting from its clearinghouse. Zayotti Affidavit, Exh. B, at 33 (G.Nielsson).

13.    Over a period of several months, Iceland Express "repeatedly asked [Sutra] to take a look at this and give [Iceland Express] the correct information so [Iceland Express] could get the books to add up." Zayotti Affidavit, Exh. B, at 25 (G.Nielsson); Exh. A, at 131, 209-214 (S.Niketic).

14.    In response to Iceland Express's repeated requests for resolution of this problem, Sutra indicated that there was nothing wrong with the AirKiosk System and that Iceland Express's problems with obtaining accurate sales data was Iceland Express's own fault. In correspondence from Sutra to Iceland Express dated June 26, 2003, Sutra stated that "[o]ur customer support and Novak have tested and checked your MIS Consolidated TSR report functions a number of times over the past week (at least) against AEU queries and found no problems. . . . We have explained over the past several months that MIS Flown Revenue reports require AEU's completion of the MIS cycle (handback, update, final of flown flights), which you still do not perform." Zayotti Affidavit, Exh. D.

15.    Although Sutra acknowledged in correspondence to Iceland Express dated July 10, 2003, that "Navision [Iceland Express's accounting software system], a product from a company that supposedly supports standards, is not congruent with the import of csv files", Sutra nevertheless stated "[w]e believe a good part of your accounting department problems may be the result of no training. . . ." Zayotti Affidavit, Exh. E.

16.    In the meantime, it was critical for Iceland Express to quickly resolve the issue of obtaining accurate sales data from the AirKiosk System. Iceland Express's CEO

"was putting the squeeze on [Mr. Nielsson] and the CFO to get the correct information so they could balance the books or get the books correct, because . . . the company was underfunded and they needed the books to be correct so they could get funding, more funding, which was – competition was very stiff. . . .  Zayotti Affidavit, Exh. B, at 43 (G.Nielsson).

17.    After several months without resolution of the issue of obtaining accurate sales data from the AirKiosk System, Iceland Express employee Gunnar Karl Nielsson decided to create "a script that opened up PNRs, just the information of each PNR into a text file, and then closed the PNR down again, then opened up another PNR copied it to a text file, saved it, closed the PNR down, and so on, and so on." Zayotti Affidavit, Exh. B, at 24 (G.Nielsson).

18.    PNRs are passenger name records, which include names of passengers, fares paid, seat assignments, and other information relating to a reservation. Zayotti Affidavit, Exh. F, at 18-19 (N. Niketic), Exh. A, at 70 (S.Niketic).

19.    The PNR text files retrieved and copied by Iceland Express by means of the script consisted of "information about the persons that are booking in the system, where they are going, and how much they spent and paid for the ticket." Zayotti Affidavit, Exh. B, at 25 (G.Nielsson).

20.    The PNR text files copied by Iceland Express contained "no codes, no programming. . . ." Zayotti Affidavit, Exh. B, at 26 (G.Nielsson).

21.    Iceland Express and other customers of Sutra would be unable to operate their businesses without access to the reservation data, inventory data and passenger list information. Zayotti Affidavit, Exh. A, at 73 (S. Niketic).

22.     Iceland Express had the right to access all reservation data, inventory data and passenger list information.  Zayotti Affidavit, Exh. A, at 57 (S. Niketic).

23.     Indeed, Iceland Express's reservation data, inventory data and passenger list information was confidential and proprietary to Iceland Express, not Sutra.  Zayotti Affidavit, Exh. A, at 79-90 (S. Niketic).

24.     The script used by Iceland Express to retrieve and copy PNRs automated the process by which Iceland Express could have manually accessed, retrieved and copied its PNR data from the AirKiosk System.  Zayotti Affidavit, Exh. B, at 38 (G. Nielsson); Exh. F, at 19 (N. Niketic), Exh. A, at 91-92 (S. Niketic).  Essentially, the script "mimic[ked]" a human user of the AirKiosk System to access and copy PNR data.  Zayotti Affidavit, Exh. F, at 19-20 (N. Niketic).

25.     Iceland Express copied by means of the script approximately 4,000 PNR text files for the purpose of having them "implemented into the . . . bookkeeping system. . . ." Zayotti Affidavit, Exh. B, at 26 (G.Nielsson).

26.     The individual PNRs copied by Iceland Express contain all of the same raw ticket sales data that is supposed to be collected in the TSR reports generated by the AirKiosk System.  Zayotti Affidavit, Exh. A, at 97-107.  (S. Niketic).

27.     Unfortunately, the script created by Mr. Nielsson did not close the PNR's fast enough, as a result of which "it save itself onto another PNR and created sort of a database error, or it damaged – there was some PNRs damaged."  Zayotti Affidavit, Exh. B, at 25 (G. Nielsson).  As a result, some of Iceland Express's PNR data became corrupted.  Zayotti Affidavit, Exh. A, at 113-114 (S. Niketic).

28.    The script run by Iceland Express did not damage the AirKiosk System or any of its programs.  Zayotti Affidavit, Exh. A, at 114 (S.Niketic).

29.    Sutra detected the script created and run by Mr. Nielsson and contacted Iceland Express to inquire whether Iceland Express knew anything about it.  Initially, Mr. Nielsson panicked and denied that he knew anything about the script because Sutra was "really harsh on the phone", Iceland Express was an "annoying customer", Sutra had complained that Iceland Express was a small customer but had many service requests, Sutra had previously questioned whether it was worthwhile to keep Iceland Express as a customer, and Sutra had the "power to shut [Iceland Express] down overnight".  Zayotti Affidavit, Exh. B, at 31-32 (G.Nielsson).

30.    Thereafter, Sutra shut down Iceland Express's access to the AirKiosk System.  Zayotti Affidavit, Exh. B, at 31 (G.Nielsson); Exh. A, at 115 (S.Niketic).

31.    Iceland Express and Mr. Nielsson subsequently admitted to Sutra that Mr. Nielsson had utilized a script to retrieve and copy PNR text files, and Iceland Express paid Sutra $5,000 U.S. to repair the corrupted PNR data.  Zayotti Affidavit, Exh. B, at 32-33 (G.Nielsson); Exh. A, at 117 (S.Niketic).

32.    Iceland Express decided to switch from using the AirKiosk System to a system known as Ticket.net because Iceland Express "could not get the books to add up" with the AirKiosk System, and Ticket.net was a "consumer-friendly booking system" that "could give . . . correct numbers according to the sales [and] feed the financial system with correct information. . . ."  Zayotti Affidavit, Exh. B, at 11 (G.Nielsson).

33.    Thereafter, the parties mutually agreed to terminate their Agreement.  Zayotti Affidavit, Exh. A, at 139-140 (S. Niketic).

34.     Sutra and Iceland Express also reached an agreement pursuant to which all of Iceland Express's PNR data was migrated from the AirKiosk System to Ticket.net. <u>Zayotti Affidavit</u>, Exh. A, at 140, 147-148 (S. Niketic)

35.     On or about November 27, 2003, Iceland Express entered into a License Agreement with Airline Management Consultants Limited, whereby Iceland Express agreed to license from Airline Management Consultants Limited an airline reservation software system developed by Tommy Wiberg and known as "Ticket.net". Pursuant to the Agreement, Airline Management Consultants Limited is the sole owner of Ticket.net and all intellectual property related thereto. <u>Zayotti Affidavit</u>, Exh. B, at 16 (G.Nielsson), Exh. G, at 3 (Ticket.net contract).

36.     Pursuant to Iceland Express's Agreement with Airline Management Consultants Limited, Iceland Express agreed to pay a monthly user fee of 2,995 EUROS, which converts to approximately $3,576.93 US as of the date of the contract. <u>Zayotti Affidavit</u>, Exh. G, at 16, Exh. H (currency conversion).

37.     When Iceland Express began using its new airline reservation system, "the books added up. And [Iceland Express] [was] using the same payment provider and all the same information. The only – new thing in the equation was the booking system." <u>Zayotti Affidavit</u>, Exh. B, at 43 (G.Nielsson).

38.     Iceland Express did not give Tommy Wiberg access to the AirKiosk System or AirKiosk System manuals. <u>Zayotti Affidavit</u>, Exh. B, at 27-28 (G.Nielsson); <u>Wiberg Affidavit</u>, at ¶ 7.

39.    Tommy Wiberg never had access to the AirKiosk System software, source codes, object codes or algorithms underlying the software.  <u>Wiberg Affidavit</u>, at ¶ 7; <u>Zayotti Affidavit</u>, Exh. A, at 42-43, 46 (S. Niketic).

40.    Prior to creating Ticket.net, Tommy Wiberg created the airline reservation software system known as GoodJet.  <u>Wiberg Affidavit</u>, at ¶¶ 3-4.

41.    In response to Iceland Express's First Set of Interrogatories to Sutra, Sutra stated, in relevant part, as follows:

<u>Interrogatory No. 7</u>:

Please state each and every material fact that supports your allegation . . . that 'Iceland Express disclosed confidential, proprietary trade secret information regarding the Airkiosk System,' including in your response specifically identifying each and every trade secret and all confidential or proprietary information that you contend Iceland Express disclosed.

<u>Objection</u>:  Plaintiff objects to this interrogatory as being premature.  Discovery is ongoing.  Plaintiff reserves the right to supplement its answers to this Interrogatory as more information becomes available.

<u>Response</u>:  Iceland Express began using Ticket.net after Sutra terminated its use of the AirKiosk System.  Ticket.net, in early 2003, lacked certain features and functionality found in the AirKiosk System.  The features and functionality included those provided by the Control Agent and Reservation Control interfaces and modules, which were the subject of the attack by the external script in June 2003.  Shortly thereafter, Ticket.net included such features and functionality which appeared similar to at least one consultant familiar with both systems. . . .  The trade secrets and confidential and proprietary information include the operation, appearance, features and functionality of the Control Agent and the Reservation Control interfaces and modules of the AirKiosk System.  These modules are only accessible by authorized customers of Sutra who have agreed to maintain the confidentiality of the AirKiosk System.  Security for access to these modules is controlled through the use of IDs, passwords, and Internet address verification.  These security measures were thwarted by Iceland Express in its operation of the AirKiosk System.

Zayotti Affidavit, Exh. I, at 6.

42.    During its deposition, however, Sutra admitted that it is "impossible [for Sutra] to say" whether Iceland Express retrieved any data other than PNRs by means of the script. Zayotti Affidavit, Exh. F, at 21 (N. Niketic).

43.    Although Sutra testified that it may have in its possession log files that would show that Iceland Express retrieved information about the manner in which data is structured and stored in the AirKiosk System, Sutra failed and refused to produce log files and/or other relevant documents in response to Iceland Express's document requests. Zayotti Affidavit, at ¶ 12, and Exh. J, and Exh. F, at 28-32 (N. Nikitec).

44.    Sutra admitted that it is unable to identify what aspects of the operation, appearance, features and functionality of the AirKiosk System were allegedly misappropriated by Iceland Express and incorporated into Ticket.net. Zayotti Affidavit, Exh. F, at 40 (N. Niketic).

45.    Sutra admitted that it is "almost impossible" for Sutra to identify what features of the AirKiosk System Sutra is claiming were misappropriated by Iceland Express. Zayotti Affidavit, Exh. A, at 153-154 (S.Niketic).

46.    Sutra admitted that is unable to say to what extent other airline reservation systems on the market may have features similar to the AirKiosk System. Zayotti Affidavit, Exh. A, at 155 (S.Niketic).

47.    Sutra admitted that it is not familiar with the features, functionality, operation or appearance of the Goodjet System, the Qust System or the Ticket.net System. Zayotti Affidavit, Exh. F, at 36-37 (N. Niketic).

48.     Sutra admitted that its allegation that its trade secrets are incorporated into the Ticket.net system is based solely on the statements of a Swedish company known as Aton and/or an individual named Peter Nimerius to the effect that "ticket.net had substantially different and expanded functions than it had when it was the reservation system at Goodjet." Zayotti Affidavit, Exh. A, at 186-187, 221-222 (S. Niketic). According Sutra, Aton and/or Nimerius asserted that the expanded features and functionality of the Ticket.net system were in the administrative area of the reservation system. Zayotti Affidavit, Exh. A, at 187 (S.Niketic). Aton never explained to Sutra which specific functions and features of Ticket.net were supposedly similar to the AirKiosk System or how they were supposedly similar. Zayotti Affidavit, Exh. A, at 188-193 (S.Niketic).

49.     Sutra failed and refused to provide any formal response or objection to Iceland Express's Request for Inspection of the Airkiosk System. Informally, Sutra stated through counsel that "Sutra cannot allow access to the data of any other airline. Use of the system without any data will not show anything." Zayotti Affidavit, at ¶ 13 and Exh. K and Exh. L.

50.     Sutra objected to Iceland Express's request for the Airkiosk System source code as follows:

> Plaintiff objects to this request as being irrelevant, overly broad, unduly burdensome, and unlikely to lead to admissible evidence. Iceland Express only had access to the AirKiosk System from January to July 2003. The AirKiosk Systems for all other time periods, both before and after, including all changes and modifications, is irrelevant. Furthermore, Iceland Express never had access to the source code or documents relating to the source code.

Zayotti Affidavit, Exh. M.

11

51.    Sutra admitted that it copied a portion of the publicly available website of a competitor and incorporated such material into the AirKiosk System. Specifically, Sutra accessed a site use terms and conditions page on a publicly available portion of the website of Sabre, a Sutra competitor, and Sutra copied the Sabre site use terms and conditions and incorporated them into the AirKiosk System. Zayotti Affidavit, Exh. A, at 166-176 (S.Niketic).

52.    Apart from the site use terms and conditions that Sutra copied from the website of its competitor, Sabre, Sutra testified that it does not know whether the AirKiosk System incorporates any open source code or whether any other portions of the AirKiosk System were derived from a publicly available source. Zayotti Affidavit, Exh. A, at 177-178 (S.Niketic), and Exh. F, at 15-16 (N.Niketic).

53.    Sutra failed and refused to respond or object in any fashion whatsoever to the following document requests set forth in Iceland Express's Fourth Request for Production of Documents:

> REQUEST NO. 1:
>
> Any and all documents that establish or evidence the nature and content of information that Iceland Express allegedly retrieved from the Airkiosk System by means of an external script, including without limitation any all log files relevant thereto.
>
> REQUEST NO. 2:
>
> A representative screen shot, either printout or electronic copy, of every screen displayed during use, at any time by Iceland Express, of the Airkiosk System.
>
> REQUEST NO. 3:
>
> Any and all documents that constitute, relate or refer to communications by and between Sutra, Inc. and Peter Nimerius regarding the subject matter of this litigation,

including without limitation the alleged similarities
between the Airkiosk System and Ticket.net.

REQUEST NO. 4:

Any and all documents that constitute, relate or refer to
communications by and between Sutra, Inc. and Qust, Inc.
and/or the entity known as Aton regarding the subject
matter of this litigation, including without limitation the
alleged similarities between the Airkiosk System and
Ticket.net.

REQUEST NO. 5:

Any and all documents that constitute, relate or refer to
claims by Qust, Inc. and/or Aton against Tommy Wiberg,
Airline Management Consultants Limited and/or Iceland
Express.

REQUEST NO. 6:

Any and all documents that constitute, relate or refer to
reports concerning infringement and/or trade secret
misappropriation claims relating to the Goodjet, Flyme,
Ticket.net and Airkiosk airline reservation systems.

REQUEST NO. 7:

Any and all documents that relate or refer to the alleged
similarities and/or differences between any and/or all of the
following airline reservation systems:  Goodjet, Flyme,
Ticket.net and Airkiosk.

REQUEST NO. 8:

Any and all documents that support Sutra's contention that
Iceland Express participated in the development and/or
marketing of the Ticket.net System.

Zayotti Affidavit, at ¶ 12 and Exh. J.

54.    On July 5, 2006, Sutra belatedly objected and responded, in relevant part,

to Iceland Express's Second Set of Interrogatories, served on May 31, 2006, as follows:

INTERROGATORY NO. 4:

With respect to any and all categories of confidential
information and or trade secrets that you identify in
response to interrogatories 1, 2 and 3 above, please state in
full detail the extent to which such confidential information
is known within and without Sutra, the measures taken by
Sutra to protect the alleged secrecy of such information,
and the amount of effort or money expended by the
corporation in developing such information.

Objections:  Plaintiff objects to this interrogatory as being
premature in that discovery is still ongoing.  Defendant has
yet to provide information and documents relating to the
functionality and operation of the ticket.net system and the
external script.  Plaintiff reserves the right to supplement its
answer to this interrogatory as more information becomes
available.

Plaintiff further objects to this Interrogatory as including
multiple unrelated subparts.  Separation of this
Interrogatory into the distinct parts would result in the
Defendant exceeding the maximum number of
interrogatories allowed by Rule 33, Fed. R. Civ. P.
Plaintiff will respond to the first two, related parts of this
Interrogatory.

Response:  Subject to the foregoing objection and the
general objections, Plaintiff responds as follows:

Information regarding the AirKiosk system is provided to
employees of Sutra on a need to know basis.  All
employees of Sutra must execute confidentiality
agreements before any information regarding the AirKiosk
system is disclosed.  Full information regarding the design
of the databases and operation of the system is known only
to a few people at Sutra.

All customers who are given access to the AirKiosk system
are required to execute an ASP Agreement which includes
provisions to maintain the confidentiality of all information
relating to the AirKiosk system.  Access to portions of the
AirKiosk system is limited to specific Internet addresses
designated by customers.

14

INTERROGATORY NO. 5:

Please describe in full detail the nature and substance of any and all features and functionality of the Airkiosk System that you claim were confidential and/or trade secrets that were misappropriated by Iceland Express.

Objections:  Plaintiff objects to this interrogatory as being premature in that discovery is still ongoing.  Defendant has yet to provide information and documents relating to the functionality and operation of the ticket.net system and the external script.  Plaintiff reserves the right to supplement its answer to this interrogatory as more information becomes available.

Response:  Subject to the foregoing objection and the general objections, Plaintiff will not answer this interrogatory until an acceptable Protective Order has been entered by the Court.

INTERROGATORY NO. 6:

Please specifically describe the features and functions of Ticket.net and the Airkiosk System that you contend were similar as a result of Iceland Express's alleged misappropriation of Sutra's confidential information and or trade secrets, including in your response the manner in which said features and functions of the two systems were similar.

Objections:  Plaintiff objects to this interrogatory as being premature in that discovery is still ongoing.  Defendant has yet to provide information and documents relating to the functionality and operation of the ticket.net system and the external script.  Plaintiff reserves the right to supplement its answer to this interrogatory as more information becomes available.

Response:  Subject to the foregoing objection and the general objections, Plaintiff will not answer this interrogatory until an acceptable Protective Order has been entered by the Court.

INTERROGATORY NO. 8:

Please identify all categories of damages that you allege you have suffered, including in your response an itemized breakdown of each such category of damages.

Objections:  Plaintiff objects to this interrogatory as being premature in that discovery is still ongoing.  Iceland Express has not yet provided information regarding its bookings, boardings, and finances, which are necessary to determine damages.  Plaintiff reserves the right to supplement its answer to this interrogatory as more information becomes available.

Response:  Subject to the foregoing objection and the general objections, Plaintiff responds as follows:

1.  Lost payment for AirKiosk use, including maintenance and support, by Iceland Express for approximately three years:  at least $54,000.

2.  Value of airline reservation system improperly obtained by Iceland Express:  at least $1,000,000.

3.  Value of airline reservation system improperly provided by Iceland Express to Tommy Wiberg:  at least $1,000,000.

4.  Value of airline reservation system improperly provided by Iceland Express to any other users of Ticket.net:  unknown.

INTERROGATORY NO. 9:

Please identify any and all documents that relate to and/or support any and all of your contentions set forth in your responses to these interrogatories.

Objections:  Plaintiff objects to this interrogatory as being premature in that discovery is still ongoing.  Plaintiff reserves the right to supplement its answer to this interrogatory as more information becomes available.

Response:  Subject to the foregoing objection and the general objections, Plaintiff will produce such documents pursuant to Rule 33, Fed. R. Civ. P., once an acceptable Protective Order has been entered by the Court.

Zayotti Affidavit, Exh. N, Exh. O, Exh. P. and Exh. Q.

55.    On July 5, 2006, Sutra belatedly objected and responded, in relevant part,

to Iceland Express's Second Request for Documents, served on May 31, 2006, as

follows:

REQUEST NO. 1:

All documents that support your allegation in paragraph 20
of the Complaint that "Iceland Express disclosed
confidential, proprietary trade secret information regarding
the Airkiosk System, including information obtained by the
external script and by calls to Sutra customer support, to
the creators of ticket.net."

Response:  Subject to the general objections, Plaintiff will
produce the requested documents once an acceptable
Protective Order has been entered by the Court.

REQUEST NO. 2:

All documents that constitute, relate or refer to any
infringement action brought against Iceland Express and/or
Tommy Wiberg by the company that produced the airline
reservation system known as GoodJet.

Response:  Subject to the general objections, Plaintiff will
produce the requested documents once an acceptable
Protective Order has been entered by the Court.

REQUEST NO. 3:

All documents that constitute, relate or refer to
communications by and between Peter Nimerius and Sutra,
including but not limited to any and all documents or
communications that comment on the supposed similarities
between new portions of Ticket.net and the Airkiosk
System.

Objection:  Plaintiff objects to this request as being overly
broad, unduly burdensome, and unlikely to lead to
admissible evidence to the extent that it seeks documents
unrelated to Ticket.net and/or Iceland Express.

Response:  Subject to the foregoing objection and general
objections, Plaintiff will produce the requested documents
once an acceptable Protective Order has been entered by
the Court.

REQUEST NO. 4:

All documents or communications that relate or refer to any and all alleged similarities between the features and functions of the Airkiosk System and ticket.net.

Response:  Subject to the general objections, Plaintiff will produce the requested documents once an acceptable Protective Order has been entered by the Court.

REQUEST NO. 5:

All documents that support or relate to your contention that Iceland Express allowed persons other than staff and agents to access the Control Agent module of the Airkiosk System in violation of the parties' agreement.

Response:  Subject to the general objections, Plaintiff will produce the requested documents once an acceptable Protective Order has been entered by the Court.

REQUEST NO. 6:

All documents that support or relate to your contention that Iceland Express disclosed confidential information and or trade secrets regarding the Airkiosk System to third parties, including Tommy Wiberg.

Response:  Subject to the general objections, Plaintiff will produce the requested documents once an acceptable Protective Order has been entered by the Court.

REQUEST NO. 7:

All documents or communications requested to be identified in Iceland Express's Second Set of Interrogatories to Sutra.

Response:  Subject to the general objections, Plaintiff has produced the requested documents and/or will produce the requested documents once an acceptable Protective Order has been entered by the Court.

Zayotti Affidavit, Exh. O and Exh. Q.

56.    Although a Stipulated Protective Order was entered by this Court on

January 5, 2007, Sutra failed to supplement its responses to Iceland Express's second sets

of interrogatories and document requests, and failed to supplement its document

production, as required, including but not limited to failing to produce copies of

confidentiality agreements supposedly signed by Sutra employees. <u>Zayotti Affidavit</u>, at

¶¶ 17, 19.

57.    Sutra objected and responded to Iceland Express's expert witness

interrogatory as follows:

> <u>INTERROGATORY NO. 16</u>:
>
> Please identify each person you expect to call as an expert
> witness at trial and for each person state:
>
> a)    his/her name;
>
> b)    address;
>
> c)    the subject matter upon which he/she is expected to
>        testify;
>
> d)    the substance of the facts and opinions to which
>        he/she is expected to testify; and
>
> e)    fully and completely the substance of the grounds
>        for each opinion.
>
> <u>Objection</u>:  Plaintiff objects to this Interrogatory as being
> premature.  Plaintiff further objects to this Interrogatory as
> requiring more than Rule 26, Fed. R. Civ. P.  Plaintiff will
> supplement its answer regarding experts expected to testify
> at trial at the times as required by the court.
>
> <u>Response</u>:  Plaintiff has not yet determined whom it
> expects to call as an expert witness or the substance of the
> testimony to be given.

<u>Zayotti Affidavit</u>, Exh. I, at 11.

58.    Pursuant to the Court's Scheduling Order dated April 30, 2007, the Court

ordered as follows:

> Fact discovery completed by 4/30/07; Plaintiff expert
> disclosure by 5/25/07; defendant's expert disclosure by

> 6/22/07; expert depositions completed by 7/15/07;
> dispositive motions due 8/17/07 with responses due
> 9/17/07. Parties shall notify court by 8/17/07 if no
> dispositive motions are anticipated. No further extensions
> of discovery schedule will be entertained.

See Scheduling Order.

59.    On August 9, 2007, more than two months after the deadline for Plaintiff's

expert disclosures and only 8 days before the deadline for filing dispositive motions,

Sutra produced a Report on Comparison between Sutra Airkiosk System and Iceland

Express System signed by Peter Nimerius. Sutra did not seek to extend the deadline for

making its expert disclosures. Zayotti Affidavit, at ¶ 20 and Exh. R.

60.    The Report on Comparison between Sutra Airkiosk System and Iceland

Express System purports to compare four items in the area of administrative functions of

the GoodJet, Airkiosk and Ticket.net airline reservation systems and draws certain

conclusions, but the report includes no information or facts concerning the basis of and

reasons for Mr. Nimerius's opinions, or the data or other information considered by Mr.

Nimerius in forming his opinions. Zayotti Affidavit, Exh. R.

61.    According to Mr. Nimerius's report:

> In the Goodjet system from late 2002 and early 2003 there
> is a small set of administrative functions. Most of the
> administrative work has been done directly into the system
> database.

> Notably, in the Goodjet system very little airline business
> terminology is used.

> A court order in Sweden 2007 decided that the [Ticket.net]
> system was a copy of the Goodjet system, so therefore it is
> fare [sic] to conclude that the [Ticket.net] system had a
> very limited set of administrative functions from the start.

Zayotti Affidavit, Exh. R, at 1.

62.     Mr. Nimerius's report does not include copies of the documents upon

which he relies, including the court order in Sweden 2007, nor does it include the bases

for Mr. Nimerius's conclusions regarding the administrative functions of the Goodjet

system or the Ticket.net system.

63.     With regard to the first item of comparison, route and fare management

functions, Mr. Nimerius concludes:

> In terms of handling booking classes and routes, the Sutra
> Airkiosk system is much more advanced than either
> [Ticket.net] or the Goodjet system.  The Iceland Express
> system in turn has improved many functions especially for
> fares since the Goodjet system.
>
> The Iceland Express fares contain functions such as:
>
> o     Class
>
> o     Seats
>
> o     Currencies
>
> o     Valid from
>
> o     Valid to
>
> o     Child Discount
>
> o     Infant discount
>
> These functions could very well be influenced by the Sutra
> Airkiosk since this system contains *all normal fare
> functions used in the airline industry*.  It suggests that the
> [sic] some of the functions used by Iceland Express at the
> time they used the Sutra Airkiosk system were of such
> value that they had to be implemented in the [Ticket.net]
> system as well.  However, the [Ticket.net] system is not a
> clean and full copy of Sutra Airkiosk in this respect, rather
> influenced by.

Zayotti Affidavit, Exh. R, at 4 (emphasis supplied).

64.    The concepts of fare functions that handle seat assignments, class, child discounts, infant discounts and different currencies are readily ascertainable from the websites of Sutra AirKiosk customers, including Jet2.com, Aero and Tobago Express. Zayotti Affidavit, Exh. S and Exh. T.

65.    With regard to the second item of comparison, functions relating to load factor, alerts, inventory and yield management, Mr. Nimerius concludes:

> In the Goodjet system, terms like load factor and alerts were not present.  The Sutra Airkiosk system contains an inventory management function where alerts are shown per flight and day when load factors become critical.  The [Ticket.net] system has both a load report that among other things show load facts and alerts, and an auto yield function where automatic action is taken base don certain predefined criteria (yield schemas).
>
> The conclusion is that it is fair to say that the [Ticket.net] system has been strongly influenced by the Sutra Airkiosk system for the handling of functions such as load factor, alert reports, goals, etc.  *The Sutra Airkiosk system does not contain any automatic system for yield management which the [Ticket.net] system does, but the Airkiosk Inventory management function allows the administrator to manually take almost the exact same actions.*  So, also on this function, it seems likely that the [Ticket.net] system has chosen a different approach to handling this functionality.

Zayotti Affidavit, Exh. R, at 6 (emphasis supplied).

66.    With respect to the third item of comparison, a system configuration tool, Mr. Nimerius states as follows:

> The [Ticket.net] system contains a System wide configuration tool where system wide configuration is handled.  None of these functions existed in the Goodjet system *in a web interface but was instead done directly in the system database*.
>
> The Sutra Airkiosk system contains a System wide configuration tool as part of the Control Agent Interface Tables.

. . . .

> The concept of SSR's was not present in the Goodjet system and has been introduced afterwards in the [Ticket.net] system.  Terminology for SSR's in the [Ticket.net] system very much resembles that used in the Airkiosk system.  *Terms like UM and WC is [sic] part of the general airline lingua, but must have been brought into the [Ticket.net] system influenced and possibly copied from the Sutra Airkiosk system.*

> Somehow, the [Ticket.net] system has developed many functions for a System wide configuration tool, which has strong similarities to how the Sutra Airkiosk system is set up.  Our assessment is that this part of the [Ticket.net] system has been strongly influenced by the Sutra Airkiosk system.

Zayotti Affidavit, Exh. R, at 7 (emphasis supplied).

67.     Finally, with respect to the fourth item of comparison in Mr. Nimerius's

report, bookings and block space functions, Mr. Nimerius states as follows:

> Both systems contain similar types of functionality for handling groups and blocks of space for multiple flight dates.

> . . . .

> The Goodjet system does not contain any functionality for booking groups or block space.  The [Ticket.net] system has quite advanced functions for doing these services.  The Sutra Airkiosk system also contains functions for both booking a group and for booking groups on the same flight over a specified time period.

> Somehow, the concept of group bookings and block space was brought into the [Ticket.net] system.  *Whether this comes from the Sutra Airkiosk system directly or from the requirements from Iceland Express after they had been using the Sutra Airkiosk system is hard to establish.*

Zayotti Affidavit, Exh. R, at 7-8 (emphasis supplied).

68.     The concept of group bookings and block space is readily ascertainable from the publicly available airline reservation websites, such as the website of Sutra customer Jet2.com. Zayotti Affidavit, Exh. S and Exh. T.

69.     Sutra advertises most if not all of the foregoing administrative functions in the Frequently Asked Questions page of Sutra's website:

**1.    What does the AirKiosk system do?**
The AirKiosk system is an integrated solution for distribution, reservations, inventory management, check-in and revenue management.

Five GUIs provide differentiated user access to inventory and system functions.

**AT-A-GLANCE USER FUNCTIONALITY**

| Control Agent Interface | Call Center Interface |
|---|---|
| Schedule Create and Change | Full Schedule, AV, Fares display |
| Inventory Management | Full PNR handling for all points of sale |
| Fares | Ticket Stock management |
| Point-of-Sale Control | TSR (Ticket Sales Report) by POS |
| Offices and Agents | Queues |
| Flight Activity Tracking and Alerts | Lists |
| Revenue Management Tools | Passenger Protection and Reaccommodation |
| Sales Statistics and Reports with graphic presentation | **Internet Agent Interface** |
| Customer Loyalty Database | *Private access for travel agents, wholesalers, corporate accounts, other direct channels:* |
| System Tables | You control, at each agent office: |
| Message Switching Control |  |
| **Check-In Interface** | • AV and Fares display |
| Lists: PNL, ADL, Standby, Boarded, Service |  |
| Seat map with point-and-click assignment | • PNR, Payment and Ticket handling |
| Seat plan by gender for load control | Agency Management functions |
| Online validation of tickets and PNRs | **Self-Booking Interface** |
| Optional boarding pass and bag tag printing | *Public access for Internet consumers:* |
|  | Controlled AV and Fares display |
|  | Credit card or T/L hold bookings, or both |
|  | Automatic booking confirmation and e-ticket delivery |

AirKiosk system interfaces and message switching allow you to connect to:

- GDSs

- Other airlines

- Credit Card Authorization bureaus

- Other systems, including external DCS and RM

and any other trading partners with whom you have commercial links.

AirKiosk system inventory management functions support interline and codesharing agreements.

24

**2.    How does the AirKiosk system work?**

The AirKiosk system runs on Linux servers over TCP/IP, based on an N-tier, network-centric architecture. The AirKiosk system can run on multiple logical and physical servers. Processing power and data reside wherever they are most needed and cost-effective.

| *Airkiosk System Advantage* | *Your Benefit* |
|---|---|
| Network-centric architecture | <ul><li>Reliability</li><li>System management and maintenance</li><li>Rapid application development</li><li>Compatibility with multiple OSs</li></ul> |
| Structured data, object and message-based databases | <ul><li>Response time</li><li>Scalability</li></ul> |
| Component application servers | <ul><li>Shortened development cycles</li><li>Maintenance ease</li><li>Security</li></ul> |
| Ability to distribute logical servers among multiple, physical servers in a network | <ul><li>System availability</li><li>Reduced communications costs</li><li>Security</li><li>Tailoring of POS presentations to distinct user groups</li></ul> |
| Ability to use commodity hardware products and a range of processor types and sizes. | <ul><li>Reduced hardware platform costs</li><li>Scalability</li><li>Flexibility to use new technology as it becomes available</li></ul> |
| Ability to integrate with legacy systems and access devices. | <ul><li>Investment protection</li><li>Gradual migration capability</li></ul> |

**3.    Can the AirKiosk system help me if I already have a reservations solution?**

Yes. Although the AirKiosk system is a full reservations and inventory management solution, its architecture is flexible enough to allow for integration and cooperative implementations with other systems. This is true whether you own your current reservation solution or are hosted on a third party's system.

For example, you can use the AirKiosk system to make all -- or selected parts -- of your master inventory

available to points-of-sale which cannot access your host. The inventory available on the AirKiosk system is sold via AVS Open/Close messages managed by your host.

You can also split your inventory, making selected parts available only through the AirKiosk system and the points-of-sale you have designated for AirKiosk system access.

There are multiple benefits to using the AirKiosk system with legacy solutions:

- Cost-savings on ATO/CTO sales for vendors currently hosted by a third-party.

- Fast, easy (and controlled) introduction of direct sales to corporate accounts, travel agents or consumers, or all of these segments.

- Protection of host resources from excessive, and often unproductive, availability and fare "look ups" generated by Internet sites.

- Lower-cost distribution for special categories of inventory, such as charter flight operations, tour/consolidator operator sales, or discounted products.

These are just a few examples. If you have questions about a specific implementation idea, let us know.

If you are a large vendor with your own reservations host and high-level CRS/GDS participation, read our White Paper "Death by Booking Engine" to understand how the AirKiosk system will help you.


4.  **Is the AirKiosk system a "booking engine?"**
    The AirKiosk system can be used as a "booking engine." However, the AirKiosk system is not a "booking engine."

    The difference is critical. Unlike "booking engines," the AirKiosk system has fully functional inventory management, booking file, passenger handling, revenue management, and point-of-sale control functions.

    To understand more about the difference, download our White Paper "Death by Booking Engine".


5.  **Is there a limit to the transactions I can process with the AirKiosk system?**
    AirKiosk system software is scalable. For each AirKiosk system implementation, we specify hardware to handle expected transaction loads. As transaction requirements grow, the AirKiosk system can grow, too. We can determine and configure necessary hardware upgrades whenever they are required.


6.  **How do I get the AirKiosk system?**
    There are two options:

    **ASP Service**
    We host your system on our own server complex. Monthly fees, based on your passenger volume, allow you to use to all system functions and our processing and technical support facilities.

    **License Purchase**
    A one-time license payment allows you perpetual use of the AirKiosk system on your site. Support and maintenance (including software upgrades) is contracted annually.


7.  **What do I need to install the AirKiosk system?**
    If you use our ASP, you only need PCs with browsers for your users and an Internet connection to our servers.

    If you are installing the AirKiosk software on your site, you will need:

    **Hardware**
    One or more servers, depending on your needs. We will help you size, specify and configure the hardware for your installation.

    **Software**
    Linux operating system

Standard browser software

**Communication**
Internet (ISP) connection

For CCA, GDS and interline connections, you will need appropriate commercial agreements with those entities. The AirKiosk system provides for the physical links.

8.  *Do I need any other software licenses?*
    NO. The AirKiosk system does NOT require that you license or use TP monitors, RDBMs, MS Windows or other third-party packaged software. All of the functions provided by these "extra layers" in other systems are built into the AirKiosk system software.

9.  *How long does it take to get started?*
    There are three steps to installing the AirKiosk system, in many cases the entire process can take as few as 6 to 8 weeks.

    **Hardware/Network Implementation**
    We provision your server and network requirements on our ASP or, if you are installing the AirKiosk software on your site, we help you with planning, specifications and configuration.

    **Software Implementation**
    We configure the AirKiosk software for your requirements, prepare any customizations required, brand your public interfaces, and load your initial databases and tables.

    **Training**
    We "train the trainers" in separate programs: System and Database Control, Reservations and Ticketing, Check-In and, if you have purchased a license, System Administration.

10. *What support and maintenance is included?*
    We provide both online and telephone support, including expert-level support for your control agents. AirKiosk system users receive standard software upgrades and new releases. We also assist you with system expansions to handle increased transaction volumes.

Zayotti Affidavit, Exh. T.

## III.  ARGUMENT

## A.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Grub v. KMS Patriots, L.P., 88 F.3d 1, 3 (1st Cir. 1996), citing, Kelly v. United States, 924 F.2d 355, 357 (1st Cir. 1991); Fed. R. Civ. P. 56(c).  Under this standard, "a party seeking summary judgment must make a preliminary showing that no genuine issue of material fact exists.  Once the moving party has made this showing, the

nonmoving party must contradict the showing by pointing to specific facts demonstrating that there is, indeed, a trialworthy issue." Blackie v. State of Maine, 75 F.3d 716, 721 (1st Cir. 1996). To avoid summary judgment, the nonmoving party "must offer the court more than posturing and conclusory rhetoric. This principle is brought into bold relief when the motion targets an issue on which the nonmoving party bears the ultimate burden of proof." McIntosh v. Antonino, 71 F.3d 29, 33 (1st Cir. 1995). "Conclusory statements, general denials, and factual allegations not based on personal knowledge would be insufficient to avoid summary judgment." Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3rd Cir. 1972). Similarly, conclusory statements not unsupported by a statement of specific facts are insufficient. Aldahonda-Rivera v. Parke Davis & Co., 882 F.2d 590, 594 (1st Cir. 1989). Finally, in ruling upon a motion for summary judgment, "[m]atters of law . . . are for the court to resolve." Blackie, 75 F.3d at 721.

**B. ICELAND EXPRESS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON SUTRA'S CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS BECAUSE SUTRA HAS FAILED TO IDENTIFY THE SUPPOSED TRADE SECRETS ALLEGEDLY MISAPPROPRIATED BY ICELAND EXPRESS**

There are no genuine issues of material fact and Iceland Express is entitled to judgment as a matter of law on Sutra's claim for misappropriation of trade secrets because Sutra had failed to identify the supposed trade secrets allegedly misappropriated by Iceland Express.

To prevail on a claim for misappropriation of trade secrets, a plaintiff must prove that: "(1) the information in question is a trade secret; (2) the plaintiff took reasonable steps to preserve the secrecy of that information; and (3) the defendant used 'improper means, in breach of a confidential relationship, to acquire and use the trade secret.'"

28

Mill-Bern Associates, 2002 WL 1340853, *6, citing, DB Riley, Inc. v. AB Engineering

Corp., 977 F.Supp. 84, 89 (D.Mass.1997); J.T. Healy & Son, Inc. v. James A. Murphy &

Son, Inc., 357 Mass. 728, 737-739 (1970); USM Corp. v. Marson Fastener Corp., 379

Mass. 90, 98-101 (1979). "Trade secret protection is unavailable for information that is

not actually secret." Storage Technology Corp. v. Custom Hardware Engineering &

Consulting, Inc., 421 F.3d 1307, 1319 (C.A.Fed. 2005), citing, Jet Spray Cooler, Inc. v.

Crampton, 361 Mass. 835 (1972). "Therefore, information that is in the public domain

cannot be appropriated by a party as its proprietary trade secret." Storage Technology

Corp., 421 F.3d at 1319, citing, CVD, Inc. v. Raytheon Co., 769 F.2d 842, 850 (1st

Cir.1985) ("Once a trade secret enters the public domain, the possessor's exclusive rights

to the secret are lost.").

     "A trade secret may consist of 'any formula, pattern, device or compilation of

information which is used in one's business, and which [provides] an opportunity to

obtain an advantage over competitors who do not know or use it.'" TouchPoint

Solutions, 345 F.Supp.2d at 27, quoting, Burten v. Milton Bradley Co., 763 F.2d 461,

463 (1st Cir.1985). In determining what qualifies as a trade secret, the court considers:

"1) the extent to which the information is known outside of the business; 2) the extent to

which it is known by employees and others involved in the business; 3) the extent of

measures taken by the employer to guard the secrecy of the information; 4) the value of

the information to the employer and to his competitors; 5) the amount of effort or money

expended by the employer in developing the information; and 6) the ease or difficulty

with which the information could be properly acquired or duplicated by others."

TouchPoint Solutions, Inc. v. Eastman Kodak Co., 345 F.Supp.2d 23, 27-28 (D.Mass.

2004), citing, American Science and Engineering, Inc. v. Kelly, 69 F.Supp.2d 227, 238
(D.Mass. 1999) (quoting RESTATEMENT (SECOND) OF TORTS § 727).

Additionally, in considering whether the plaintiff has taken reasonable measures
to protect secrecy, Massachusetts courts consider several factors including: "1) the
existence or absence of a confidentiality agreement, 2) the nature and extent of
precautions taken, 3) the circumstances under which the information was disclosed and 4)
the degree to which the information has been placed in the public domain or rendered
readily ascertainable." TouchPoint Solutions, 345 F.Supp.2d at 29, citing, Picker Intern.
Corp. v. Imaging Equipment Services, Inc., 931 F.Supp. 18, 23 (D.Mass.1995).

"For software, trade secret protection is not limited to the source code."
TouchPoint Solutions, 345 F.Supp.2d 23, at 28, citing, Harbor Software, Inc. v. Applied
Sys., Inc., 887 F.Supp. 86, 90 (S.D.N.Y.1995). "Rather, the overall design of software
can constitute a trade secret." Id. "In determining whether a particular software design is
protectable, courts focus on whether that design could be duplicated without undue time
or expense." TouchPoint Solutions, 345 F.Supp.2d 23, at 28, citing, Hamer Holding
Group, Inc. v. Elmore, 202 Ill.App.3d 994, 148 Ill.Dec. 310, 560 N.E.2d 907, 918 (1990).

Importantly, however, "[a] plaintiff has no cognizable trade secret claim until it
has adequately identified the specific trade secrets that are at issue." Cambridge Internet
Solutions, Inc. v. Avicon Group, 1999 WL 959673, *2 (Mass.Super. 1999), citing,
Microwave Research Corp. v. Sanders Assoc., 110 F.R.D. 69, 672 (D.Mass.1986). "Such
identification is necessary to ensure that plaintiffs are not using an unmeritorious lawsuit
to discover a competitor's trade secrets." Id. Consequently, plaintiffs must demonstrate
a factual basis for their claim and identify their alleged trade secrets with some

specificity.  Cambridge Internet Solutions, 1999 WL 959673, *2, citing, Microwave

Research Corp., 110 F.R.D. at 674.  "The court must strike a balance between a plaintiff's

right to discovery and a defendant's right to be protected against devastating injury which

may result if it develops that plaintiff's claim is without substance."  Cambridge Internet

Solutions, 1999 WL 959673, *2, citing, Microwave Research Corp., 110 F.R.D. at 672

(quoting Ray v. Allied Chemical Corp., 34 F.R.D. 456, 458 (S.D.N.Y.1964)).  Thus, "[i]t

is not enough to point to broad areas of technology and assert that something there must

have been secret and misappropriated.  The plaintiff must show concrete secrets."

AutoMed Technologies, Inc. v. Eller, 160 F.Supp.2d 915, 920 (N.D.Ill. 2001), citing,

Composite Marine Propellers, Inc. v. Van Der Woude, 962 F.2d 1263, 1265 (7th Cir.

1992).  Moreover, neither a defendant nor the court is required to "sift through technical

data to distill out a trade secret, [and] the plaintiff must be clear about what information is

protectable."  TouchPoint Solutions, 345 F.Supp.2d at 28, citing, Julie Research Labs.,

Inc., v. Select Photographic Eng'g, Inc., 810 F.Supp. 513, 519 (S.D.N.Y.1992), aff'd in

part, 998 F.2d 65 (2nd Cir. 1993).

   Under circumstances even less favorable to the moving party than in the present

case, the Seventh Circuit Court of Appeals in IDX Systems Corp. v. Epic Systems Corp.,

285 F.3d 581 (7th Cir.2002), upheld the trial court's entry of summary judgment in favor

of the defendants on grounds that the plaintiff had failed to specifically identify the trade

secrets that had allegedly been misappropriated.  In that case, a provider of medical

business management software attempted to enforce trade secret rights against a

competitor and former customer, identifying, as its trade secret, "'a 43-page description

of the methods and processes underlying and the inter-relationships among various

features making up IDX's software package'". 285 F.3d 581, 583. Affirming summary

judgment in favor of defendants on this claim, the Seventh Circuit had little difficulty

concluding that this broad description was not nearly specific enough to qualify for trade

secret protection. In rejecting the plaintiff's argument that the 43-page document

describing the "methods and processes underlying" its software was a sufficiently

specific description the Court stated:

> No, it isn't. These 43 pages describe the software; although
> the document was created for this litigation, it does not
> separate the trade secrets from the other information that
> goes into any software package. Which aspects are known
> to the trade, and which are not? That's vital under the
> statutory definition. Likewise, IDX's tender of the
> complete documentation for the software leaves mysterious
> exactly which pieces of information are the trade secrets.

Id. at 583-84.

Similarly, under circumstances less egregious than in the present case, the Court

in Staffbridge, Inc. v. Gary D. Nelson Associates, Inc., 2004 WL 1429935 (Mass.Super.

2004) (Van Gestel, J.) ruled that it would grant summary judgment in favor of the

defendants unless the plaintiffs served on the defendants within a short time provided a:

> designation, in affidavit form and under oath, that sets forth
> with rigorous and focused particularity what, and only
> what, the plaintiffs claim to constitute the trade secrets
> allegedly misappropriated by either of the defendants that
> form the basis for this law suit.
>
> The designation must, with clarity that can be understood
> by a lay person, make clear and distinguish what is
> protectable from that which is not.

2004 WL 1429935, *4. In that case, the plaintiff claimed its software related trade

secrets were "the source code as a whole; the database schema; and the customer

databases." However, the Court agreed with the defendants' expert that the plaintiff's

designation of trade secrets was insufficient because:

> 1. The source code designation "fails to separate the claimed secrets from the vast body of source code designated; and without this, it is impossible to determine whether such claimed trade secrets are present in the WFL software, and whether those claimed trade secrets are in fact generally know to the trade";
>
> 2. The database schema designation "makes no distinction between the portions of the database tables, field definitions, and formats that would be naturally dictated by user-visible requirements, and those portions (if any) that represent trade secrets, the posited similarity would tell nothing"; and
>
> 3. The customer databases designation "does not distinguish unique or proprietary material from the vast body of the StaffFind program and source code (including its patently generic portions), and does not apprise a person what trade secrets StaffBridge claims are to be found in WFL."

Id. at * 3.  See also, Composite Marine Propellers, Inc. v. Van Der Woude, 962 F.2d

1263, 1266 (7th Cir.1992) (plaintiff identified no commercially valuable adaptations of

well known manufacturing techniques); Lear Siegler, Inc. v. Glass Plastics Corp., 1987

WL 15749, *2 (N.D.Ill. 1987) ("Plaintiff's lack of specificity concerning the marketing

information it alleges constitutes trade secrets is fatal to that claim."); AMP Inc. v.

Feischhacker, No. 84 C 1676, slip op. (7th Cir. July 16, 1987) ("plaintiff had failed

throughout the litigation to identify 'any particularized trade secrets actually at risk'");

See also, Microwave Research Corp. v. Sanders Associates, Inc., 110 F.R.D. 669, 674

(D.Mass.,1986) (denying discovery where plaintiff cannot specify the trade secrets and/or

confidential information which it claims were misappropriated).

In the present case Sutra has failed to specifically identify any alleged AirKiosk trade secrets that it claims have been misappropriated by Iceland Express and incorporated into Ticket.net.  Instead, Sutra vaguely asserts that in early 2003, Ticket.net "lacked certain features and functionality found in the AirKiosk System", including features and functionality "provided by the Control Agent and Reservation Control interfaces and modules [of the AirKiosk System], which were the subject of the attack by the external script in June 2003."  Further, Sutra asserts that "[s]hortly thereafter, Ticket.net included such features and functionality which appeared similar to at least one consultant familiar with both systems. . . .  The trade secrets and confidential and proprietary information include the operation, appearance, features and functionality of the Control Agent and the Reservation Control interfaces and modules of the AirKiosk System."  Statement of Undisputed Facts, at ¶ 41.

Contrary to Sutra's responses to interrogatories, however, Sutra admitted during its deposition that it is "impossible [for Sutra] to say" whether Iceland Express retrieved any data other than PNRs by means of the script.  Id. at ¶ 42.  Moreover, it is clear that the PNRs text files retrieved and copied by Iceland Express by means of the script did not constitute confidential or proprietary information of Sutra as to which trade secret protection applied.  On the contrary, the PNR data consisted of "information about the persons that are booking in the system, where they are going, and how much they spent and paid for the ticket."  Id. at ¶¶ 18-19.  This PNR data was proprietary to Iceland Express and Iceland Express had a right to access and to use it in its accounting software system, contained "no codes, no programming".  Id. at ¶¶ 20-23, 25-26.  Iceland Express used the external script to retrieve the PNRs because Iceland Express experienced

problems for several months in obtaining accurate sales data from the AirKiosk TSRs, and Iceland Express needed to be able to balance its books in order to obtain additional funding for its start-up airline operation. Id. at ¶¶ 9-17.[1]  Additionally, the PNR data retrieved by means of the script but merely automated the process by which Iceland Express could manually access and retrieve the same data so that the data could be used in Iceland Express's accounting software system. Id. at ¶¶ 24-26.  Upon the mutually agreed termination of the parties' Agreement, Sutra migrated all of Iceland Express's PNR data to Iceland Express's new airline reservation software system. Id. at ¶¶ 32-34.

Moreover, Sutra admitted that it is unable to identify what aspects of the operation, appearance, features and functionality of the AirKiosk System were allegedly misappropriated by Iceland Express and incorporated into Ticket.net, and that it is "almost impossible" for Sutra to identify what features of the AirKiosk System Sutra is claiming were misappropriated by Iceland Express. Id. at ¶¶ 44-45.  Indeed, Sutra further admitted that is not even familiar with the features, functionality, operation or appearance of the Goodjet System, the Qust System or the Ticket.net System, and that is unable to say to what extent other airline reservation systems on the market may have features similar to the AirKiosk System. Id. at ¶¶ 46-47.  Finally, Sutra admitted that its allegation that its trade secrets are incorporated into the Ticket.net system is based solely on the conclusory hearsay statements of a Swedish company known as Aton and/or an individual named Peter Nimerius. Id. at ¶ 48.

---

[1] From a financial perspective, it would have made no sense in the short term for Iceland Express to switch from the AirKiosk System to Ticket.net if Iceland Express had been able to extract accurate ticket sale sales data. Iceland Express had paid a one-time fee of $20,000 in order to implement the AirKiosk System, and thereafter it only had to pay monthly fees of $1,500. Statement of Undisputed Facts, at ¶ 4. By contrast, switching to Ticket.net meant a substantial increase in Iceland Express's monthly fees to approximately $3,576.93. Id. at ¶ 36.

Additionally, Sutra failed and refused to provide Iceland Express requested discovery that would have enabled Iceland Express to conduct its own analysis to refute Sutra's vague and conclusory allegations that the Ticket.net system incorporates certain unspecified administrative features and functions that appeared to Mr. Nimerius to be similar to the AirKiosk System and that were also absent in from the prior airline reservation software system created by Tommy Wiberg for Goodjet. Among other things, Sutra failed and refused to (i) give Iceland Express access to the AirKiosk System pursuant to a Rule 34 request for inspection, (ii) produce AirKiosk source code, (iii) produce documents and communications with Aton, Qust and Nimerius concerning the alleged similarities of the two systems, (iv) supplement its responses to interrogatories as required so as to specifically identify the alleged similarities of the two systems, (v) produce documents relating to the so-called Goodjet Sweden litigation, or (vi) produce requested log files that Sutra testified might show that Iceland Express retrieved by means of the script information other than PNRs concerning the structure of the PNR data. Id. at ¶¶ 49-50, 53-57. All of the foregoing requested discovery was highly relevant for purposes of determining any Sutra trade secrets even exist, especially in light of Sutra's admissions that part of the AirKiosk System was actually copied from a publicly available portion of a competitor's website, that Sutra does not know whether other parts of the AirKiosk System were derived from publicly available sources, and that Sutra does not know whether the AirKiosk System incorporates any open source code. Id. at ¶¶ 51-52.

Because Sutra failed and refused to specifically identify the alleged trade secrets it contends were misappropriated by Iceland Express, Sutra effectively prevented Iceland

Express from discovering information, or the lack thereof as it now appears, critical to Iceland Express's defense, including but not limited to whether the alleged trade secrets are actually secrets, whether Sutra took reasonable measures to protect the secrecy of the information, the extent to which the alleged secrets are known inside and outside of Sutra's business, the value of the alleged secret to Sutra's customers and competitors, the amount of time and effort it took for Sutra to develop the alleged trade secret, and the ease or difficulty with which the alleged secret could be acquired or duplicated by others.

Finally, discovery closed on April 30, 2007, and the Court ordered that no further extensions of discovery would be entertained. Id. at ¶ 58. Moreover, as argued in further detail below, Sutra inexcusably provided Iceland Express its expert report more than two months after the May 25, 2007 deadline without seeking an extension, and the expert report itself insufficiently fails to identify any Sutra trade secrets entitled to protection. Id.

Accordingly, because Sutra failed to specifically identify the alleged trade secrets at issue in this case, and since Sutra failed and refused to provide requested discovery to Iceland Express that would enable Iceland Express to refute Sutra's vague and conclusory allegations, there are no genuine issues of material fact and Iceland Express is entitled to judgment as a matter of law on Sutra's claim for misappropriation of trade secrets.

**C.    ICELAND EXPRESS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON SUTRA'S CLAIM FOR MISAPPROPRIATION OF TRADE SECRETS BECAUSE SUTRA EXPERT REPORT IS UNTIMELY AND FAILS TO SPECIFICALLY IDENTIFY ANY TRADE SECRETS**

There are no genuine issues of material fact and Iceland Express is entitled to judgment as a matter of law on Sutra's claim for misappropriation of trade secrets because Sutra's expert report regarding certain alleged similarities between AirKiosk and

Ticket.net is untimely, and Sutra's expert report fails to specifically identify any trade secrets.

"Rule 37(c)(1) enforces Rule 26(a) by providing that '[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence . . . any witness or information not so disclosed." Poulis-Minott v. Smith, 388 F.3d 354, 358 (1st Cir. 2004), quoting, Fed. R. Civ. P. 37(c)(1). "Although Rule 37(c)(1) is traditionally invoked to preclude expert testimony at trial, it can also be applied to motions for summary judgment." Poulis-Minott, 388 F.3d at 358, citing, Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 60 (1st Cir. 2001) (citing Trost v. Trek Bicycle Corp., 162 F.3d 1004, 1007-09 (8th Cir. 1998) (finding that a products liability defendant, whose summary judgment motion relied partially on the plaintiff's lack of expert testimony, would have been significantly prejudiced by plaintiff's untimely expert disclosure)).

"The purpose of the expert disclosure rules is 'to facilitate a 'fair contest with the basic issues and facts disclosed to the fullest practical extent.'" Id. quoting Thibeault v. Square D. Co., 960 F.2d 239, 244 (1st Cir. 1992). "Thus Rules 26(a) and 37(c)(1) seek to prevent the unfair tactical advantage that can be gained by failing to unveil an expert in a timely fashion, and thereby potentially deprive a plaintiff of the opportunity to 'depose the proposed expert, challenge his credentials, solicit expert opinions of his own, or conduct expert-related discovery.'" Id.

Under circumstances similar to the present case, the Eight Circuit Court of Appeals in Trost upheld the lower court's entry of summary judgment in favor of the defendant and the exclusion of the plaintiff's expert opinion as untimely. In so doing, the

Court noted that "failure to disclose in a timely manner is equivalent to failure to disclose". 162 F.3d 1004, 1008.  Moreover, the Court found that the plaintiff's untimely disclosure of its expert opinion was neither substantially justified nor harmless.  Id.  In that regard, the Court found that the defendant "had prepared its summary judgment motion at least partially premised on the lack of expert opinion to support Trost's claims", and the defendant "would have been significantly prejudiced by the late production of Engel's opinion because of lack of time to prepare to refute the evidence at trial."  Id. at 1008-1009.  Finally, the Court opined that if the plaintiff had a legitimate need for additional time to "produce the evidence necessary to meet his burden of proof, then his proper course of action would have been to seek an extension of the deadline."  Id. at 1008.

Similarly, in the present case Sutra's untimely production of its expert report is neither substantially justified nor harmless.  Throughout the course of discovery, Sutra has failed and refused to identify the trade secrets allegedly misappropriated by Iceland Express, thereby preventing Iceland Express from discovery information necessary to its defense.  Although Sutra was aware of the Court's scheduling order, including deadlines for completing discovery, expert disclosures and filing dispositive motions, Sutra failed to request the extension of any deadlines and provided its expert disclosure nearly two-and one-half months late and only 8 days before the deadline for filing motions for summary judgment.  Id. at ¶¶ 57-59.  In the meantime, Iceland Express prepared its motion for summary judgment based on the discovery record and the absence of any expert report.  If Sutra had a legitimate reason for needing extra time to make its expert disclosure, the proper course would have been to move for an extension of time, but Sutra

failed to do so.  More importantly, Iceland Express would be severely prejudiced by the admission of Sutra's untimely expert report because Sutra's belated disclosure effectively deprived Iceland Express of "the opportunity to 'depose the proposed expert, challenge his credentials, solicit expert opinions of his own, or conduct expert-related discovery.'" Poulis-Minott, 388 F.3d at 358.

Even if Sutra's expert opinion had been timely, it fails to raise any genuine material issue of fact because it does not specifically identify any trade secrets and is fatally conclusory.  The expert report of Peter Nimerius is fatally deficient because it is speculative, conclusory, fails to identify any alleged trade secrets, and does not set forth the basis and reasons for his opinions, or the data or other information upon which he supposedly relied as required by Fed. R. Civ. P. 26(a)(2)(B).  For example, Mr. Nimerius's opinion is supposedly based upon a comparison of the AirKiosk, Ticket.net and Goodjet systems, but his report does not disclose the basis of his knowledge regarding the Goodjet system or the information and data upon which he relied.  Mr. Nimerius states in cocnlusory fashion that "[i]n the Goodjet system from late 2002 and early 2003 there is a small set of administrative functions. . . .  A court order in Sweden 2007 decided that the [Tikcet.net] system was a copy of the Goodjet system, so therefore it is far [sic] to conclude that the [Ticket.net] system had a very limited set of administrative functions from the start."  Undisputed Statement of Facts, at ¶ 61.  Neither the basis for Mr. Nimerius's conclusion that the Goodjet system had a very limited set of administrative functions, nor the data or information upon which he relies in drawing this conclusion, is set forth in the report.  In addition, although documents relating to the purported litigation in Sweden were requested by Iceland Express during discovery, none

were ever produced and the supposed Court order is not included as an exhibit to Mr.

Nimerius's report. Moreover, Mr. Nimerius assertion that the 2007 Swedish court order

determined that Ticket.net was a copy of the Goodjet system could be read to mean that

all of the unspecified features that Sutra claims were misappropriated by Iceland Express

and incorporated into the AirKiosk System were already present in Ticket.net before

Iceland Express began using that system. Moreover, the Nimerius report does not even

purport to identify what functions of the AirKiosk System are actually trade secrets. For

all of these reasons the expert report of Mr. Nimerius is too speculative and conclusory to

raise a genuine issue of material fact. See Hayes v. Douglas Dynamics, Inc., 8 F.3d 88,

92 (1st Cir.1993) ("Although expert testimony may be more inferential than that of fact

witnesses, in order to defeat a motion for summary judgment an expert opinion must be

more than a conclusory assertion about ultimate legal issues."); Staffbridge, 2004 WL

1429935 (speculative and conclusory expert would be insufficient to avoid summary

judgment absent further designation, in affidavit form and under oath, that sets forth with

rigorous and focused particularity what, and only what, the plaintiffs claim to constitute

the trade secrets allegedly misappropriated).

Additionally, none of the functions identified by Mr. Nimerius constitute trade

secrets. Mr. Nimerius opines that certain Ticket.net functions relating to booking classes

and routes, "could very well be influenced by the Sutra AirKiosk" but he provides no

explanation as to how the functions are similar in any respect. Id. at ¶ 63. In addition to

being vague on the subject, Mr. Nimerius acknowledges that such functions are "normal

fare functions used in the airline industry" and as such they cannot possibly be afforded

trade secret protection. Id. Sutra admits that Iceland Express never had access to the

AirKiosk System software or source code, and in the absence of any facts to support

Sutra's conclusory allegations to the contrary, Sutra cannot refute the sworn testimony of

Iceland Express and the sworn statement of Tommy Wiberg that Tommy Wiberg was

never given access to the AirKiosk System or documentation. Id. at ¶¶ 5, 18-20, 34, 38-

39; Wiberg Affidavit, at ¶ 7. Moreover, the concept of functions that handle seat

assignments, class, child discounts, infant discounts and different currencies, is readily

ascertainable from the publicly available portions of the websites of customers that use

the AirKiosk System. Id. at ¶ 64. Accordingly, the opinion of Mr. Nimerius raises no

genuine issue of material fact as to the route and fare management functions of the

AirKiosk System.

Mr. Nimerius's opinion that Ticket.net has been "strongly influenced" by Sutra's

AirKiosk System with respect to functions handling load factor, alerts, inventory and

yield management is similarly conclusory. Id. at ¶ 65. Ironically, Mr. Nimerius draws

the foregoing conclusion despite his finding that "[t]he Sutra Airkiosk system does not

contain any automatic system for yield management which the [Ticket.net] system does,

but the Airkiosk Inventory management function allows the administrator to manually

take almost the exact same actions". Id. In that regard, Mr. Nimerius concludes that "it

seems likely that the [Ticket.net] system has chosen a different approach to handling this

functionality." Id. Assuming, *arguendo*, that Iceland Express was influenced by the

AirKiosk System but chose a different approach to handling this functionality as stated

by Mr. Nimerius, Sutra still cannot establish this feature of the Ticket.net System was

developed using improper means to acquire a trade secret in breach of a confidential

relationship. See Storage Technology Corp. v. Custom Hardware Engineering &

Consulting, Inc., 421 F.3d 1307, 1321 (C.A.Fed. 2005) (where defendant used publicly available information about what fault symptom codes meant, and developed the LEM and ELEM devices independently to diagnose problems in silos, no showing that either of those activities breached a confidential relationship).  Also, the AirKiosk System functions for handling load factor, alerts, inventory and yield management are not trade secrets because Sutra promotes these functions on its website.  Id. at ¶ 69.  Mr. Nimerius's opinion is devoid of any explanation as to how these features work or how they are similar in any respect, and such, raises no genuine issue of material fact.

Mr. Nimerius's opinion that a system configuration tool which is part of Ticket.net has been strongly influenced by the AirKiosk System, is completely contradicted by his finding that in the Goodjet system these function were "done directly in the system database.  Id. at ¶ 66.  Moreover, Mr. Nimerius states that "[t]erms like UM and WC is [sic] part of the general airline lingua" and, therefore, such functions do not constitute trade secrets and the use of this terminology does not establish that there was a misappropriation of any trade secrets.  Id.  As with the rest of Mr. Nimerius's analysis, his opinions regarding the alleged similarities of the system wide configuration tool and the concept of SSRs are too conclusory and speculative to create any genuine issue of material fact for trial.

Finally, Mr. Nimerius's opinion that the concept of group bookings and block space may have been introduced into the Ticket.net system "from the Sutra Airkiosk system directly or from the requirements from Iceland Express after they had been using the Sutra Airkiosk system" is insufficient for Sutra to avoid summary judgment in this matter.  In addition to being inadequately conclusory, the concept of group bookings and

block space functions are readily ascertainable from publicly available portions of websites of Sutra AirKiosk customers and, therefore, these functions do not constitute trade secrets. Id. at ¶¶ 67-68.

Accordingly, for the additional reasons stated herein there are no genuine issues of material fact and Iceland Express is entitled to judgment as a matter of law on Sutra's claim for the alleged misappropriation of trade secrets.

**D.    SUTRA IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON SUTRA'S BREACH OF CONTRACT CLAIM BECAUSE SUTRA'S BREACH OF CONTRACT CLAIM IS DUPLICATIVE OF ITS MISAPPROPRIATION CLAIM**

There are no genuine issues of material fact and Iceland Express is entitled to judgment as a matter of law because Sutra's claim for breach of contract is duplicative of its claim for misappropriation of trade secrets as to which Iceland Express is entitled to judgment as a matter of law for the reasons stated above. Complaint, at ¶¶ 6-28; Statement of Undisputed Facts, at ¶ 54 (objections and response to Interrogatory No. 8). To the extent that Sutra's breach of contract claim is based upon "[l]ost payment for AirKiosk use, including maintenance and support, by Iceland Express for approximately three years", Statement of Undisputed Facts, at ¶ 54 (objections and response to Interrogatory No. 8), Sutra's claim is utterly devoid of merit because the term of the AirKiosk Agreement was for a period of only twelve (12) months, which could be extended only by mutual agreement of the parties, Id. at ¶ 3, and the AirKiosk Agreement was terminated by mutual agreement of the parties. Id. at ¶ 33. Additionally, to the extent that Sutra's breach of contract claim is premised upon the PNR corruption damage caused by Iceland Express's use of the script, any such claim is equally devoid of merit because no damage was done to the AirKiosk System and Iceland Express paid Sutra

44

$5,000 for work performed in connection with repairing the damage.  Id., at ¶ 27-28, 31.

As such, even if Iceland Express's use of the external script amounted to a breach of

contract, which Iceland Express denies, Sutra suffered no damages and such claim would

be barred in any event under the doctrine of accord and satisfaction.  Accordingly, there

are no genuine issues of material fact and Iceland Express is entitled to judgment as a

matter of law on Sutra's claim for breach of contract.

## IV.  CONCLUSION

WHEREFORE, based upon the foregoing points and authorities the Defendant

Iceland Express, ehf respectfully requests that this Honorable Court grant its Motion for

Summary Judgment.

ICELAND EXPRESS, EHF

Respectfully submitted,

Richard Kirby, BBO# 273600
Matthew P. Zayotti, BBO# 638265
Keegan Werlin LLP
265 Franklin Street
Boston, Massachusetts  02110-3113
(617) 951-1400

Dated:  August 17, 2007

**CERTIFICATE OF SERVICE**
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on
_august 17, 2007_ .

45