**Stephanie N. Niketic**
**April 27, 2007**

166

```
 1    -------------------------------------------------------

 2                      MORNING SESSION

 3                       10:10 a.m.

 4    -------------------------------------------------------

 5                  STEPHANIE N. NIKETIC,

 6         having been previously sworn on oath, was

 7         examined and testified further as follows:

 8                  EXAMINATION, resumed

 9    BY MR. ZAYOTTI:

10       Q.    Good morning, Ms. Niketic.  Thanks for

11    coming back.  When we met on Wednesday we talked

12    about a number of things, obviously.  I wanted to

13    just go back and clarify a couple things that we

14    talked about.  We talked a little bit about the

15    training that Sutra and Iceland Express did, and you

16    told me who appeared on behalf of Iceland Express to

17    be trained.  I don't think I asked you, who on

18    behalf of Sutra performed the training?

19       A.    It was Novak Niketic, Stephanie Niketic

20    and Predrag Kos.

21       Q.    And did each of the individuals you've

22    named participate in each day of the training?

23       A.    I don't remember.

24       Q.    Also, and I'm sorry for jumping around a
```

Stephanie N. Niketic
April 27, 2007

167

1  little bit, in speaking we talked extensively about

2  the external script and in talking about the

3  external script you mentioned that the development

4  of the external script involved reverse-engineering

5  a portion of the AirKiosk system.  What portion of

6  the AirKiosk system are you referring to when you

7  say that creation of the external script involved

8  reverse engineering?

9      A.    I don't know.

10     Q.    Who would know?

11     A.    Novak Niketic.

12     Q.    When you say that the external script

13 involved reverse-engineering of a portion of the

14 AirKiosk system, what do you mean by reverse

15 engineering?

16     A.    I mean what is commonly understood by

17 software engineers to be reverse engineering.

18     Q.    For lay people like myself and others, can

19 you just describe briefly what that means in terms

20 that someone outside of your field could understand?

21     A.    I am not a software programmer myself.

22 Novak Niketic is.  He is probably better qualified

23 to answer that question.

24     Q.    Okay.

EPPLEY COURT REPORTING, LLC
(508) 478-9795

**Stephanie N. Niketic**
**April 27, 2007**

168

```
 1            To your understanding -- Strike that.

 2   I'll save that for another day.

 3            MR. ZAYOTTI:  Could we have this document

 4   marked as the next exhibit, please.  I think it's 3.

 5            MR. DORNY:  It is 3.

 6            (Niketic Deposition Exhibit 3 marked for

 7   identification.)

 8   BY MR. ZAYOTTI:

 9      Q.    Ms. Niketic, I'm going to show you a

10   document that's been marked as Exhibit 3 for

11   identification, and just ask you to take a look at

12   that briefly; and when you're done, just let me

13   know.

14      A.    I am done.

15      Q.    When we last met, you mentioned a terms

16   and conditions page that would appear on the

17   AirKiosk system when users are signing onto the

18   system, I think is how you described it.  Is this

19   document that's been marked as Exhibit 3 the terms

20   and conditions document you were referring to when

21   we last met?

22      A.    This appears to be that document.

23      Q.    Can you describe for me briefly the

24   process by which a user of the AirKiosk system would
```

**EPPLEY COURT REPORTING, LLC**
**(508) 478-9795**

**Stephanie N. Niketic**
**April 27, 2007**

169

1  come to see this document?

2      A.    The user would first enter a specific

3  Internet URL that had been described to them by

4  whoever had instructed them to access the system.

5  That URL would allow them to reach a sign-in form.

6  They would need to fill in the sign-in form with a

7  user ID, a password, a duty code, and in certain

8  circumstances some other information, and then they

9  would enter that and they would reach this page.

10      Q.    What sorts of individuals or categories of

11  individuals would be using the AirKiosk system in a

12  manner that would bring them to this page?

13      A.    It depends on the level of authority given

14  to them by the airline.

15      Q.    So there are a number of levels of

16  authority, sign-in authorities, if you will.  Would

17  everyone who uses the system come to this page or

18  only certain individuals?

19      A.    Only certain individuals.

20      Q.    Let's start with the levels of authority

21  you described.  What are the levels of authority for

22  purposes of using the AirKiosk system?

23      A.    They are divided by department code, duty

24  code.  And then separate from anything listed by the

**Stephanie N. Niketic**
**April 27, 2007**

1    airline in the agent listing there is an IP address

2    in some cases that must be registered by Sutra.

3        Q.    So when you're talking about department

4    codes and duty codes, what are you referring to when

5    you say that?

6        A.    It's part of the access authority.  A

7    department code could be RC, which is restricted to

8    airline staff.  It could be TA, which would be used

9    for external agents connected to the system.  Or GS,

10    also for external agents connected to the system.

11    There is also a department code CC, which can be

12    used by agents who are not airline staff.  I'm

13    sorry, I left one out.

14        Q.    Sure.

15        A.    AP, which is usually the department code

16    given to people accessing the check-in interface.

17        Q.    And who are the people that would access

18    the check-in interface?

19        A.    Well, a variety of people, but the people

20    who check in and board passengers on a flight would

21    need access to the check-in interface.  And airline

22    reservations control and control agent may need

23    access to see what's happening in check-in.

24        Q.    So you've given me a series of codes.  Are

**Stephanie N. Niketic**
**April 27, 2007**

171

```
1     those all the codes within the department code

2     feature you described?

3          A.      Those are the primary codes.

4          Q.      Are there other codes that fall under the

5     category of duty code?

6          A.      Yes.

7          Q.      And they're different than the ones you

8     just described?

9          A.      Yes.

10         Q.      Can you tell me what those are?

11         A.      There is a duty code GS, a duty code SAGT,

12    a duty code AK_admin, a duty code HAGT.  Those are

13    the primary duty codes.

14         Q.      And then are there also varying authority

15    levels?  You mentioned a third thing called IP

16    address.  Are there varying authority levels or

17    codes that relate to the IP address?

18         A.      The IP address is for access to the

19    control agent interface.  The control agent

20    interface requires for access that you have a

21    listing which is department code RC.  It may be duty

22    code SAGT or AK_admin and you must be accessing the

23    system from a registered IP address.

24         Q.      For the duty codes you mentioned, can you
```

**Stephanie N. Niketic**
**April 27, 2007**

172

```
1   tell me who the users are that would be using these

2   varying duty codes starting with the GS duty code?

3       A.    GS stands for general sales.  It is used

4   by general sales agents.

5       Q.    And how about SAGT?

6       A.    That stands for supervisory agent and it

7   is for use by airline reservations control

8   supervisors.

9       Q.    And the AK_admin?

10      A.    Stands for AirKiosk administration and is

11  reserved for airline employees who need to do very

12  specific operations in the control agent interface.

13      Q.    And I think the last one was the HAGT duty

14  code.

15      A.    That stands for handling agent, and that

16  code is used by airport handling agents, again, in

17  the check-in interface.

18      Q.    Do all of the department codes and duty

19  codes you mentioned require that the user come to

20  this Exhibit 3 site use terms and conditions page?

21      A.    Yes.

22      Q.    You mentioned that depending on the

23  authority level, some users may not see the terms

24  and conditions page.
```

**Stephanie N. Niketic**
**April 27, 2007**

173

1      A.      If the user is accessing control agent

2  rather than another interface, then they will not

3  see the terms and conditions page.

4      Q.      Is there also a capability for members of

5  the public to sign onto an airline website and

6  utilize the AirKiosk system to make their own

7  reservations or to find flight information?

8      A.      Yes.

9      Q.      Can you tell me how that works, briefly?

10     A.      You would type in the airline's Web

11  address, so www.icelandexpress.com, for example.

12  The airline would provide whatever graphical

13  information or presentation it would want to about

14  itself.  They would provide some means for a user to

15  access the AirKiosk system by, for example, having a

16  button that says "book now" or whatever they feel

17  will be helpful to the member of the public to

18  understand they can look at schedule and fares and

19  availability.

20          So when the customer clicks on whatever

21  that button is, they are redirected to Sutra servers

22  and they have access to our Web booking interface.

23     Q.      And would members of the public using the

24  means you just described of accessing the AirKiosk

Stephanie N. Niketic
April 27, 2007

174

1    system also come to see the site use terms and

2    conditions document that's been marked as Exhibit 3?

3        A.    No.

4        Q.    On Exhibit 3, if you'd take a look at

5    paragraph 1 on the first page where it says

6    Ownership, do you see the first sentence where it

7    says "This site, each of its modules and its

8    underlying software programs and databases are the

9    property of Sutra, Inc.," and then in parentheses

10   Sutra, "and/or its various third-party providers and

11   customers."  You see that sentence?

12       A.    I do.

13       Q.    Did I read that correctly?

14       A.    You did.

15       Q.    The reference to customers in that

16   sentence, is that referring to airlines that are

17   using the AirKiosk system?

18       A.    It could refer to them, yes.

19       Q.    Do you know who drafted the site terms and

20   conditions document?

21       A.    Can you define drafted for me?

22       Q.    Do you know who wrote it?

23       A.    Yes.

24       Q.    Who wrote the site use terms and

Stephanie N. Niketic
April 27, 2007

175

1    conditions?

2        A.    Somebody working for Sabre.

3        Q.    And who is Sabre?

4        A.    Sabre is a company that provides airline

5    services.

6        Q.    Are they a competitor of Sutra?

7        A.    Yes.

8        Q.    How did it come to be that the site use

9    terms and conditions that were drafted for Sabre --

10    Strike the question, please.  When you say someone

11    who worked for Sabre drafted these site use terms

12    and conditions, who was that individual, if you

13    know?

14        A.    I don't know.

15        Q.    Do you know whether the individual who

16    drafted the site use terms and conditions drafted

17    this document for Sabre?

18        A.    I would guess that they did.

19        Q.    How did it come to be that Sutra began to

20    utilize the site use terms and conditions that were

21    drafted for Sabre?

22        A.    This was a document publicly available on

23    the Sabre site and I accessed it; I made a copy of

24    it and then I prepared it with the language changes

Stephanie N. Niketic
April 27, 2007

176

1   needed to make it applicable to Sutra.

2        Q.    Did you consult with anyone in making

3   changes to the site use terms and conditions?

4        A.    I don't recall.

5        Q.    If you would refer down to paragraph 5 of

6   Exhibit 3 where it says Limitation of Liability, the

7   first sentence -- actually, there's just one

8   sentence -- reads "Sutra and any third-party

9   providers and customers shall not be liable for any

10  special, consequential or incidental damages of any

11  kind whatsoever, whether based in contract, tort,

12  strict liability, or other operation of law which

13  arises out of or is in any way connected with any

14  use of this site or content found herein."  Did

15  I read that correctly?

16       A.    You read it.

17       Q.    Correctly?

18       A.    Yes.

19       Q.    The reference to customers in paragraph 5,

20  is that referring to or would it include airlines

21  using the AirKiosk system?

22            MR. DORNY:  Objection, form.  You may

23  answer.

24       A.    It may.

**Stephanie N. Niketic**
**April 27, 2007**

177

1    Q.    Do you understand or have an understanding

2    of what the first sentence of paragraph 5 means?

3    A.    The first sentence?

4    Q.    Yes.

5    A.    I'm not a lawyer, so no.

6    Q.    This document, the site use terms and

7    conditions document and its content, do not appear

8    anywhere within the AirKiosk agreement between Sutra

9    and Iceland Express.    Correct?

10    A.    I'm sorry.    Could you ask the question

11    again?

12    Q.    Sure.    The site use terms and conditions

13    do not appear anywhere within the text of the

14    AirKiosk agreement.    Correct?

15    A.    This document is not within the AirKiosk

16    ASP agreement.

17    Q.    You mentioned that the site use terms and

18    conditions document was a document that was publicly

19    available and you obtained it by copying it.    Do you

20    know whether the AirKiosk system uses any publicly

21    available source code?

22    A.    I don't.

23    Q.    Do you know what open source code means?

24    A.    I have some idea.

**Stephanie N. Niketic**
**April 27, 2007**

178

```
 1      Q.    Do you know whether the AirKiosk system

 2  utilizes or incorporates any open source code?

 3      A.    I don't know.

 4            MR. ZAYOTTI:  Could we have this marked as

 5  the next exhibit, please.

 6            (Niketic Deposition Exhibit 4 marked for

 7  identification.)

 8  BY MR. ZAYOTTI:

 9      Q.    Would Novak Niketic be the person who

10  would know whether the AirKiosk system incorporates

11  any open source code?

12      A.    Yes.

13      Q.    And that's because he is the designer of

14  the system?

15      A.    That's correct.

16      Q.    I'm going to show you a document that's

17  been marked as Exhibit 4, and I would ask you just

18  to turn to the last page of that document, and ask

19  you:  Is that your signature on the last page?

20      A.    Yes.

21      Q.    Do you remember seeing this document?

22      A.    May I look at it?

23      Q.    Sure.

24      A.    (Pause)  I'm sorry.  Could you ask your
```

**Stephanie N. Niketic**
**April 27, 2007**

186

1   the communications with Aton?

2       A.      Only that it was in 2004 that we were

3   introduced to each other.

4       Q.      Who introduced you to Aton?

5       A.      A consultant.

6       Q.      And who was that?

7       A.      I cannot remember his name, but it would

8   be in documents.  If the documents are available, I

9   can flip through.

10      Q.      If I said the name Peter Nimerius, and I'm

11  not sure if I have the pronunciation right, but

12  would that sound right?

13      A.      The name rings a bell.  I would check my

14  own documents before I confirmed that's who I'm

15  talking about.

16      Q.      All right.  You said you communicated with

17  Aton to compare notes on time frame and incidents

18  involving Iceland Express and Tommy Wiberg.  What do

19  you mean by that?

20      A.      I mean that they contacted us.  They

21  explained that they had a situation in which their

22  customer's rights had been infringed by Tommy

23  Wiberg.  They were familiar with the AirKiosk system

24  enough to know, and familiar with the GoodJet system

**Stephanie N. Niketic**
**April 27, 2007**

187

1    both, to know that in comparison, the system Tommy

2    Wiberg was calling Ticket.net had substantially

3    different and expanded functions than it had when it

4    was the reservation system at GoodJet.

5             They knew that Iceland Express had been

6    our client and was now a Ticket.net client, so they

7    were interested in knowing what happened at Iceland

8    Express in terms of their use of our system and if

9    we were aware of any information about how Tommy

10   Wiberg might have so quickly improved and expanded

11   the system that was known as the GoodJet system.

12       Q.    Did the individuals you communicated with

13   explain what the expanded functions and features of

14   Ticket.net were relative to the GoodJet system?

15       A.    As I recall, they described them as being

16   functions and features in the administrative area of

17   a reservation system.

18       Q.    And did they explain to you in any greater

19   detail what the expanded functions and features

20   were?

21       A.    No.

22       Q.    Do you know whether Aton and/or its

23   representatives performed any sort of comparison

24   between Ticket.net and GoodJet?

**Stephanie N. Niketic**
**April 27, 2007**

188

1      A.     I know that they hoped to.

2      Q.     You have never seen any report, for

3   instance, comparing the Ticket.net system with

4   GoodJet?

5      A.     No.

6      Q.     Do you know whether one exists?

7      A.     I don't know.

8      Q.     Was Aton and/or its representatives --

9   Strike the question, please.

10          Did Aton and/or its representatives

11  express any opinion or suspicion as to how Tommy

12  Wiberg developed the expanded functions or features

13  of the Ticket.net system?

14          MR. DORNY:  Objection.  You may answer.

15     A.     Could you repeat the question?

16     Q.     I can try.

17          Did Aton and/or its representatives

18  express an opinion to Sutra concerning how Tommy

19  Wiberg may have developed the expanded functions and

20  features of Ticket.net?

21     A.     Yes.

22     Q.     What was that opinion that Aton expressed?

23     A.     Their opinion was that he had gotten

24  access to the AirKiosk system and based on that

**Stephanie N. Niketic**
**April 27, 2007**

189

1  access, that he had started to develop the expanded

2  portion of his system.

3      Q.    Do you know what the basis of that opinion

4  was?

5      A.    The basis of that opinion, do I know what

6  it was?

7      Q.    Yes.

8      A.    No.

9      Q.    Now, Aton had its own claim against

10 Ticket.net, I take it?

11     A.    I don't know.  Ticket.net is, to me, a

12 nothing.  I don't know if it's a company; I don't

13 know if it's a product.  I don't know what it is.  I

14 know that this company had filed a complaint against

15 some entity or entities that was useful to them in

16 pursuing the protection of their intellectual

17 property.

18     Q.    Did you say earlier that it was your

19 understanding that Tommy Wiberg developed the

20 GoodJet system?

21     A.    No.

22     Q.    I'm sorry if I asked you this.  Do you

23 know who did develop the GoodJet system?

24     A.    No.

**Stephanie N. Niketic**
**April 27, 2007**

190

1      Q.     Do you know what the basis of Aton's

2   claims against Ticket.net was?

3      A.     No.

4      Q.     Did Aton and/or its representatives ever

5   explain to Sutra how the expanded functions and

6   features in the administrative area of Ticket.net

7   were similar to the AirKiosk system?

8      A.     Have I answered that question?

9      Q.     I don't think so.

10      A.     Did they explain how they were similar?

11      Q.     How they were similar.

12      A.     No.

13      Q.     And Aton never explained which particular

14   features and functions of the Ticket.net system were

15   similar to AirKiosk either.  Correct?

16      A.     Aton?

17      Q.     Yes.

18      A.     Isn't that who you just asked about?

19      Q.     Well, I'm asking you questions relative to

20   Aton, yes.  So Aton never said to you which specific

21   functions and features of Ticket.net were similar to

22   AirKiosk?

23      A.     More specific than administrative

24   functions?  No.

**Stephanie N. Niketic**
**April 27, 2007**

1    Q.    If I could just have you take a look on

2    page 5 of Exhibit 4, towards the top of the page,

3    it's the second full sentence which begins "In late

4    2003": "In late 2003, following the breaches by

5    Iceland Express of the application service provider

6    agreement and commencement of their use of

7    Ticket.net, Iceland Express, Mr. Wiberg and/or their

8    partners were actively marketing the Ticket.net

9    system and asserting it included functions which had

10    been lacking in GoodJet.    Furthermore, in 2004 Sutra

11    was contacted by a consultant, Peter Nimerius,

12    familiar with the GoodJet system, AirKiosk system

13    and Ticket.net, who commented on the similarities

14    between the new portions of Ticket.net and the

15    AirKiosk system."

16    Does that ring any bells as to the

17    identity of the consultant you mentioned earlier?

18    A.    Yes.

19    Q.    Based on this response, tell me about your

20    memory as it has been refreshed.

21    A.    Well, Peter Nimerius was the name of the

22    consultant who originally contacted us.  He told us

23    that the expanded portions of Ticket.net were

24    similar to the AirKiosk system.  He did not

**Stephanie N. Niketic**
**April 27, 2007**

192

1   elaborate on that.

2      Q.    When, if you recall, approximately, did

3   Peter Nimerius contact Sutra?

4      A.    Again, it was in 2004.  But a more

5   specific date I can't recall without documentation.

6      Q.    Are you still in communication with

7   Mr. Nimerius?

8      A.    No.

9      Q.    Can you estimate for me how many times you

10   have communicated with Peter Nimerius?

11      A.    The same number of times I communicated

12   with the group of people who were involved in that

13   correspondence.

14      Q.    So did Mr. Nimerius participate in

15   approximately ten or fewer communications between

16   Sutra and Aton?

17      A.    That's what I recall.

18      Q.    Do you know where Peter Nimerius resides?

19      A.    No.

20      Q.    Do you know anything about his background?

21      A.    He worked for Scandinavian Airlines and

22   their IT division when we met him.

23      Q.    Do you know who employed Peter Nimerius at

24   the time he contacted Sutra?  Oh, you said that.

**Stephanie N. Niketic**
**April 27, 2007**

193

1    I'm sorry.  You said he worked for Scandinavian

2    Airlines?

3        A.    No.  When we met him, when we originally

4    met him, he worked for Scandinavian Airlines.  When

5    he contacted us about the GoodJet system and Iceland

6    Express and Tommy Wiberg, he worked for another

7    consulting firm and I don't remember the name of

8    that firm.

9        Q.    So you had met him sometime prior to his

10   contacting you and advising you that he thought

11   Ticket.net was similar to AirKiosk.  Is that right?

12       A.    That's correct.

13       Q.    How did you meet Mr. Nimerius initially?

14       A.    He was involved in the evaluation and

15   selection of reservation systems for an airline

16   owned by Scandinavian Airlines called Snowflake.

17   And then once our system was selected for Snowflake

18   he was involved in the implementation.

19       Q.    And Snowflake is still a customer of

20   Sutra's?

21       A.    No, it is not.

22       Q.    It is not.  Do you know what system

23   Snowflake is using now?

24       A.    Snowflake no longer exists at this time.

Stephanie N. Niketic
April 27, 2007

209

1    Q.    And then the text of the e-mail on the

2    first page says "Dear Einar"?

3    A.    I see that.

4    Q.    Who is Einar Valdimarsson?

5    A.    Einar was also a manager at Iceland

6    Express.

7    Q.    And Johannes Georgsson, who was that?

8    A.    Johannes Georgsson was the managing

9    director of Iceland Express.

10    Q.    Do you remember sending these e-mails?

11    A.    Yes.

12    Q.    If you would refer down to --

13    A.    I remember sending these e-mails.  Again,

14    they are as received by someone, and e-mails can be

15    altered.  So I would rely more on what I sent rather

16    than what's being presented to me as received.

17    Q.    Okay.  Do you see down at paragraph 4,

18    there are some numbered paragraphs on the first

19    page, paragraph 4 where it says "Johannes says that

20    you are unable to extract accurate ticket sales data

21    from your system"?

22    A.    I see that.

23    Q.    Were Iceland Express and Sutra having

24    telephone conversations in addition to communicating

**EPPLEY COURT REPORTING, LLC**
**(508) 478-9795**

**Stephanie N. Niketic**
**April 27, 2007**

210

1   by written e-mails in or about the time period when

2   this e-mail was apparently sent, June 26, 2003?

3       A.    Yes.

4       Q.    Do you remember conversations with

5   Johannes about Iceland Express being unable to

6   extract accurate ticket sales data from the AirKiosk

7   system?

8       A.    I remember the conversation in which he

9   said that.

10      Q.    Did you only talk about it on one

11  occasion?

12      A.    I only had one telephone conversation with

13  Johannes about this.

14      Q.    Do you remember what he said?

15      A.    About?

16      Q.    About being unable to extract accurate

17  ticket sales data from the AirKiosk system.

18      A.    He said that Einar said that he was unable

19  to extract accurate ticket sales data from the

20  AirKiosk system.

21      Q.    So Johannes said that Einar told him he

22  was unable to extract accurate data?

23      A.    Yes.

24      Q.    Did you ever speak with Einar about this

**EPPLEY COURT REPORTING, LLC**
**(508) 478-9795**

**Stephanie N. Niketic**
**April 27, 2007**

211

1    issue?

2        A.    We corresponded with Einar multiple times.

3    We may have or someone in the company may have also

4    spoken to him on the phone.

5        Q.    You see down at the end of paragraph 4 it

6    says "We have explained over the past months that

7    MIS flown revenue reports require AEU's completion

8    of the MIS cycle (handback, update, final of flown

9    flights), which you still do not perform."

10        A.    I see that.

11        Q.    Was it Sutra's belief that Iceland Express

12    was unable to extract accurate ticket sales data

13    because Iceland Express wasn't using the AirKiosk

14    system correctly?

15        A.    If they couldn't extract accurate ticket

16    sales data, they were not using the system

17    correctly.

18        Q.    Was the use of the ticket sales data

19    reports function of the AirKiosk system covered in

20    the training that Sutra provided to Iceland Express?

21        A.    Yes.

22            MR. ZAYOTTI:    Could we mark this next

23    document, please.

24            (Niketic Deposition Exhibit 7 marked for

**Stephanie N. Niketic**
**April 27, 2007**

212

```
 1   identification.)

 2   BY MR. ZAYOTTI:

 3       Q.    Ms. Niketic, I am going to show you a

 4   document that's been marked as Exhibit 7, ask you to

 5   take a moment to review it and let me know if you

 6   recognize the document.

 7       A.    (Pause)  This appears to be an e-mail

 8   exchange between me and Adalsteinn Magnusson.  It's

 9   printed from his system, as received.

10       Q.    Do you remember sending this e-mail?

11       A.    I remember sending this e-mail.  As with

12   the other e-mail, I would normally check it against

13   what I sent, but I recognize this.

14       Q.    I know you mentioned the caveat that these

15   exhibits, Exhibit 7 and Exhibit 6, are documents

16   that are correspondence sent by you to someone else

17   and printed as received.  Did you see anything in

18   either Exhibit 6 or Exhibit 7 which suggested to you

19   that either of these documents had been altered?

20       A.    Exhibit 6 contains something which

21   suggests either it was changed or I made a typo.

22       Q.    Can you point it out to me?

23       A.    On the first page, under 5, "Attached is a

24   zip file containing a colon" and then the symbol for
```

Stephanie N. Niketic
April 27, 2007

213

1    a colon "separated values file."

2        Q.    And what stands out to you about that?

3        A.    Reading this today, I would expect that it

4    would read comma and the symbol for comma-separated

5    values file, because that is normally how we send

6    our records.  But these are provided to me by our

7    technical staff and it's possible that this was in a

8    different format.  I simply don't know.

9        Q.    Was there anything else about either

10   Exhibit 6 or Exhibit 7 which suggested to you that

11   any changes had been made?

12       A.    Nothing that I can see today.

13       Q.    In paragraph 2 of Exhibit 7, you see where

14   it says "It is not clear to me what 'transparency in

15   marketing decisions' means"?

16       A.    I see that.

17       Q.    Is the phrase "transparency in marketing

18   decisions" a phrase that is used in the industry?

19       A.    No.

20       Q.    So you have no idea what that meant?

21       A.    I have no idea what that meant.

22       Q.    You see paragraph 3 of Exhibit 7 where it

23   says "It is a shame that Navision, a product from a

24   company which supposedly supports standards, is not

Stephanie N. Niketic
April 27, 2007

214

1    congruent with the import of standard csv files"?

2        A.    I see that.

3        Q.    What are csv files?

4        A.    Csv files are comma-separated value files.

5    It is the format used by Microsoft's popular Excel

6    product and by most spreadsheet products or products

7    which incorporate spreadsheets.

8        Q.    The sentence immediately after the one we

9    just looked at reads "We believe a good part of your

10   accounting department problems may be the result of

11   no training, but this is an area in which airlines

12   need to invest whatever system they use."

13       A.    I see that.

14       Q.    So that sentence refers again to issues

15   concerning problems Iceland Express was experiencing

16   with its accounting system.   Correct?

17            MR. DORNY:   Objection.   You may answer.

18       A.    This refers to problems Iceland Express

19   had with ensuring that its people were sent to us

20   for proper training.

21       Q.    And the result of the training problem was

22   that they were having difficulties extracting

23   accurate data for use in their accounting system?

24       A.    I don't know why they were having these

Stephanie N. Niketic
April 27, 2007

221

1  good and open channel to AK though we experiment

2  with a new system."  And then moving forward in this

3  paragraph he says "In my experience it is always

4  good to have access to experienced parties for

5  consultative purposes if need arises."

6           This told us that they were working on

7  their alternative system using the AirKiosk system

8  as some sort of basis of experience and

9  consultation.  We then learned through Peter

10 Nimerius that he had actually seen that system and

11 AirKiosk at the same point in time and that the

12 system that Iceland Express was using after AirKiosk

13 was substantially different and expanded than the

14 system he saw before Iceland Express had access or

15 gave Tommy Wiberg access to our programs for

16 copying, reverse engineering, misappropriation.

17           MR. DORNY:  You're done?

18           THE WITNESS:  I'm done.

19           MR. DORNY:  Okay.

20 BY MR. ZAYOTTI:

21    Q.    Concerning the similarities between the

22 features and functions of the Ticket.net system and

23 the AirKiosk system, the only information Sutra has

24 right now regarding the similarities between those

**Stephanie N. Niketic**
**April 27, 2007**

222

```
1   two systems is the opinion of Mr. Nimerius and Aton.

2   Is that accurate?

3           MR. DORNY:  Objection.  You may answer.

4       A.      As far as I know.

5       Q.      And would it be accurate to say that it

6   was the opinion of Mr. Nimerius and Aton which led

7   Sutra to believe that -- Strike the question,

8   please.

9           Is it accurate to say that apart from

10  Mr. Nimerius' opinion and Aton's opinion, Sutra does

11  not have any other information concerning the

12  supposed similarities between Ticket.net and the

13  AirKiosk system?

14          MR. DORNY:  Objection.  You may answer.

15      A.      Specific similarities, no.

16      Q.      Can I refer your attention back to Exhibit

17  4?  It is Sutra's responses to interrogatories.  If

18  you would turn to page 8, please, just above the

19  bolded wording where it says Interrogatory Number

20  11, the last sentence before interrogatory 11 which

21  says "Plaintiff has been damaged in the amount of

22  the value of an airline reservation system, an

23  amount over $1,000,000."

24      A.      I see that.
```

**EPPLEY COURT REPORTING, LLC**
**(508) 478-9795**