**EXHIBIT B**

1

Volume I
Pages 1 to 66
Exhibits: 1 - 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x
                              :
SUTRA, INC.,                  :
              Plaintiff,      :
                              :
        vs.                   :   Civil Action No.
                              :   04-CV-11360 DPW
ICELAND EXPRESS EHF,          :
              Defendant.      :
                              :
- - - - - - - - - - - - - - -x

        DEPOSITION OF GUNNAR KARL NIELSSON, a
witness called on behalf of the Plaintiff, taken
pursuant to Rule 30 of the Massachusetts Rules of
Civil Procedure before Carol H. Kusinitz, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Offices of
Jonsson & Hall Law Firm, Sudurlandsbraut 4, 108
Reykjavik, Iceland, on Tuesday, April 10, 2007,
commencing at 12:38 p.m.


PRESENT:

    Law Office of Brett N. Dorny (by Brett N. Dorny,
        Esq.) 386 West Main Street, Suite 12A,
        Northborough, MA  01532 for the Plaintiff.

    Keegan Werlin LLP (by Matthew P. Zayotti, Esq.)
        265 Franklin Street, Boston, MA
        02110-3113, for the Defendant.



                    *   *   *   *

8

     A.    I got training by Novak and Stephanie and
two of their employees at their office in
Newburyport.

     Q.    Do you recall when you received training?

     A.    Yes.  It was on the 9th and 10th, 11th and
12th of January, 2003, when the company started.  I
had been there just for a few days.

     Q.    Who else received training with you?

     A.    Bryndis Jonsdottir.  Do you want me to
spell that one?

     Q.    That would be great if you can spell that.

     A.    B-r-y-n-d-i-s J-o-n-s-d-o-t-t-i-r.

     Q.    And what was Ms. Jonsdottir's -- I'm sorry
I can't say the Icelandic pronunciation.

     A.    What was her what?

     Q.    What was her positions?

     A.    She was the manager, routes and revenue,
also known as yield manager.

     Q.    Did anyone else from Iceland Express
receive training on AirKiosk?

     A.    Just the ones that we trained in Iceland.
Not to my knowledge anyone that went to Boston.

     Q.    Did you receive any additional training
from Sutra regarding the AirKiosk system?

1   Ticket.NET?

2        A.    Not the exact date, but approximately six

3   months into operation, somewhere around that.  But I

4   guess Sutra knows that better than I do to a date.

5        Q.    I'm going to have you look at some

6   documents.

7                    (Document marked as Exhibit 1

8                     for identification)

9        A.    (Reviewing document)

10        Q.    The document which was marked as Exhibit 1,

11   I ask you if you've ever seen that document before.

12        A.    I think I've seen a similar document, but

13   not this one, I think.  I think I saw a document in

14   regards to the training manuals, that we couldn't

15   reveal those to anyone outside the company, but I'm

16   not sure I've seen this one.  I think not, to be

17   very honest.

18        Q.    At the bottom of the page it's marked "Page

19   1 of 12."  If you go to the one that's marked "Page

20   8 of 12."  This indicates that it was executed on

21   the 27th day of November, 2003.

22        A.    Uh-huh.

23        Q.    Do you recall if you started using

24   Ticket.NET in November of 2003?

24

1   to delete e-mail files?

2       A.    No.   The only person that asked me to

3   delete e-mail the whole time I was at Iceland

4   Express was Stephanie and Novak.

5       Q.    And why did she ask for you to delete

6   e-mails?

7       A.    She asked me to delete a script that I

8   created, which I had sent to them.   They asked me to

9   delete it, which I did.

10      Q.    And what was that script that you created?

11      A.    It was half a page, like this (indicating),

12  A4 page, a script that opened up PNRs in the

13  administrative account, saved down the PNRs, just

14  the information of each PNR into a text file, and

15  then closed the PNR down again, then opened up

16  another PNR, copied it to a text file, saved it,

17  closed the PNR down, and so on, and so on.

18      Q.    Why did you create that script?

19      A.    It was because we had great difficulties

20  with getting the books to add up.   The information

21  that we got from the AirKiosk system didn't add up

22  to what the information from our credit card

23  companies told us.   So there was not a match between

24  the two systems.

25

1          And our CFO, our CEO, myself, Bryndis and,

2   I think, a few others had repeatedly asked Novak and

3   Stephanie to take a look at this and give us the

4   correct information so we could get the books to add

5   up.

6          When that didn't happen, I basically said,

7   "Well, why don't we create a script?" And I created

8   the script.  I ran it on one of the computers that

9   had administrative accounts.  That basically

10  resulted in a PNR wasn't closed fast enough.  So it

11  saved itself onto another PNR and created sort of a

12  database error, or it damaged -- there were some

13  PNRs damaged.

14         But, again, this was a very simple script,

15  nothing malice about it, just a customer trying to

16  retrieve information about the persons that are

17  booking in the system, where they were going, and

18  how much they spent and paid for the ticket.

19      Q.    Did anyone help you in creating the script?

20      A.    No.  If Stephanie Novak has a copy of that

21  script, you can see it's like -- it's a Biblical

22  verse and lines, something like that.

23      Q.    What did you do with the text file that was

24  created by the script?

26

1     A.    That was -- we took that -- there were

2  about 4,000 of them, and we planned to have them

3  implemented into the Axapta system, the bookkeeping

4  system, Concord Axapta, to be correct.  And we were

5  going to feed them over to that system to try to

6  make sense of the booking, and we were going to try

7  to take that -- take these text files and migrate

8  them into a new system.

9          So we gave Tommy Wiberg some of the text

10  files and had him try to create a script to take it

11  into his system or put it into a system, however he

12  did it.

13     Q.    You gave those text files to Tommy?

14     A.    Yes, we did.  These were just, you know,

15  common text files, nothing in them but the names of

16  the passengers, a certain set-up that is a common

17  language for airlines.  So there is nothing

18  dangerous in them.  There were no codes, no

19  programming, nothing.

20     Q.    When did you give them to Tommy?

21     A.    I think when we had a few hundred or a few

22  of those, we gave a bunch of them to him to test

23  out.  He didn't get the whole batch.  Just needed a

24  sample.

27

1    Q.    Now, did you give him those -- the sample

2    as soon as you had retrieved them?

3    A.    If I remember it correctly, I had run the

4    script on one of the manager's computers, which was

5    in the room just on -- just beside the CFO -- yes,

6    CFO.  And because he was away, I used that computer.

7           I think when I had a couple of hundred, I

8    just -- I just hit "Control A," took all the few

9    hundred, put them in a file, and gave it to him.  I

10   don't remember if I stored it or not on a flash

11   drive or if I sent it by e-mail.  I think it was

12   flash drive.  I gave it to him.

13   Q.    Now, did you physically hand the flash

14   drive to Tommy, or did you mail it to him?

15   A.    He was in Iceland at the time.

16   Q.    Was he in the offices of Iceland Express?

17   A.    He was in one of the meeting rooms he had

18   set up there.  So I just handed it over to him

19   there.

20           Just to emphasize, he was not even on the

21   same network as all the computers in there.  We had

22   him on a separate wireless Internet, which we used

23   for all guests.  So he was using wireless Internet.

24   So there was no way for him to see any of the

28

1    AirKiosk system.  Plus he needed to have a special

2    IP address on his computer, which he didn't.  So

3    there was no way for him to see the AirKiosk system.

4         Q.    So he never saw AirKiosk system?

5         A.    He saw the front end, which every consumer

6    sees.  He might have -- I don't know -- not from my

7    part, but he might have caught a glimpse of the

8    system when walking through -- what do you call

9    it -- where all the girls sit answering the

10   telephones.  They had sort of a sales representative

11   view.  He might have seen a glimpse of that.  It's a

12   possibility.

13        But he was mainly confined to the

14   conference room.  Basically he programmed there 16

15   hours a day.  He did nothing else.

16        Q.    Did Mr. Wiberg have access to the manuals

17   for the AirKiosk system?

18        A.    No, he didn't.  They were kept in my

19   office, at least one set, in a locked -- what's this

20   called -- cupboard.

21        Q.    How many sets of manuals for the AirKiosk

22   system did Iceland Express have?

23        A.    I remember seeing three.  One of those was

24   locked in my -- one set was locked in my cupboard.

30

1    them into the bookkeeping system, because we were

2    already doing that at the time.  But our CFO told us

3    and told our boss he couldn't get things to add up;

4    there was always a discrepancy between the number of

5    airline tickets sold, if I remember correctly, and

6    the amounts that we were getting into our accounts.

7         Q.    And were you able to put those PNRs into

8    the bookkeeping system?

9         A.    I'm not -- I can't remember the results of

10   it, but I know he spent some -- he spent, and I

11   think he billed us some time for it.

12              But these were, of course -- you know,

13   Sutra stopped the system when we had done some -- we

14   had retrieved some 4,000 PNRs.  They called us up

15   and shut -- after that phone call, they shut us

16   down.

17        Q.    But did you put those 4,000 into your

18   bookkeeping system?

19        A.    No.  I think only a couple.

20        Q.    You only put a couple into the bookkeeping

21   system?

22        A.    Yes, because this wasn't the whole mass.

23   This was just a portion, because Sutra saw that

24   there was a manuscript -- there was a script being

31

1    run, they detected that, called us up, said, "There

2    is a script running on your system.  Do you know

3    anything about it?"   And, which was my mistake, I

4    said, "No, we don't know anything about it,"

5    because -- this goes to the nature of the

6    relationship from them, from Sutra to Iceland

7    Express.  I -- it was my fault.  I said, "No," and

8    immediately they closed down the system.

9        Q.   Why did you say you didn't know anything

10   about it?

11       A.   Because -- it's difficult to put a finger

12   on it.  Because sort of Iceland Express -- just to

13   use Stephanie's words, we were the smallest company

14   that they had doing business with them with the most

15   service requests.  We were sort of the annoying

16   customer, which they were thinking -- I even -- I

17   have a vague recollection of them talking about, you

18   know, saying something like if it was worth having

19   us if we had so many service requests.  Because they

20   weren't charging for service requests, but we were

21   always calling them up and saying, "Hey, can you do"

22   this and that and this and that.

23           So we were a start-up company, our current

24   owners say underfunded, which might be correct,

32

1  which were very dependent on the booking system and

2  needed a really flexible booking system.

3           And basically they had the power to shut us

4  down overnight.  If they had shut us down for --

5  like they shut us down, I think, in the evening.  If

6  that would have continued for 12 hours, we probably

7  would have gone bankrupt because of the publicity

8  and stuff like that.

9           But it was completely my fault.  I

10 panicked, basically, because they were, you know,

11 really harsh on the phone.  I just panicked.  I had

12 written this short script, and I felt bad about it.

13 I panicked.  I said, "No."  They shut down the

14 system.

15          It's nothing -- it was mainly my fault,

16 but...  But I think I tried to correct that with

17 Stephanie.  I owned up to my mistake, and she had us

18 pay 5,000 U.S. dollars to fix the problem.

19          On that subject, I had seven people working

20 a whole weekend fixing the problem, which I also

21 paid them $5,000 to fix.  I felt that was a bit

22 unfair, but considering that I had made a mistake,

23 which I owned up to, I didn't make any complaints

24 about that.  I just paid the 5,000 U.S. and fixed

33

1   the problem.

2        Q.    I'm going to go back to the bookkeeping

3   system.   You said you put a couple of the PNRs into

4   the bookkeeping system?

5        A.    No, I didn't do that myself.

6        Q.    Okay.

7        A.    Because I basically took care of the

8   consumer end, the Web page, and coordinated with the

9   yield manager.   With the bookkeeping system itself,

10  I didn't have much to do with that.

11          The CFO just talked to the service company.

12  So I don't know how many they put in.   I think they

13  put in a couple.   They had already made a script to

14  put some PNRs into the system, PNRs that could be

15  generated via our report that was in the AirKiosk

16  manual.   That report and the sums that we got from

17  our clearinghouse did not add up.

18       Q.    So the bookkeeping service created a script

19  that put the PNRs from the report into the

20  bookkeeping system?

21       A.    Yes.   And it also tried these scripts --

22  also tried these PNRs as well, because they were

23  going to use them.   If I remember correctly, the

24  script that was in the report created a huge text

38

1    the other two guys that work there.  And we always

2    get the same reply."

3            He then asked us if we were doing

4    everything that they said that we should be doing,

5    and we said, "Yes, to our best belief we are doing

6    so."  "Is there any other way that you can retrieve

7    the information from the system?"  And this was the

8    result.

9        Q.    Who said, "Is there any other way to

10   retrieve the information from the system?"

11       A.    I think it was the CEO.

12           I mean, we were just getting our data from

13   the system.  Basically we were just mimicking what

14   we could have done manually.  It would have taken us

15   a few days, but we were just mimicking it with a

16   short script.

17       Q.    Now, did you give the information from

18   these PNRs that you retrieved to the CFO first or to

19   Tommy first?

20       A.    I can't remember.  I honestly can't.

21       Q.    How did you give the few files that you had

22   to the CFO?  Was that electronically or also on a

23   flash drive?

24           MR. ZAYOTTI:  Objection.  Asked and

43

1      A.    I think it was Johaness Georgsson.

2  Basically he was putting the squeeze on me and the

3  CFO to get the correct information so they could

4  balance the books or get the books correct, because

5  as the current owners have mentioned probably to

6  you, the company was underfunded and they needed the

7  books to be correct so that they could get funding,

8  more funding, which was -- competition was very

9  stiff, and I guess the ticket price was lower than

10  they anticipated.  I guess so.  I don't know.

11      Q.    Now, you say that the books wouldn't add up

12  with the data from AirKiosk; is that right?

13      A.    That's correct.

14      Q.    Did you ever figure out whether the books

15  were ever correct?

16      A.    Oh, the books were correct, yes.

17      Q.    And how do you know the books were correct?

18      A.    Because when we changed over to the new

19  system, magically enough, the books added up.  And

20  we were using the same payment provider and all the

21  same information.  The only -- the new thing in the

22  equation was the booking system.

23                 (Document marked as Exhibit 4

24                     for identification)

**EXHIBIT C**

## Aðalsteinn Magnússon

**From:** novak [nn@airkiosk.com]
**Sent:** 25. júní 2003 08:09
**To:** Gunnar Karl Níelsson
**Cc:** niketic; support; Jóhannes    Georgsson; Sigurður I.  Halldórsson;    Aðalsteinn J.
    Magnússon
**Subject:** Re: IMPORTANT!! STILL ERROR IN REPORT FILE

Hi Gunnar,

1. TSRs downloads:
I see no reason why should system not work for you but it works for me?

Please let me know the steps you follow when requesting the TSR export
file.

I will ask Pedja to send you the TSRs file of July, but if this works I
am expecting that you take this process in your hands.

2. Sales Planner:
I used the Sales Planner function and have searched all months, but can
not find any flight that shows more seats then your capacity.

Question: Did you look at the Sales Planner at all?

3. I checked your flown flights and have noticed that you guys are NOT
updating the flights and tickets with post departure data.

This must be a serious issue for Iceland Express:
- You don't know your flown revenue.
- Passengers may use tickets again and again.

My support desk told me that you are aware about this situation and have
chosen not to follow the Handback procedure.

Please confirm.

Novak



Gunnar Karl Níelsson wrote:
>
> Hi Novak
>
> We have been trying to get some information out of the consolidated
> TSRs but the only message we get is;
>
> Searched records.
> Content-type: text/html Status: 500 AirKiosk Agents Activities
> Database Error
>
> AirKiosk Agents Activities Database Error
>
> Database Error! Please contact for more information.
>
> What we want is: ONE FILE CONTAINING ALL ACTIVE TICKETS FROM TODAY
> UNTIL THE END OF THE SEASON (25.OCT) - WE DON'T CARE HOW IT'S DONE!
> AND WE NEED IT A.S.A.P.!!!!
>
> Með bestu kveðjum / Med venlig hilsen / Best regards,

KW 00621

> _____
>
> Gunnar Karl Nielsson
>
> Svæðisstjóri Internets / Manager Internet Sales
> E-mail: gkn@icelandexpress.is
> Phone: +354 5 500 650
> Fax: +354 5 500 601
>
> Iceland Express | Sudurlandsbraut 24 | 108 Reykjavik | Iceland
>
> Þessi tölvupóstur og viðhengi hans gætu innihaldið trúnaðarupplýsingar
> eingöngu ætlaðar þeim sem hann er stílaður á.  Efni tölvupóstsins og
> viðhengi er á ábyrgð sendanda ef það tengist ekki starfsemi  Iceland
> Express.
>
> The information transmitted is intended only for the person or entity
> to which it is addressed and may contain confidential and/or
> privileged material.  Any review, retransmission, dissemination or
> other use of, or taking of any action in reliance upon this
> information by persons or entities other than the intended recipient
> is prohibited.  If you received this in error, please contact the
> sender and delete the material from any computer.
>
> www.icelandexpress.is | www.icelandexpress.co.uk |
> www.icelandexpress.com | www.icelandexpress.dk
>
>  novak <nn@airkiosk.com>                                          To
>                              Gunnar Karl Nielsson
>  25.06.2003 11:16            <GunnarN@icelandexpress.is>
>
>                                                                  cc
>                              support@airkiosk.com,
>                              niketic@airkiosk.com
>                                                             Subject
>                              Re: IMPORTANT!! STILL ERROR IN REPORT
>                              FILE
>  >

KW 00622

**EXHIBIT D**

KW 00542

**Adalsteinn Magnusson**

| | |
|---|---|
| **From:** | Stephanie Niketic [niketic@airkiosk.com] |
| **Sent:** | 30. juni 2003 10:33 |
| **To:** | Adalsteinn J. Magnusson |
| **Cc:** | einars@icelandexpress.is; Johannes@icelandexpress.is; Sigurdurh@icelandexpress.is; Gudmundurg@icelandexpress.is |
| **Subject:** | Fwd: AEU System Intrusion |

EXHIBIT
Niketic
62
4-27-07 EV

>Date: Thu, 26 Jun 2003 20:47:52
>To: "Einar S. Valdimarsson" <einars@icelandexpress.is>
>From: Stephanie Niketic <niketic@airkiosk.com>
>Subject: AEU System Intrusion
>Cc: Johannes Georgsson <Johannes@icelandexpress.is>, nn@airkiosk.com, support@airkiosk.com
>X-Attachments: C:\NIKETIC\NIKETIC\TSRS_FOR.ZIP;
>
>Dear Einar,
>
>From our conversation I understand that your department was the intruder, based on a program written and executed by Gunnar.
>
>I am not addressing in this email the scope of the damage related to this. The matter can be fully addressed when Johannes returns; this is what I have agreed today with Johannes, who called from London:
>
>1. We will reopen access to your RC interface.
>
>2. We will allow access by one IP address to the control area of your system. You personally need to send us in writing the IP address and warrant that it is accessible only from AEU's premises and will be used for Control Agent access only by qualified AEU staff.
>
>3. By using the intrusion program, AEU intentionally corrupted its own PNR database and inventory. We recorded approximately 40,000 record access attempts by this program. Intentional damage to your databases falls outside of our normal customer support. Nevertheless, we have volunteered that tomorrow our System Administration staff will attempt to capture the extent of the damage (number of PNRs corrupted), and based on this will repair the identified PNRs and fix your inventory. This will be our entire support response related to this damage.
>
>4. Johannes says that you are unable to extract accurate ticket sales data from your system. Our customer support and Novak have tested and checked your MIS Consolidated TSR report functions a number of times over the past week (at least) against AEU queries and found no problems. As I have explained earlier, the two sources of your revenue accounting are your Consolidated TSR Database for your ticket sales information and your Flown Revenue Database for your flown revenue information, not Flight Sales or Forward Bookings as these databases do require reconciling with reservations changes and cancellations, which in the AirKiosk system occurs through completion of the MIS cycle. We have explained over the past months that MIS Flown Revenue reports require completion of the MIS cycle (handback, update, final of flown flights), which you still do not perform.
>
>5. I have requested from AK Customer Support a one-time comprehensive download of your ticketed sales records.
>
>-> Attached is a zip file containing a "colon (:) separated values" file of all authorized TSR records in your system up until this moment.

KW 00543

>-This file contains 49,856 records; most contain onward and return
journeys in a single record (ie, the number of segments is higher).
>- Before processing this information, all records from office 1234 should
be removed. This is Sutra's own support office, used for testing and
debugging purposes. In the future, office 1234 TSRs should not be authorized.
>- Our tool for your routine extraction of this data is a "comma separated
value" file exported through HIS TSR Consolidated Reports. The Consolidated
TSR Report can be exported for one month at a time assuming that your email
gateway does not restrict the size of attachments.
<
>We will continue to treat any non-conforming access to the Airtkiosk system
ASP and your databases as a security intrusion. This causes a step-by-step
shut down of system access based on the severity and source of the intrusion.
<
>With regards,
>Stephanie
<
>>Date: Thu, 26 Jun 2003 16:43:36
>>To: Johannes Georgsson <Johannes@icelandexpress.is>
>>From: Stephanie Niketic <niketic@airtkiosk.com>
>>Subject: AEU System Intrusion
>>Cc: nn@airtkiosk.com, mason@airtkiosk.com
<
>>Dear Johannes,
<
>>We discovered today that an external script was running to
>>programmatically retrieve your PNRs on the AirtKiosk system. The program was
>>designed to (attempt to) download your customer data, and in the process it
>>was also corrupting your PNRs and your inventory.
<
>>Among many problems this event caused and represents, from our standpoint
>>as a secure data processor it is a serious system intrusion. The intruder
>>was entering the system from one of your own IP addresses. All of your IP
>>addresses should be, and are according to Gunar, located on your premises.
>>Therefore, we must assume that the intruder is on your premises.
<
>>We have taken these immediate actions:
>> - Access to control areas from your IP addresses is denied.
>> - Access to your RC interface has been closed.
<
>>At this point we believe that your Self-booking pages and your Internet
>>Agent and Check-In interfaces are not being targeted for intrusion; access
>>to these interfaces remains open.
<
>>Our next step must be to identify the intruder.  Because the intruder is
>>most likely on your premises, we believe you can help.
<
>>Can you please investigate and, if you are able, identify/explain the
>>intrusion.
<
>>We will not respond to any calls about this or system access from any
>>person other than you.  Could you please get in touch with us tomorrow
>>morning, our time.
<
>>With best regards,
>>Stephanie

**EXHIBIT E**

## Aðalsteinn Magnússon

| | |
|---|---|
| **From:** | Stephanie Niketic [niketic@airkiosk.com] |
| **Sent:** | 10. júlí 2003 11:49 |
| **To:** | Aðalsteinn J. Magnússon |
| **Cc:** | Sigurður I. Halldórsson; Jóhannes Georgsson; Novak Niketic |
| **Subject:** | AEU/AirKiosk ASP Termination |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Blue |

EXHIBIT
Niketic
7
4-27-07 EV

Dear Adalsteinn,

Thank you for your response to my question about the alternative system and timing of your plans.

Sutra views each of its airline customers as a long-term partnership. Our customer service levels and our pricing, particularly at the entry-level you contracted, are based on having such a relationship; no system provider could do what we do profitably at these prices in a short-term relationship. When we are asked to provide the AirKiosk system we try our best to determine if the airline is compatible for such a relationship.

With start-up airlines this can be very difficult to judge, but we were happy to have Iceland Express as our customer. Given our "partnership" approach, we have gone beyond contractual obligations to help you cope with a very short start-up timeframe, your absence of planning for system use including training, PSP difficulties and special requests. We are of course disappointed that we miscalculated our compatibility.

In terms of your original email below, there is not much I understand, but I will try to respond to some of the points.

1. Many of our airline customers are, successfully, niche players in highly competitive environments, many have larger and more complex route structures. As Iceland Express is routinely booking twice (or more) seats than you projected for your system sizing, I do not understand in what way the AirKiosk system has failed to help you take advantage of your window of opportunity.

2. It is not clear to me what "transparency in marketing decisions" means or what relationship it has to the AirKiosk system.

3. It is a shame that Navision, a product from a company which supposedly support standards, is not congruent with the import of standard csv files. We believe a good part of your accounting department problems may be the result of no training, but this is an area in which airlines need to invest, whatever systems they use.

Attached is the letter I mentioned last week. Because you are terminating your AirKiosk service, there was not much sense in using this letter to address ways to improve our relationship, thus it addresses the breach only. It is a notice pursuant to the termination provisions of our agreement and has been sent by post as well.

- In any situation, it is not in our interest to have an airline using the AirKiosk system which does not want to use the system. We will terminate your service without further system use charges.

- We are not interested in providing the AirKiosk system in tandem with another reservations system. Thank you for your offer to continue to be on

KW 00643

our customer list, but our customer list really is reserved for our customers.

- We are not interested in providing consulting or a prototype to another reservations system provider.

Therefore, the scenario we envision is one in which your AirKiosk system service termination will be expedited and occur prior to your use of any other system.

With best regards,

Stephanie


>Date: Wed, 09 Jul 2003 11:20:12
>To: "Aðalsteinn J. Magnússon" <AdalsteinnM@icelandexpress.is>
>From: Stephanie Niketic <niketic@airkiosk.com>
>Subject: Re: winter season
>
>Dear Adalsteinn,
>
>Could you please let us know what reservations system you are moving to and
when you are planning this move.  This will allow us to be most complete in
responding to you.
>
>With regards,
>
>Stephanie
>
>At 03:37 PM 7/8/2003 +0000, Aðalsteinn J. Magnússon wrote:
>>Dear Stephanie,
>>
>>In response to your forward looking comments to me in your last e-mail and
>>in light of current and ongoing discussions within Iceland Express
>>management team I would like to both explain and propose a scenario. There
>>is a desire on our part to let our current contract with AK go to maturity
>>without renewal i.e. book the winter season in an alternative system.  I
>>do feel that the concerns or issues I have heard and are further outlined
>>below have merits given our present status as a start-up seeking a system
>>that is more tailored to our specific requirements.  We feel huge pressure
>>to perform on a level not required of larger and more financially strong
>>competitors.  Now, having said this I want to ensure you that we do not
>>want to burn bridges because as one Apple shareholder supposedly said
>>"life is like a box of chocolates and you never know what you get" meaning
>>that we do want to have a good and open channel to AK though we experiment
>>with a new system.  To underline this position I am proposing e.g.
>>expediting payments remaining to you if you so desire and furthermore, if
>>you so desire, we would remain on your client list if that is to your
>>benefit.  In my experience it is always good to have access to experienced
>>parties for consultative purposes if need arises. Though perhaps not wise
>>I feel that you are entitled to know our concerns mentioned above as they
>>most likely have value as information to you.  I want to stress though
>>that they reflect our competitive environment as a small niche player in a
>>highly competitive and at the same time restrictive environment that has
>>given us only a small opening that we must break through.  Our extra needs
>>are the following with regards to booking include
>>
>>financial data format more congruent with our requirements e.g. Navision
>>and a very restrictive regulatory environment
>>increased yield management flexibility and ease as we are going make our
>>structure more complex
>>less transparency in marketing decisions as our competitor is always
>>breathing heavily down our neck

KW 00644

```
>>more control over development and new features as we think it can reduce
>>the load on or call center
>>
>>A you can see these are concerns that will best be addressed if we take
>>the booking process closer to us and do not reflect badly in any way on
>>AK.  We feel we have to address these concerns locally in a very
>>competitive environment.  As you must appreciate we are the underdog in
>>our operating environment and must stay very sharp to outdo our much
>>larger competitor. Yours and Novakâ€™s fast response to this letter would be
>>greatly appreciated as time and timing are important elements and require
>>that we find a mutually agreeable solution soon for both our businesses.
>>
>>Brgds,
>>
>>Adalsteinn
```



**AEUNOT~1.PDF**
**(65 KB)**

```
> - AEUNOT~1.PDF
```

KW 00645

**EXHIBIT F**

1

PAGES 1 - 71

EXHS. 8 - 9

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * *

Sutra, Inc.,                    *

        Plaintiff   *      Civil Action

v.                              *      No. 04-11360-DPW

Iceland Express ehf,   *

        Defendant   *

* * * * * * * * * * * *

Deposition of Novak M. Niketic

Friday, April 27, 2007

Keegan Werlin LLP

265 Franklin Street - 6th Floor

Boston, Massachusetts 02110

----------- J. Edward Varallo, RMR, CRR ----------

Registered Professional Reporter

EPPLEY COURT REPORTING, LLC

P.O. Box 382, Hopedale, Massachusetts 01747

508.478.9795 ~ Fax 508.478.0595

leppley@msn.com

**Novak M. Niketic**
**April 27, 2007**

15

1    airlines for their commercial needs.

2        Q.    And when you say commercial needs, are you

3    referring to airline reservations and management of

4    data relating to --

5        A.    That's included.

6        Q.    Are you familiar with the term open source

7    code?

8        A.    Yes.

9        Q.    What does that term mean?

10       A.    I don't know.

11       Q.    Do you know whether there is any open

12   source code incorporated in the AirKiosk system?

13       A.    We were careful not to incorporate, but I

14   don't know.

15       Q.    So you tried to be careful not to

16   incorporate open source code but you're not

17   certain --

18       A.    I am aware about open source.  Well, open

19   source, there are differences.  But anyway, no, I

20   don't think.

21       Q.    Earlier today testimony was given that the

22   site used terms and conditions that are included in

23   the AirKiosk system -- I'll have you take a look at

24   Exhibit 3 -- were actually taken from a publicly

**Novak M. Niketic**
**April 27, 2007**

16

1  available source.  Do you know whether any other

2  portions of the AirKiosk system were derived from a

3  publicly available source?

4          MR. DORNY:  Objection.  You may answer.

5    A.  I don't know.

6    Q.  Is there anyone other than you who might

7  know the answer to that question?

8    A.  I don't think so.

9    Q.  I'll take that document back.  Thanks.

10  I'll have you take a look at what's been marked as

11  Exhibit 4.  I will just ask you to take a look at

12  that briefly and let me know if you recognize that

13  document.

14    A.  No, I don't think.  I don't remember ever

15  seeing this document.

16    Q.  Do you know what that document is?

17    A.  Well, it's written here, plaintiff's

18  response to defendant's first set of

19  interrogatories.

20    Q.  Did you have any role in providing

21  information in the preparation of those responses?

22    A.  I would need to read this to know.

23    Q.  Well, without reading it you wouldn't

24  know?

**Novak M. Niketic**
**April 27, 2007**

18

1      A.      Gaining information about how systems have

2   internally stored and organized data and the

3   relationship between the data.

4      Q.      It is correct to say that the data that

5   was accessed by means of the external script was

6   data to which Iceland Express otherwise had access

7   manually.  Is that correct?

8      A.      No.

9      Q.      No?

10      A.      Manually?  I don't understand, what do you

11   mean manually?

12      Q.      What data was accessed by means of the

13   external script, to your knowledge?

14      A.      PNRs.

15      Q.      And PNRs?

16      A.      Passenger name records.

17      Q.      And when you say passenger name records,

18   you're talking about records which contain

19   information concerning passengers on flights.

20   Correct?

21      A.      Beside other things, yes.

22      Q.      The type of information you are referring

23   to is names of passengers, fares paid, seat

24   assignments, things like that.  Correct?

**Novak M. Niketic**
**April 27, 2007**

19

1            MR. DORNY:  Objection.  You may answer.

2      A.      Some of these, yes.

3      Q.      And the airline, Iceland Express, had the

4  ability to access PNRs using the AirKiosk system.

5  Correct?

6      A.      It's hundred thousand feet, yes, that's

7  correct.

8      Q.      What do you mean, hundred thousand feet?

9      A.      I mean they are able to access PNRs, yes.

10     Q.      And the external script that was used to

11 access the PNRs automated the process of accessing

12 that information.  Is that accurate?

13     A.      No.

14     Q.      Can you tell me what it did to your

15 understanding?

16     A.      Corrupted the database.

17     Q.      Well, that was the result.  Correct?

18     A.      Well, then I don't understand the

19 question.

20     Q.      What exactly did the external script do?

21     A.      Mimic human.

22     Q.      And when you say it mimicked a human, what

23 do you mean by that?

24     A.      Took the knowledge of human, put in a

**Novak M. Niketic**
**April 27, 2007**

20

1    program and tried to run it.

2        Q.    So if I understand what you're saying --

3    don't let me put words in your mouth; you tell me if

4    I get it wrong -- the external script did what a

5    person could do using the AirKiosk system to access

6    data stored in the AirKiosk database.  Is that

7    right?

8        A.    Very unlikely.

9        Q.    Why do you say very unlikely?

10        A.    When you design interface for human, you

11    take into account the time human needs to process

12    some information and the program behave in different

13    way.

14        Q.    And how did it behave differently?

15        A.    Doesn't interpret messages coming from

16    system.

17        Q.    So when a person is accessing the system,

18    messages may pop up which the person can respond to

19    but the external script could not interpret or

20    respond to those messages.  Is that correct?

21        A.    That is one of the points that I am

22    making, yes.

23        Q.    Did the external script open PNR data

24    files in the AirKiosk system?

**Novak M. Niketic**
**April 27, 2007**

21

    1        A.      What do you mean by open?

    2        Q.      Did it access PNR data files in the

    3   AirKiosk system?

    4        A.      A different way of access.  I'm not trying

    5   to be difficult.  That's just not accurate.  I

    6   cannot give you answer with that kind of question,

    7   access.  I mean, in general terms, yes, script does

    8   access.

    9        Q.      And did the external script also copy the

   10   data that was in the PNR?

   11        A.      I don't know; I was not on the other side.

   12   But the system says that the data has been retrieved

   13   by external source.

   14        Q.      And when you say the data has been

   15   retrieved, you're talking about the PNR data?

   16        A.      There may be some other data too.  That's

   17   impossible to say.

   18        Q.      So you don't know whether other data may

   19   have been retrieved as well?

   20        A.      I don't remember.

   21        Q.      A person using the AirKiosk system could

   22   look at information in the PNR data file.  Correct?

   23        A.      If the data is for human, that person is

   24   able to read, yes.

**Novak M. Niketic**
**April 27, 2007**

28

1        A.      As objects.

2        Q.      And what does that mean?  I assume you're

3    talking in technical terms.

4        A.      It's a form of data storage object.

5        Q.      What information does Sutra have in its

6    possession which shows that Iceland Express

7    retrieved information using an external script other

8    than things like passenger names, flight

9    information, and fare amounts?

10       A.      Excuse me.  I didn't -- The question was

11   little bit long so I lost the beginning.

12       Q.      Okay.  What information does Sutra have

13   which indicates that Iceland Express retrieved

14   information about the way the data is stored and

15   structured in the AirKiosk system?

16       A.      What information?  Okay.  Well, I guess

17   you're asking about log files.  I'm not sure what

18   you are asking, what information.  We have log

19   files.

20       Q.      You have log files.  And what do the log

21   files show?

22       A.      A trace of the activities on the AirKiosk

23   system.

24       Q.      A trace of activity on the AirKiosk

Novak M. Niketic
April 27, 2007

29

1   system.  So do the log files actually show what

2   specific information and data was retrieved by the

3   external script?

4       A.      They may, yes.

5       Q.      And is that information you've given your

6   lawyer?

7       A.      I don't know.

8               MR. ZAYOTTI:  Can we go off the record for

9   a second.

10              (Discussion off the record.)

11              MR. ZAYOTTI:  Let's go back on.

12  BY MR. ZAYOTTI:

13      Q.      Apart from log files which may exist, are

14  there any other sorts of electronic records or paper

15  records or anything else that would show what was

16  retrieved by means of an external script?

17      A.      I would need to see what did they store on

18  the other end to let you know.  Is that the

19  question?

20      Q.      No.  Well, I'm not sure if it's the

21  question.  I think what you've said to me is that

22  log files will show what data and information was

23  retrieved by use of an external script.  Do I have

24  that right?

**EPPLEY COURT REPORTING, LLC**
**(508) 478-9795**

Novak M. Niketic
April 27, 2007

1      A.      For larger amounts, for almost -- You

2    cannot log everything, but there are different log

3    files; and application log files, if properly

4    organized, will let you know that.

5      Q.      And log files would show what information

6    concerning the structure of data stored in the

7    AirKiosk system was retrieved?

8      A.      It may not -- Excuse me.  Finish.

9      Q.      No, you're right.  So he can get it down,

10   we need to not talk over each other.  Go ahead; you

11   knew what I was going to ask.

12     A.      To larger extent you can see the

13   activities and you can recreate what was going on.

14   However, because of amount of information, you

15   cannot register everything.

16     Q.      You can't do everything as a log file?

17     A.      Within the log file.  So the larger

18   portion of what is going on, various accesses, they

19   are stored within the log files but you cannot

20   register everything what is going on.  It's

21   unpractical, impractical.

22     Q.      Are there any other records of any kind

23   that Sutra would have that would show what

24   information Iceland Express may have retrieved by

**Novak M. Niketic**
**April 27, 2007**

31

1    means of the external script?

2        A.    If this information -- I apologize if I

3    miss your question.   By recreating database which is

4    corrupted, we had an assumption they retrieved

5    everything or at least they tried to retrieve

6    everything.   Again, I don't know what they managed

7    to do because I am on this side of the system.   I

8    know what's happening within the system; I don't

9    know what they have been doing on the other end of

10   the system.

11       Q.    So is it accurate to say that you are not

12   really sure what information Iceland Express may

13   have retrieved by means of the external script?

14       A.    No.   I said the extent beyond what we

15   already discussed, and these are the PNR data and

16   structure of the records of the PNR, whether they

17   were having any attempts to do same on every part of

18   the system, I would need to go through all logs, if

19   they are still available, to find out.   But it's

20   easier to ask them.   I mean, on the other end that's

21   available.

22       Q.    Sure.   And I understand you can't tell me

23   about something you don't know about, so really all

24   I'm trying to find out is what do you know about.

**Novak M. Niketic**
**April 27, 2007**

32

1    And if there's other information or records which

2    tend to show that in Sutra's view Iceland Express

3    retrieved information about the structure of data

4    stored in the AirKiosk system, that's what I'm

5    interested in.  Is there anything like that?

6        A.    I cannot give you guarantee.  The amount

7    of efforts we went to to recreate the AirKiosk

8    database just shows there were lot of activities

9    through these scripts.  What went out and how much

10   of that went out we really don't know.

11       Q.    The external script we've been talking

12   about did not duplicate the features and functions

13   of the portion of the AirKiosk system where the PNRs

14   are stored.  Is that accurate?

15           MR. DORNY:  Objection.  You may answer.

16       A.    That's far from accurate.  I mean, the

17   commands used to retrieve data, human commands,

18   tells you exactly the functionality of the system.

19   So basically you can write functional specifications

20   by using the commands provided, provided or used in

21   this case through the program.

22       Q.    If I understand you correctly, I think

23   what you're saying is external script could have

24   been used to retrieve information about what the

**Novak M. Niketic**
**April 27, 2007**

36

1  that other system, whatever.  "Familiar" is broad

2  term.  I mean, I heard the name, yes.

3      Q.    What is your understanding of what the

4  GoodJet system is?

5      A.    It looks like it was some attempts to

6  provide reservations.

7      Q.    Are you personally familiar with the

8  features, functionality, operation, or appearance of

9  the GoodJet system?

10      A.    No.  You know, I have I don't know how

11  many, maybe thirty, forty years of experience on

12  many different systems, so....  But I never -- I

13  really cannot recall ever that I saw that system.

14      Q.    Is the GoodJet system to your

15  understanding a system used by an entity known as

16  Aton?

17      A.    I cannot remember.  I cannot recall that

18  name, so it doesn't ring a bell.

19      Q.    Do you remember the name Qust, Q-u-s-t?

20      A.    I heard that name in this context, but I

21  don't know what they are, no.  I don't know for

22  certain.  I don't know.  That's -- I'm not

23  interested, really.

24      Q.    Are you familiar with the features,

**Novak M. Niketic**
**April 27, 2007**

37

1  functions, operation, or appearance of the airline

2  reservation systems used by either Aton or Qust?

3      A.    No.

4      Q.    Are you familiar with an airline

5  reservation system -- Well, are you familiar with a

6  system known as Ticket.net?

7      A.    I heard that it has to do something with

8  our case, yes.

9      Q.    Do you know what it is, Ticket.net?

10     A.    I believe it is something registered like

11 reservation system.  Right?

12     Q.    I'm just asking you what your

13 understanding is, sir.  Your answer is fine.

14           Are you personally familiar with the

15 features, functionality, operation, or appearance of

16 the Ticket.net system?

17     A.    No.  I -- No, I don't believe.

18     Q.    Have you ever had the opportunity to

19 compare the AirKiosk system with the Ticket.net

20 system?

21     A.    Again, I don't know Ticket.net system.

22 I don't know that system.  I never -- And anyway,

23 I mean, this appeared to be that they register

24 later.  I mean, I'm not sure when they register, but

Novak M. Niketic
April 27, 2007

40

1    Q.    You have a document before you which has

2    been marked as Exhibit 4.    If you could turn your

3    attention to page 6 and if you'd look towards the

4    top of the page where the first full sentence

5    begins, it says "The trade secrets and confidential

6    and proprietary information include the operation,

7    appearance, features, and functionality of the

8    control agent and reservation control interfaces and

9    modules of the AirKiosk system."

10    A.    Mm-hmm.

11    Q.    Are you able to tell me from personal

12    knowledge what aspects of the operation, appearance,

13    features, and functionality of Ticket.net are

14    similar to the AirKiosk system?

15    A.    But I told you about Ticket.net that I

16    don't know that system.

17    Q.    Okay.    Has anyone expressed any opinion to

18    you as to what specific aspects of the operation,

19    appearance, features, or functionality of the

20    Ticket.net system are similar to the AirKiosk

21    system?

22    A.    Well, I just remember being told but I

23    don't know by who that that system didn't have

24    control agent access to the information.    That the

**EXHIBIT G**

This agreement for licensing of the Ticket.NET product and Service Level Agreement (hereinafter referred to as the "Agreement") is made and entered into on the day herein written by and between:

AIRLINE MANAGEMENT CONSULTANTS LIMITED                    (hereinafter referred to as "AMC LTD")
Omar House Building
Wickhans KCAY1
PO Box 362
Roadtown
Tortola
British Virgin Islands
Company Number: fn.39903

**CONFIDENTIAL**

and

Iceland Express                                           (hereinafter referred to as "the Licensee")
Suðurlandsbraut 24
108 Reykjavik
Iceland
Registration No.: 700497-2919



Iceland Express ehf. currently organizes and manages daily scheduled flights between Iceland, Denmark and the UK; and

Whereas Iceland Express presently is a licensee to a reservation system for its managed flights, which is well proven with a number of customers, and

Whereas the need for Iceland Express is to continuously be able to develop and amend its reservation system and its platform; and

Whereas Iceland Express recognize the inherent limitations of the present Licensor to provide flexibility to the degree Iceland Express needs; and

Whereas Iceland Express met the company AMC LTD, which declared its willingness to develop, hand in hand with Iceland Express according to its demands, a reservation system;

AMC LTD is in the business of developing, marketing, distributing and servicing booking software products for electronic booking of passengers for the airline and tourist industry (hereinafter referred to as "the Product").

Such software products are developed by AMC LTD, which company retains all copyrights and all other intellectual property rights to such software products and all copies hereof.

AMC LTD is willing, on the terms and conditions set forth herein, to lease use of the Product, on a nonexclusive basis, to The Licensee for use in its business operations worldwide. The Licensee as the user of the first commercial release retains the right to compensation bases on hourly rates and time employed to develop features that become part of the standard Product.

NOW, THEREFORE, in consideration of the covenants and conditions hereinafter set forth, it is agreed by and between the parties as follows:

Definitions.
As used herein, the following terms shall have the meanings set forth below:

"License Agreement" means the license agreement included herein between the AMC LTD and The Licensee that sets forth the terms and conditions governing the Customer's use of the Product.

"End-user" is anyone actually using the Product for its intended purpose of use.

"Iceland Express" and "the Licensee" refers to Iceland Express and its subsidiaries.

"The Product" means the licensed software product and all accompanying items. The Products trade name is Ticket.NET. It also refers to all intellectual property rights embodied therein, including but not limited to commercial marks as copyrights, images, video, audio, text incorporated into the Product, valuable trade secrets and coding methodology and all know-how, including knowledge, experience, data, technology, designs, techniques, drawings, software, and other information and knowledge, relating in any way to the Product, are good, valid and owned by AMC LTD. Herein are set forth the terms and conditions upon which AMC LTD contracts to develop and grant a license to the Licensee for use of said product. AMC LTD and the Licensee mutually agree on the specifications for the Product as listed in Exhibit A of the Agreement.

KW 001152

**1.1    Grant of License.**

Subject to the terms and conditions of this Agreement AMC LTD grants to the Licensee a non-exclusive and non-transferable right and license, hereinafter referred to as "the License", to use the Product and to make and assemble products/services based on the Product as well as the right to sell or lease such products/services world-wide.

**1.2    Use of License.**

The Product is licensed, not sold, to Licensee for use only under the terms of this Agreement. Licensee own the disk or other media on which the Product is originally or subsequently recorded or fixed but AMC LTD retains all ownership of the Product and reserves all rights not expressly granted to Licensee.  The Product is licensed for unlimited number of copies or instances of its use and without any limitations on capacity of the Product such as number of users, number of flights it can handle or other parameters.

**1.3    Insolvency remedies.**

If AMC LTD becomes insolvent or enters bankruptcy whether voluntary or involuntary, or admits in writing its inability to pay its debts, or makes or attempts to make an assignment for the benefit of creditors or ceases to function as a going concern or to conduct its operations in a normal course of business; i.e. perform its obligations fully as described in this contract, it is agreed that the source code and documentation will be accessible to the Licensee through placement with a trustee to be designated by the Licensee. In such a case as described in this section and the Licensee is allowed to develop the Product further for his own use.

**2        Restrictions**

**2.1    Reverse Engineering.**

Except to the extent expressly permitted by this Agreement Licensee may not decompile, disassemble or otherwise reverse engineer the Product, or engage in any other activities to obtain underlying information that is not visible to the user in connection with normal use of the Product. In any event, Licensee will notify AMC LTD of any information derived from reverse engineering or such other activities, and the results thereof will constitute the Confidential Information of AMC LTD that may be used only in connection with the Product and this Agreement. Licensee may not for any purpose transmit the Product or display the Products object code on any computer screen or to make any hard copy memory dumps of the Products object code, except as necessary in diagnostic purposes of failures or debugging of the Product.

**2.2.    Permissions to use.**

Licensee may not sell, redistribute, encumber, sub-license, rent, lease, or in any other way permit others to use the Product or any of Licensee's rights under this Agreement without AMC LTD's prior written consent.

**2.3    Backup copies.**

Licensee may make copies of the machine-readable portion of the Product for backup purposes only in support of Licensee's use of the Product, provided that Licensee reproduce on the copy all copyright and other proprietary rights notices included on the originals of the Product.

**2.4    AMC LTD's Access to the Product.**

AMC LTD guarantees that it will not have or gain access to the Product after installation without prior consent with Licensee.

**3        Delivery and Installation**

**3.1    Installation.**

AMC LTD will deliver and install the Product at an installation site to be determined by Licensee.  AMC LTD will supply the requirements of the Product for hardware, security measures, communication capabilities and system software. AMC LTD will further provide such instructions and environmental specifications as requested by the Licensee to enable the Licensee to prepare the installation site for installation. The system requirements must at minimum support 1,500 concurrent users with response time of <1 second at 1st production date. The Product must be scalable to handle operations that are two orders of magnitude larger than the initial installation, with same performance parameters, provided proper hardware and software platform.

**3.2    Sourcing providers.**

AMC LTD will assist in sourcing all providers relating to the full functioning of the Product.

**3.3    Timeframe for installation.**

AMC LTD will install the Product on the Licensee's system within four weeks of the Licensee's request.

KW 001153

**3.4    Acceptance test.**

After installation of the system, representatives of AMC LTD and the Licensee will perform a user acceptance test. All requirements listed in Exhibit A will be reviewed and evaluation made as to being complete, acceptable or unsatisfactory and prioritized. A list detailing all deficiencies will be compiled and such items corrected within a mutually agreed time period.

Ongoing development of the Product shall be discussed and scheduled in quarterly meetings between the parties. In those meetings acceptance tests of all development performed during the previous quarter will be performed.

4    Products Training and Service requirements.

4.1    Minimum Service.
During the term of this Agreement AMC LTD will dedicate a Staff of at least five (5) employees who shall be responsible for development and technical support of the Product. Until this requirement is met a third-party designated by the Licensee shall be given sufficient training to handle both emergency and routine maintenance of the Product. This training is done at the expense of the Licensee except for the current two dedicated employees whose remaining training will be done on a shared cost basis with regards hourly rate paid to AMC LTD for such services.

4.2    Service levels and service hours.
AMC LTD provides regular support during normal business hours from 9am to 5pm (GMT) Monday to Friday. Regular support fees are included in monthly license fees.

Emergency service is provided by AMC LTD 24 hours a day every day of the year (24/7). For this purpose AMC LTD will designate a telephone number that can be reached during those hours. Response time for emergency service shall not be more than 1 (one) hour and shall be worked on until a satisfactory solution as judged by the Licensee, has been implemented.

In the case of emergency rising out of hardware failures or failures in system software, communication or other supporting technologies that are not supplied by AMC LTD, the only obligation AMC LTD has is to assist the Licensee with diagnostics and determination of the source of the failure.

AMC LTD develops automatic monitoring features for the Product, that will detect malfunctions or bottlenecks impeding the proper functioning of the System.

Licensee is responsible for support to end-users that are his customers or the general public.

4.2    Training.
AMC LTD shall provide all relevant user manuals and documentation. Administrative users of the Licensee staff shall be trained with respect to use of the Product by AMC LTD on Licensee's demand and shall fulfill the training and certification requirements set forth by AMC LTD from time to time. For such training AMC LTD has the right to charge hourly rates as agreed in Exhibit B.

The Licensee shall pay its own out-of-pocket expenses for any such education and training provided by AMC LTD. However, if training is provided at The Licensee's location, The Licensee shall pay AMC LTD's out-of-pocket expenses in relation hereto.

In addition to the Licensee training program regarding the Product, AMC LTD shall make education and training available to the Licensee Staff.

5    Property rights

KW 001154

5.1    Compensation for Know-how.
All know-how, such as knowledge, experience, data, technology, designs, techniques, drawings, software and other information, such as sales material etc., relating in any way to this Agreement or the Product, disclosed to either Party shall become the subject matter of this Agreement without any right to compensation or any obligation to abide additional costs for either Party, unless expressly stated in the Agreement.

5.2    Intellectual Property Rights.
This Agreement provides Licensee only a limited use license, and no ownership of any intellectual property. AMC LTD is the sole owner of the developed product.

5.3    Property of Data.
All data entered into the database of the Product and information and data produced by the Product from that data is the property of the Licensee. The Licensee is free to export, transfer, copy and make use of that data as he sees fit. AMC LTD has the duty to assist Licensee to transfer the data in a requested electronic format within 15 days of a formal request.

5.4    Trademarks.
Licensee shall use the Product only under names and commercial marks provided by AMC LTD. Licensee agrees that it will not obliterate, remove, conceal, or modify any mark of AMC LTD (the size to be mutually agreed) appearing on the Product or on any package containing the Product, nor will it append any additional marks thereto without the prior written consent of AMC LTD. Licensee shall undertake no action that will interfere with or diminish AMC LTD's rights.

5.5    Integration with other Products.
Any portion of the Product merged into or integrated with another program, if any, will continue to be subject to the terms and conditions of this Agreement, and Licensee must reproduce on the merged or integrated portion all copyright and other proprietary rights notices included on the originals of the Product.

5.6    Property of modifications.
Any modification or development of the Product made by any of the Parties or their employees, whether patentable by itself or not or protect able by other types of intellectual property rights or not, conceived or first actually reduced to practice in performance under this Agreement and shall be owned by the party responsible for the modification or development. If the modifications are made by AMC LTD they shall be included in the license. If the modifications are made by Licensee, AMC LTD shall have a perpetual non exclusive royalty free license to use the modifications or development.

CONFIDENTIAL

6      Upgrades and Technical Support.

6.1    Upgrades. Modifications and Related Material.
       AMC LTD shall provide upgrades of the latest standard version of the Product. AMC LTD shall deliver to The Licensee all such upgrades and
       material related to the Product generally provided by AMC LTD to its customers. Upgrades, modifications and custom development of the
       Product made by AMC LTD shall be covered by this Agreement.

       Such upgrades shall include improvements and enhancements made to the latest standard version of the Product at the discretion of AMC
       LTD. The upgrades may include revisions that: (i) relate to changes in legislation or changes to business practices, or (ii) keep the Product up
       to date with the general technological development(s) and general demand(s) of the end-users of the Product or (iii) are otherwise considered
       appropriate by AMC LTD.

       AMC LTD shall try to fulfill and take the general demands of the end-users of the Product into consideration, but AMC LTD solely decides: (i)
       the content of the upgrades, (ii) when and how such upgrades are released, and (iii) for what hardware and Product platforms and
       configurations such upgraded versions are designed.

6.2    Technical Product Support.
       AMC LTD shall be available to The Licensee for technical support of the Product by telephone or other means of communication during AMC
       LTD's normal business hours. In the event of a problem requiring technical support of the Product that cannot be resolved via telephone or
       other means of communication within a reasonable time, the parties will jointly develop and implement a plan to resolve the problem, such
       plan may provide for payment of AMC LTD's fees and travel expenses for AMC LTD's personnel involved.

7      Joint Effort to Market and Sell the Ticket.NET product.

7.1    The Right of Referral and Duty to Assist
       AMC LTD has the right to refer prospects for the Product to the Licensee for evaluation of the Product. The Licensee shall provide on a best
       effort basis, assistance in sales and marketing of the Product. Such assistance can include but not be limited to, informing prospects of the
       qualities of the Product, meeting with representatives of the prospect and/or supplying relevant information to the prospect.

7.2    Compensation for Assisted Sales
       Sales generated through assistance of the Licensee shall be compensated for by payment of 10% commission on any proceeds from sale of
       software and usage rights in the first 12 months after contract date.

7.3    Finders Fee
       The Licensee is entitled to a 5% finder's fee for referring prospects to AMC LTD. The finder's fee is calculated on any proceeds from sale of
       software and usage rights in the first 12 months after contract date. Clauses 7.2 and 7.3 are mutually exclusive.

7.4    The right to refusal
       The Licensee has the right to refuse to assist in a sale if the prospect is judged to be a competitor or a potential competitor.

8      Compensation and Payment.

8.1    License and Service Fees.
       The monthly fees for use the Product are set forth in the Price List, which is attached as Exhibit "B" hereto.

8.2    Prices for Various Materials.
       The Prices for, manuals, documentation, marketing materials, tools and other materials provided by AMC LTD are set forth in the Price List,
       which is attached as Exhibit "B" hereto.

8.3    Due Date
       The Licensee shall pay AMC LTD no later than thirty (30) days after the invoice date.

8.4    Payment
       The Licensee shall make the payment into a bank account specified by AMC LTD.

8.5    Sales Taxe
       Unless otherwise specified, all prices, fees and payments are exclusive VAT and all other sales taxes, which shall be added and paid by The
       Licensee as required by law.

9      Protection of Confidential Information.

KW 001155

9.1    Confidentiality.
       Except as expressly permitted for The Licensee business, the parties, as specified below, shall not disclose to third parties any information
       designated as 'confidential" under this article 8.

9.2    Confidential Information.
       Confidential information disclosed under this Agreement shall be and remain the property of the disclosing Party. The Product and all parts

T. W

thereof, and all associated documentation and other written materials (except for brochures and promotional materials) provided pursuant to this Agreement are proprietary and "confidential" to AMC LTD. In addition, any party hereto may disclose, to another party hereto, certain information that is classified as "confidential" and such information shall be treated as confidential by the other party. It is also agreed and understood that information relating to Customers shall be confidential information.

9.3   Confidentiality Agreement.
Unless the parties otherwise agree in writing, the terms, conditions and provisions of this Agreement are confidential and shall not be disclosed except as may be required by law. It is, therefore, understood that a party shall not be in breach of this article 5 if it discloses confidential information in response to a court order or law compelling such disclosure, provided the disclosing party gives the other party reasonable notice prior to such disclosure.

9.4   Protection By Agreement.
The Licensee shall not, in any manner or form, copy, disclose, provide or otherwise make available, in whole or in part, the Product or other confidential or proprietary information of AMC LTD other than to its Staff and subcontractors who have executed appropriate nondisclosure agreements.

9.5   Information Not Considered Confidential.
Confidential information shall not include information which:

(i)     before the date of any disclosure to third parties is in the public domain,
(ii)    is developed independently by the Parties and is not related to or based upon the Product and
(iii)   is received from a third party that is not under a duty of nondisclosure with respect to such information.

9.6   Survival of Termination.
Article 9.1 – 9.6, inclusive, shall survive for five (5) years after the termination of this Agreement, with the exception that any source code to the Product may not ever be disclosed to any third party.

10    Liability and Limitation of Liability.

10.1  Liability.
Subject to the limitations set forth in this Agreement and the Exhibits hereof, each party shall have the right to claim damages and compensation from the other party for economic losses and costs it has suffered because of the other party's breach of its obligations of this Agreement and the Exhibits hereof.

Furthermore, AMC LTD shall indemnify, defend and hold the Licensee harmless from and against any claims and liabilities to third parties arising out of breach of this Agreement and the Exhibits hereof by such party.

10.2  Limitation of Liability.
None of the parties shall be liable for any incidental, special, punitive or consequential damages arising from or connected with this Agreement or the Exhibits hereof (including without limitation, damages for loss of business profit, business interruption, loss of business data and information or other pecuniary loss) even if a party has been advised of the possibility of such damages.

These limitations of liability do not apply in case of The Licensee its Staff's or subcontractors' breach of:

(i)     the confidentiality clauses in article 8 hereof and
(ii)    The Licensee's payment obligations according to article 7 hereof.

KW 001156

10.3  Limited Warranty
AMC LTD warrants that (i) the standard versions of the Product provided by AMC LTD will perform substantially in accordance with the accompanying user documentation for a period of one (1) year from the date of receipt and (ii) any media will be free from defects in materials and workmanship under normal use and service for a period of ninety (90) days from the date of receipt.

AMC LTD's entire liability and The Licensee exclusive remedy under the foregoing warranty shall be to repair or replace the standard versions of the Product that do not meet this Limited Warranty. This Limited Warranty is void if failure of the standard versions of the Product has resulted from accident, abuse or misapplication. Any replacement of the Product will be warranted for the remainder of the original warranty period or thirty (30) days, whichever is longer.

No other warranties are expressed and none shall be implied. AMC LTD specifically excludes any implied warranties of merchantability and fitness for a particular purpose.

10.4  Product Liability.
To the maximum extent permitted by applicable law, AMC LTD disclaims any product liability caused by the Product.

In the event that a claim is made against The Licensee based on product liability concerning the Product provided by AMC LTD, The Licensee shall notify AMC LTD of such claim. AMC LTD shall assist The Licensee in its defense against such a claim upon demand on a shared cost basis

10.5  Force Majeure – Release from Responsibility.
Neither party shall be liable for failure to perform their obligations under this Agreement, when such failure is due to force majeure or any other cause beyond the reasonable control of the parties, providing that these events could not be foreseen or the effects of such events be

CONFIDENTIAL

prevented.

**11    Warrants.**

11.1    Intellectual Property of Third-party.
To the best of AMC LTD's knowledge the Product does not infringe any patent or other industrial property right owned by one or more third parties as the product is developed for the Licensee.

11.2    Licensed Products.
Both Parties agrees to use only properly licensed third party products in connection with this Agreement.

**12    Term and Termination.**

12.1    Term.
The term of this Agreement shall commence on the date of signing hereof by both parties and shall continue until terminated by either party as provided herein.

12.2    Termination.
This Agreement can be terminated at any time by the Licensee by giving AMC LTD no less than three (3) months prior notice in writing.

12.3    Insolvency.
AMC LTD or The Licensee may terminate this Agreement immediately if the other party has:

    (i)    made an assignment of a substantial portion of its assets for the benefit of its creditors,
    (ii)   commenced or been subject to voluntary or involuntary bankruptcy proceedings or insolvency or receivership proceedings or
    (iii)  ceased to do business in the ordinary course.

12.4    Early Termination.
The parties shall further have the right to terminate this Agreement with immediate effect:

    (i)    in the event a Party materially breaches any provision of this Agreement and the Exhibits hereof and fails to cure such breach within thirty (30) days after receiving written notice of termination from the other Party specifying the alleged breach, or
    (ii)   If a representative of either Party commits a criminal offence in connection with the fulfillment of this Agreement the other Party may terminate this Agreement immediately.

**13    Consequences of Termination.**

13.1    Termination of Rights and Licenses.
Upon termination of this Agreement, for any reason, all rights and licenses granted to The Licensee hereunder shall terminate and the termination shall be effected as set forth in articles 13.1 – 13.4.

13.2    Destruction and Return.
The Licensee shall obtain from all its Staff and subcontractors and shall promptly destroy all copies of the Product and related documentation in its possession. The Parties shall each return and deliver to the other Party all other proprietary or confidential materials in tangible form and destruct all non-tangible copies of such materials.

13.3    Cease of Trademark License.
The Licensee shall cease using the trademarks and trade names of AMC LTD.

13.4    No Claims and Payment.
The Licensee accepts that it has no right to claim compensation or payment of goodwill or damages as a result of termination of this Agreement and waives any rights according to law and court practice.

**14    Assignment.**

KW 001157

14.1    Assignment.
This Agreement shall not be assigned or otherwise transferred by either party without the prior written consent of the other; said consent shall not unreasonably be withheld. Notwithstanding the foregoing, either party may assign this Agreement to any party that acquires substantially all of the assets or stock of the party by takeover, merger, reorganization or otherwise.

**15    Relationship of the Parties.**

15.1    Independent Contractors.
This Agreement does not create and shall not be construed as creating any relationship of agency, partnership or employment between the parties. The parties enter this Agreement as, and shall remain, independent parties and independent contractors. Except as otherwise provided in this Agreement, no party shall have the right or authority to assume, create, or enlarge any obligation or commitment on behalf of

CONFIDENTIAL

The parties to this Agreement have not had any earlier commercial contact.

**16 Infringements**

**16.1** <u>Duty to notify</u>
If either party learns of an attack on or infringement of the Product or if any legal action or any proceedings are instituted against Licensee in opposition to Licensee's proper use of the Product as granted under this Agreement then Licensee shall inform AMC LTD and vice versa.

**17 Competing Activity**

**17.1** <u>Competing products</u>
Licensee shall not be directly or indirectly engaged or take an interest in the sale or the offering of products competing with the Product without the prior written consent from AMC LTD.

**17.2** <u>Competitors to the Licensee</u>
AMC LTD will not sell the Product or rights to use the Product to Icelandair or any of its subsidiaries, sister- or parent company or any other Icelandic airline operating on the routes between Keflavik and Copenhagen or Keflavik and London.

**18 Miscellaneous.**

**18.1** <u>Amendment or Modification.</u>
No amendment to or modification of this Agreement shall be binding upon any party unless such amendment or modification is submitted in writing, dated and executed by the parties to this Agreement.

**18.2** <u>Notices.</u>
Unless otherwise provided herein, all notices under this Agreement may be affected either by personal delivery in writing or by mailing to the contact persons and addresses set forth below via air mail, postage prepaid (and sending it certified mail, return receipt requested, if such service is available):

|                        | In the case of The Licensee:        | In the case of AMC LTD:           |
|------------------------|-------------------------------------|-----------------------------------|
| Contact person (name)  | _____            | _____          |
| Address                | _____            | _____          |
| Address                | _____            | _____          |
| Telephone              | _____            | _____          |

A notice has binding effect on a party provided the notice has been received by such party.

**18.3** <u>Validity.</u>
Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity and shall not invalidate the remainder of such provision or the remaining provisions of this Agreement that shall continue in full force and effect.

**18.4** <u>Entire Agreement.</u>
This Agreement and the Exhibits hereof constitute and express the entire agreement and understanding between the parties in reference to all matters referred to herein, and any and all previous agreements, discussions, promises, representations and understandings between the parties relative thereto are merged herein and superseded hereby. AMC LTD shall continue to have the benefits of all provisions of prior agreements protecting the confidentiality of and the proprietary rights of AMC LTD in the Product and other materials, and The Licensee shall still be obligated to pay any money owed to AMC LTD under any prior agreement.

**18.5** <u>Controlling language.</u>
This Agreement shall be signed and delivered in the English language. All future communications among the parties shall be delivered in the English language.

**19 Cost.**

KW 001158

**19.1** <u>Payment of Cost.</u>
Except as otherwise provided herein, each party hereto shall bear all of their cost associated with the performance of their duties under this Agreement.

**20 Disputes.**

**20.1** <u>Governing Law.</u>
This Agreement shall be governed by the laws of Iceland and secondly in accordance with lex mercatoria and The Unidroit Principles of

20.2    Venue.
Any dispute pertaining to or arising out of this Agreement shall be settled by Héraðsdómur Reykjavíkur and the language shall be English.

21    Exhibits.

21.1    Exhibits.
The following Exhibits are attached hereto and incorporated herein by reference:

Exhibit "A" - Specifications of the Product
Exhibit "B" - Price and fee schedule

IN WITNESS WHEREOF, the parties have executed this Agreement this 27 day of NOV . 2003.

Iceland Express                                              AIRLINE MANAGEMENT CONSULTANTS LTD.

_____                                     _____
Signature                                                   Signature

ADALSTEINN MAGNUSSON                                        TOMMY WIDORG
Name printed                                                Name printed

Manager Strategy                                            SALES MGR.
Corp. Affairs                                               Title
Title

KW 001159

CONFIDENTIAL

Technical specification

Basic functionality

- One consistent web-based application for customers, major accounts, agents, call centre and management
- Easy to use interface for customers, agents and call centre
- As few steps reservations with no unnecessary fields to fill in – configurable qualification and multiple level customer information with e-mail reconfirmation
- Added sales functions (merchandise, platform for hotel room reservations, connecting flights functions)
- Standby lists, Open jaws, multiple segments and non consistent legs per reservation
- Adjustable number of departures in flight list depending on role and MS.NET internal security functions
- Monthly overview only for internal personnel (lowest price finder)
- Add segments functions
- Change of segments/routes or departures online
- At least three different taxes per fare
- CRM functions
- Group administration with multiple reservation capabilities
- Partial payments (cash, vouchers, credit card, invoice, multiple currencies)
- Online changes with auto recovery if not paid in time
- Adjustable time limits for new/changed reservations
- Online administration
- Integrated into IEX web site
- Payment via credit cards, invoice, vouchers and cash.
- Refunds via credit card, complete or partial
- Black list warnings
- E-mail communication
- Customer club functions (add/change/remove, e-mail/mail)
- News forums for internal personnel only
- Campaign module with seat availability display functions
- Allotments with FCFS
- Concealed fees and concealed prices configurable per reservation
- Supervisor role for changing individual fares
- UM fees, name change fees
- SSRs per pax/segment and subject to user role (some SSRs are only available to IEX)
- Agent booking fees, sign up/registration via web site
- Group self registration with automatic sales funnel tools
- ID ticketing role (only for registered personnel with multiple fare profiles)
- Content Management based on templates
- Hotel reservation functions with administration functions
- Hotel administration by hotels themselves
- Localization tools online (Icelandic, English, Danish, ..)
- Currency tables reconfigurable per day with historical data
- Log of all transactions in currency of sale and internal currency
- Time Zone aware time limiters and date zone information
- Fare with/without taxes and display dependent of sales market
- Vouchers and gift certificates with configurable profiles (Christmas, happy birthday..)
- Travel Manager functions (add/update/remove users allowed to book, where are the employees today?)
- Printed receipt request at extra cost
- Leisure/business segmentation
- SSL protocol to secure the dialogs with the users and communicate with the payment provider

Call centre functions

- All customer functions plus;
- Limited functionality based on role and MS.NET internal security functions
- Supervisor can change fares, add/remove legs without cost, refunds in cash/credit card
- Cashier functions
- Comprehensive log features
- Booking fees should be visible, one set of rules per currency, agent configurable
- Action items with follow up

KW 001160

Agent functions

- All customer functions plus;
- Limited functionality compared to call centre personnel based on role and MS.NET internal security functions
- Cashier functions
- Comprehensive log features
- Booking fees should be concealed or visible, one set of rules per currency, agent configurable
- Super agent capability (UK)
- Action items with follow up (can be assigned to internal personnel or to IEX call centre)

Yield
- Intelligent routines with automated functions (AutoYield, Automatic safety functions and reconfiguration without manual intervention)
- Load factor reports (%, seats, diff from sales goal per flight)
- Tight fare to seat allocation
- Decision tools, flight booking patterns
- Block, range functions - rapid reconfiguration is important
- On screen summary with prediction data
- Flight history log

Handling functions
- PNL and ADL functions – fully configurable per departure
- Open/Close flights with automatic standby forwarding and no show/go show entry
- Excess baggage charging
- Duty manager reports

Reporting
- On line tools in real time (sales per hour, day, month, market,.. speed buttons)
- Sales funnel prediction
- Sales distribution for a given period
- Flight booking patterns
- Business Graphics
- Site hits, banner statistics
- OLAP functions with MS Excel
- Cashiers functions
- Revenues/cost estimations per flight
- Monthly agent sales data
- Flight SSRs and standby list
- Scanning from competitors
- Number of visitors per day or time frame

Inventory
- No limitations on flights, routes, classes (cascaded, YCFZ), fares, taxes and fees
- Class and fares with date and users limiters
- Flight history log
- Campaign connections with automatic display functions (while stock lasts)
- Standby, future overbooking capabilities
- Point of origin or point of sale pricing in multiple currencies
- On line and just in time reconfiguration
- Disturbance messaging (SMS, e-mail, lists, mail merge)
- Easy reconfiguration
- Sales Quota goals
- No overbooking possible
- UM, WC.., Infant thresholds per flight based on aircraft body

Interconnection
- Import of standard IATA PNRs
- Icelandic payment provider (Kortathjonustan) interconnection (credit/debit/refunds online)
- Instant data transfer to Concorde ERP software via XML/text format
- SAS MEXI PNL/ADL transfer in SITA format with multiple class support and party connections
- PNL distribution via e-mail to customs, handling, caterer ..
- Icelandic character support
- WebServices XML connectivity
- SMS broadcast to internal groups based on roles, specific number or flight pax
- Online access for customs and border police

External Access
- External call centres
- Customs/border police
- Handling companies
- Caterers
- Agent banners with automatic reporting
- News forums
- High security measures with integrated access control with MS.NET internal functions
- Intrusion control functions with IP lockout

CONFIDENTIAL

KW 001161

- No 3rd-party components nor software needs (components...)
- Secure SSL transport
- Non user intervention server applications – automatic stop/restart after power failure
- Load balancing support
- Failover SQL functions
- SQL Server based sessions
- Integrated role-based security

CONFIDENTIAL

Performance
- Highly scalable solution
- Uptime of >99.99%
- Reply time <5 s during peak hours (1st byte returned)

Documentation
- Fully documented installation-, agent and call centre manuals, reviewed monthly
- Emergency installation manuals with updates when necessary

Other
- Training for all internal personnel with updates when necessary
- Training for hosting company with updates when necessary
- Source code stored at trustee with updates when necessary

KW 001162

TW

Exhibit B

Fee schedule

CONFIDENTIAL

The Licensee shall pay a monthly license and usage fee covering the rights and useage as specified in this Agreement. The monthly fee is billed according to chapter 7 of the Agreement.

Monthly useage and license fee is 2.995,- EUROs for the period from 1st production date and for 36 concecutive months thereafter. After the 36 month period has passed the monthly useage and license fee is 0,- EUROs. The term of the contract is not limited by this fee period and is governed by Articles 11.1 -11.4. In case of termination monthly License fee stops.

Regular support fees are included in monthly license fees. Support during other hours is governed by regular hourly rates charged by AMC LTD. The hourly rate used for the first 12 months of the contract is €95 per agreed hour. The hourly rate can not be raised more than 5% per annum and should not deviate substantially from changes in the CPI for the Euro Zone, standing at 113.1 for July/2003 (ref: Statistics Iceland / www.hagstofa.is).

Charges for all hourly work must be based on written work requests from the Licensee.

AMC LTD will give Iceland Express 50% discount from hours used for developments of Product features later included in the standard Product and developed originally for Iceland Express and at its request. These features must have been asked for in writing to AMC LTD by the Licensee.

Resonable out of pocket expenses of AMC LTD shall be paid by the Licensee. AMC LTD does not have the right to negotiate any obligation for out of pocket expenses on behalf of the Licensee. This includes, but is not limited to, travel expenses, fares, accomodation, meals, supplies and other items, without the express permission of the Licensee. Out of pocket expenses negotiated and paid for by AMC LTD can only billed to the Licensee as provided for in corresponding work request.

Prices for other items.

Manuals 0,- EURO
Documentation 0,- EURO
Marketing material 0,- EURO

KW 001163

**EXHIBIT H**



# FXConverter Results - Currency Converter for 164 Currencies

Thursday, November 27, 2003

**2,995 Euro = 3,576.93 US Dollar**
2,995 US Dollar (USD) = 2,507.75 Euro (EUR)

Median price = 1.19380 / 1.19430 (bid/ask)
Minimum price = 1.17690 / 1.17740
Maximum price = 1.19480 / 1.19510

- Rate for <u>previous</u> or <u>next</u> day

- Get exchange rates with amount: [　　　　　]   [ New Conversion ]

⊞ Add to your site
🖶 Print
❓ Info
💼 Traveler's cheatsheet
✉ Tell a friend

[ Trade with *OANDA* ]   [ Open demo account ]

## Also See...

- <u>FXTrade</u>: trade currencies with tight spreads, no minimum deposit and earn continuous interest on your money.
- <u>FXTradeTicker</u>: A Yahoo! Widget which shows live FX rates and FXTrade/FXGame account status.
- <u>Order Currencies and Travelers Cheques</u> and get them delivered to your home with FXDelivery.
- <u>Travel Expense Report Manager</u> (FXPense): Create multi-currency expense reports online and save it in MS® Excel.
- <u>Link to Currency Converter</u>: Find out how to link to OANDA's FXConverter.

Home Page | Currency Converter | Terms of Use | Privacy Policy | Register | Contact Us | Site Map | Search

© 1996 - 2007 OANDA Corporation. All rights reserved. All Registered Trade Marks used on this Website, whether marked as Trade Marks or not marked, are declared to belong to their respective owner(s). OANDA Corporation owns Trade Marks of all its "FX" products .