UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
SUTRA, INC.,                        )
                                    )
          Plaintiff,                )
                                    )        CIVIL ACTION NO.  04-11360-DPW
v.                                  )
                                    )
ICELAND EXPRESS, EHF,               )
                                    )
          Defendant.                )
_____             )

**SUTRA'S RESPONSE TO STATEMENT OF
UNDISPUTED FACTS AND COUNTERSTATEMENT OF FACTS**

Pursuant to Local Rule 56.1, Plaintiff, Sutra, Inc. ("Sutra"), submits the following

Response to Defendant's Statement of Undisputed Facts:

1.      The Defendant, Iceland Express, ehf ("Iceland Express"), is in the

business of operating an airline, offering flights originating in Iceland, flying to

Copenhagen Denmark, London England and Hahn Germany.

**Response:**      Sutra does not dispute paragraph 1.

2.      On or about December 10, 2002, the Plaintiff, Sutra, Inc. ("Sutra"), and

Iceland Express, entered into an Airkiosk System Application Service Provider

Agreement (the "Agreement"), pursuant to which Sutra agreed to grant Iceland Express

access to Sutra's computerized airlines reservation system known as  the "AirKiosk

System."

**Response:**      Sutra does not dispute paragraph 2.

3.     The term of the Agreement was twelve months, which could be extended by mutual agreement of the parties.

**Response:**     Sutra does not dispute paragraph 3.

4.     Pursuant to the AirKiosk Agreement, the total cost of implement and training Iceland Express on how to use the AirKiosk System was $20,000.  Additionally, Iceland Express agreed to pay Sutra a monthly user fee of $1,00 US, covering the processing of up to 9,000 revenue passengers boarded per month, but no more than a total of 100,000 revenue passengers boarded in any consecutive 12 month period.  In excess of these limits, Iceland Express would pay an additional sum of $.20 USD per additional revenue passenger boarded.

**Response:**     Sutra does not dispute paragraph 4.

5.     The AirKiosk System software was and is located on servers in the offices of Sutra.

**Response:**     Sutra does not dispute paragraph 5.

6.     Pursuant to its agreement with Iceland Express, Sutra provided Iceland Express access via the Internet to the AirKiosk System.

**Response:**     Sutra does not dispute paragraph 6.

7.     Sutra did not provide Iceland Express a copy of the AirKiosk System software or source code.

**Response:**     Sutra does not dispute paragraph 7.

8.     In January, 2004, Iceland Express started up its operations in Iceland, and Sutra trained two Iceland Express employees, Gunnar Karl Nielsson and Bryndis Jonsdottir, in the use of the AirKiosk System at Sutra's offices in Massachsuetts.

**Response:**    Sutra does not dispute paragraph 8.  However, Sutra disputes the inference in paragraph 8 that the employees of Iceland Express were fully trained. Pursuant to the Agreement, Sutra was to provide training for three people for five days. Declaration of Brett N. Dorny ("Dorny Decl.") (attached as Exhibit 1 hereto) Ex. A at page 34, line 18 to page 37, line 7.  Iceland Express did not receive fully training on the AirKiosk System.  Despite the objection of Sutra, Iceland Express chose to only send two employees and to limit the training to three days.  Dorny Decl. Ex. A at page 37, lines 8-20 and page 38, line 14 to page 39, line 22 (S. Niketic).

9.    In using the AirKiosk System, Iceland Express experienced problems extracting accurate ticket sales data for use with its accounting software system. Specifically, "[t]he information that [Iceland Express] got from the AirKiosk system didn't add up to what the information from [Iceland Express's] credit card companies told [Iceland Express].  So there was not match between the two systems."  In that regard, "[t]here was always a discrepancy between the number of airline tickets sold … and the amounts that [Iceland Express] was getting into [its] accounts."

**Response:**    Sutra does not dispute that Iceland Express was having problems. However, Sutra does dispute the suggestion that the Iceland Express's problems were the fault of Sutra or the AirKiosk System.  The problems were the result of Iceland Express' failure to be fully trained in the operation of AirKiosk and/or to properly use the AirKiosk System.  Dorny Decl. Ex. A at page 131, line 4 to page 132, line 3 (S. Niketic).; Zayotti Aff. (the Affidavit of Matthew Zayotti was submitted in support of Defendant's Motion for Summary Judgment), Ex. A at page 211, lines 5-21, and page 214, lines 8-20. (S. Niketic); Zayotti Aff., Ex. C.

10.  The AirKiosk System was supposed to be able to produce various reports of financial data intended be used by Sutra customers, like Iceland Express, in connection with third-party accounting software systems.

**Response:**    Sutra does not dispute paragraph 10.

11.    One of the reports the AirKiosk System was supposed to be able to produce is a ticket sales report ("TSR"), the purpose of which is to "feed airline accounting systems."

**Response:**    Sutra does not dispute paragraph 11.

12.    Unfortunately, the TSR generated by the AirKiosk System for Iceland Express's use did not add up to the sums that Iceland Express was getting from its clearinghouse.

**Response:**    Sutra disputes that the AirKiosk System was unable to generate a correct TSR report.  Iceland Express failed to follow the correct procedures for entering information and generating TSR reports in using the AirKiosk system.  Dorny Decl. Ex. A at page 131, line 4 to page 132, line 3 (S. Niketic); Zayotti Aff. Ex. C.

13.    Over a period of several months, Iceland Express "repeatedly asked [Sutra] to take a look at this and give [Iceland Express] the correct information so [Iceland Express] could get the books to add up.

**Response:**    Sutra disputes that Iceland Express had repeatedly asked for the correct information to get its books to add up.  Iceland Express did express such a problem until after they had breached the Agreement.  Dorny Decl. Ex. A at page 132, lines 4-14 (S. Niketic); Zayotti Aff. Exs. C and D.

4

14.     In response to Iceland Express's repeated requests for resolution of this problem, Sutra indicated that there was nothing wrong with the AirKiosk System and Iceland Express's problems with obtaining accurate sales data was Iceland Express's own fault.  In correspondence from Sutra to Iceland Express dated June 26, 2003, Sutra stated that "[o]ur customer support and Novak have tested and checked your MIS Consolidated TSR report functions a number of times over the past week (at least) against AEU queries and found no problems. … We have explained over the past several months that MIS Flown Revenue reports require AEU's completion of the MIS cycle (handback, update, final flown flights), which you still do not perform."

**Response:**     Sutra does not dispute paragraph 14.

15.     Although Sutra acknowledged in correspondence to Iceland Express dated July 10, 2003, that "Navison [Iceland Express's accounting software system], a product from a company that supposedly supports standards, is not congruent with the import of csv fles," Sutra nevertheless stated "[w]e believe a good part of your accounting department problems may be the result of no training. …"

**Response:**     Sutra does not dispute paragraph 15.

16.     In the meantime, it was critical for Iceland Express to quickly resolve the issue of obtaining accurate sales data from the AirKiosk System.  Iceland Express's CEO "was putting the squeeze on [Mr. Nielsson] and the CFO to get the correct information so they could balance the books or get the books correct, because … the company was underfunded and they needed the books to be correct so they could get funding, more funding, which was – competition was very stiff. …"

**Response:**     Sutra does not dispute paragraph 16.

17.     After several months without resolution of the issue of obtaining accurate sales data from the AirKiosk System, Iceland Express employee Gunnar Karl Nielsson decided to create "a script that opened up PNR's, just the information of each PNR into a text file, and then closed the PNR down again, then opened up another PNR copied it to a text file, saved it, closed the PNR down and so on, and so on.

**Response:**     Sutra disputes that Iceland Express had been unsuccessful in obtaining accurate sales data for several months.  See response to paragraph 13.  Sutra does not dispute that Mr. Nielsson created a script file which opened PNR data. However, the script did not properly close the PNR record after opening it.   Operation of the script corrupted Iceland Express's data files on the AirKiosk System.  Zayotti Aff. Ex. A at page 113, line 11 to page 114, line 4 (S. Niketic).

18.     PNRs are passenger name records, which includes the names of passengers, fares paid, seat assignments, and other information relating to a reservation.

**Response:**     Sutra does not dispute paragraph 18.  However, paragraph 18 is incomplete.  PNRs include data and the structure of the data as stored internally in the AirKiosk System.  Dorny Decl. Ex. B at page 24 line 23 to page 25, line 25 (N. Niketic).

19.     The PNR text files retrieved and copied by Iceland Express by means of the script consisted of "information about the persons that are booking in the system, where they are going, and how much they spent and paid for the ticket."

**Response:**     Sutra disputes the characterization of PNR data files.  The PNR record in the AirKiosk System is not a text file.  It is a formatted data file containing all information about a reservation.  Dorny Decl. Ex. C at page 24 line 23 to page 25, line 25 (N. Niketic).

20.     The PNR text files copied by Iceland Express contained "no codes, no programming. …"

**Response:**     Sutra does not dispute paragraph 20.

21.     Iceland Express and other customers of Sutra would be unable to operate their business without access to the reservation data, inventory data and passenger list information.

**Response:**     Sutra does not dispute paragraph 21.

22.     Iceland Express had the right to access all reservation data, inventory data and passenger list information.

**Response:**     Sutra disputes that Iceland Express had an unlimited right to access all data in the AirKiosk System.  Pursuant to the Agreement, Iceland had the right to use the AirKiosk System to access all reservation data, inventory data and passenger list information for purposes of operating the airline.  Iceland Express did not have the right to access the data for any other purposes.  Dorny Decl. Ex. C, ¶9.3.

23.     Indeed, Iceland Express's reservation data, inventory data and passenger list information was confidential and proprietary to Iceland Express, not Sutra.

**Response:**     Sutra disputes the facts recited in paragraph 23.  While data entered by Iceland Express regarding reservations, inventory and passengers was confidential and proprietary to Iceland Express, formatted data within the AirKiosk System, including PNRs was not proprietary to Iceland Express.  Pursuant to paragraph 9.3 of the Agreement, Iceland Express agreed "not, and .. to prevent its employees to, use transmit, modify or reproduce for the benefit of third parties any information which is stored in the documentation, programs or databases of AIRKIOSK, if such heretofore

mentioned acts are not necessary in the use of the AIRKIOSK system as providing in [the] Agreement." Dorny Decl. Ex. C, ¶9.3.

25.    Iceland Express copied by means of the script approximately 4,000 PNR text files for the purpose of having them "implemented into the … bookkeeping system …."

**Response:**    Sutra does not dispute Iceland Express copied approximately 4,000 PNR data files. However, Sutra disputes the other facts in paragraph 25. PNR data files are not merely text, but are formatted files. Dorny Decl. Ex. B at page 24 line 23 to page 25, line 25 (N. Niketic). Iceland Express also planned to try to migrate the PNR data files to ticket.net system being developed by Tommy Wiberg in Iceland Express's offices at that same time. Mr. Neilsson gave the several hundred of the copied files to Mr. Wiberg after copying them. Zayotti Aff. Ex B, at page 26, line 6 to page 27, line 19 (G. Nielsson). Iceland Express never used the PNR data for checking its bookkeeping system. Zayotti Aff. Ex. B, at page 30, lines 17-19 (G. Nielsson).

26.    The individual PNRs copied by Iceland Express contain all of the same raw ticket sales data that is supposed to be collected in the TSR reports generated by the AirKiosk System.

**Response:**    Sutra disputes this fact. The data used in the TSR reports and individual PNRs are not the same. Zayotti Aff. Ex. A, at pages 97-107 (S. Niketic).

27.    Unfortunately, the script created by Mr. Nielsson did not close the PNR's fast enough, as a result of which "it save itself onto another PNR and created a sort of database error, or it damaged – there was some PNRs damaged." As a result, some of Iceland Express's PNR data became corrupted.

**Response:**     Sutra disputes this fact.  The script ended the PNR retrieval transaction and opened a new PNR as speeds faster than expected for human agents by the AirKiosk System.  This caused some PNR records to become irretrievable.  Zayotti Aff, Ex. A at page 113, line 6 to page 114, line 4 (S. Niketic).

28.     The script run by Iceland Express did not damage the AirKiosk System or any of its programs.

**Response:**     Sutra does not dispute paragraph 28.

29.     Sutra detected the script created and run by Mr. Nielsson and contacted Iceland Express to inquire whether Iceland Express knew anything about it.  Initially, Mr. Nielsson panicked and denied that he know anything about the script because Sutra was "really harsh on the phone", Iceland Express was an "annoying customer," Sutra had complaint that Iceland Express was a small customer and had many service requests, Sutra had previously questioned whether it was worthwhile to keep Iceland Express as a customer, and Sutra had the "power to shut [Iceland Express] down overnight."

**Response:**     Sutra does not dispute that when contacted by Sutra about the intrusion and corrupted data, Mr. Nielsson denied any knowledge of the use of a script to access Iceland Express data on the AirKiosk System.  Sutra cannot respond as to why Mr. Nielsson decided to lie about his actions.

30.     Thereafter, Sutra shut down Iceland Express's access to the AirKiosk System.

**Response:**     Sutra does not dispute paragraph 30.

31.    Iceland Express and Mr. Nielsson subsequently admitted to Sutra that Mr.
Nielsson had utilized a script to retrieve and copy PRN text files, and Iceland Express
paid Sutra $5,000 U.S. to repair the corrupted PNR data.

**Response:**    Sutra disputes the suggestion that Iceland Express and Mr.
Nielsson voluntarily admitted use of the script.  The AirKiosk System has security
restrictions which prevent unauthorized access to important airline data, such as PNR
data files.  Specifically, the portion of the AirKiosk System accessed by the script created
by Mr. Nielsson required a computer with an IP address designated by Iceland Express as
being on its premises and accessible only by its employees.  Iceland Express and Mr.
Nielsson only admitted the truth after Sutra had suspended Iceland Express's access to
AirKiosk had shown that the intrusion had to be from Iceland Express's offices.  Zayotti
Aff. Ex. D.  Sutra did agree to repair the damage done by Mr. Nielsson for a fee of
$5,000.

32.    Iceland Express decided to switch from using the AirKiosk System to a
system known as Ticket.net because Iceland Express "could not get the books to add up"
with the AirKiosk System, and Ticket.net was a "consumer-friendly booking system" that
"could give … correct numbers according to the sales [and] feed the financial system
with correct information. …"

**Response:**    Sutra does not dispute Iceland Express decided to switch from
using the AirKiosk System to ticket.net.  Sutra cannot comment on the reasons for the
change alleged by Mr. Nielsson.  As has been shown in a criminal proceeding in Sweden,
the ticket.net system was fraudulent obtained by Mr. Wiberg from his former employer
shortly before Iceland Express started using the system.  Dorny Decl. Ex. D at page 16.

10

The ticket.net system, as improperly obtained by Mr. Wiberg, did not include certain functionality present in the AirKiosk system. Shortly afterward, the ticket.net system included such functionality. Complaint, ¶¶19-20. Zayotti Aff. Ex. R.

33.     Thereafter, the parties mutually agreed to terminate the Agreement.

**Response:**     While the parties agreed to termination of the Agreement, Sutra reserved  its claims relating to Iceland Express's breaches. Dorny Decl. Ex. E.

34.     Sutra and Iceland Express also reached an agreement pursuant to which all of Iceland Express's PNR data was migrated from the AirKiosk System to Ticket.net.

**Response:**     While the parties reached an agreement to migrate the data, the PNR data was migrated using a csv format which removed the formatting of the data present in the AirKiosk System. Dorny Decl. Ex. A at page 146, line 10 to page 147, line 8 (S. Niketic).

35.     On or about November 27, 2003, Iceland Express entered into a License Agreement with Airline Management Consultants Limited, whereby Iceland Express agreed to license from Airlines Management Consultants Limited an airline reservation software system developed by Tommy Wiber and known as "Ticket.net". Pursuant to the Agreement, Airline Management Consultants Limited is the sole owner of Ticket.net and all intellectual property related thereto.

**Response:**     Sutra does not dispute that Iceland Express entered into an agreement with Airline Management Consultants Limited. However, in accordance with a decision of the Swedish Criminal Court, Mr. Wiberg did not own the Ticket.net system or any intellectual property related thereto, and had no right to sell, transfer or license the Ticket.net system to Iceland Express. Dorny Decl. Ex. D.

36.    Pursuant to Iceland Express's Agreement with Airline Management Consultants Limited, Iceland Express agreed to pay a monthly user fee of 2,995 Euros, which converts to approximately $3,576.93 US as of the date of the contract.

**Response:**    Sutra does not dispute paragraph 36.

37.    When Iceland Express began using its new airline reservation system, "the books added up.  And [Iceland Express] [was] using the same payment provider and all the same information.  The only—new thing in the equation was the booking system."

**Response:**    Sutra does not dispute paragraph 37.

38.    Iceland Express did not give Tommy Wiberg access to the AirKiosk System or AirKiosk System manuals.

**Response:**    Sutra disputes this fact.  Tommy Wiberg did access all public portions of the AirKiosk System.  Zayotti Aff. Ex. B at page 28, lines 5-6.  He also worked in the offices of Iceland Express where the manuals were kept and where the AirKiosk System was being used.  Zayotti Aff. Ex. B. at page 27, lines 1-19 and page 28, lines 4-20.  Finally, portions of the Ticket.net system were created by Mr. Wiberg based upon specific requests from Mr. Nielsson and Ms. Jonsdottir for functions and operations. Dorny Decl. Ex. F at page 51, line 21 to page 52, line11 (G. Nielsson); Dorny Decl. Ex. G at page 14, lines 5-23 (O. Olafsson).  Mr. Nielsson and Ms. Jonsdottir had both been trained on the AirKiosk System, had never used any other airline reservation system, and had no knowledge of any other airline reservation system.  Dorny Decl. Ex. F at page 9, line 22 to page 10, line 4 (G. Nielsson).

39.    Tommy Wiberg never had access to the AirKiosk System software, source code, object codes or algorithms underlying the software.

12

**<u>Response:</u>**    Sutra does not dispute paragraph 39.

40.    Prior to creating Ticket.net, Tommy Wiberg created the airline reservation software system known as GoodJet.

**<u>Response:</u>**    As decided by the Swedish Criminal Court, Wiberg improperly transferred the GoodJet system to Iceland Express as Ticket.net.  Dorny Decl. Ex. D at page 16.

41.    In response to Iceland Express's First Set of Interrogatories to Sutra, Sutra stated in relevant part, as follows:

Interrogatory No. 7:

Please state each and every material fact that supports your allegation . . .
that 'Iceland Express disclosed confidential, proprietary trade secret
information regarding the Airkiosk System,' including in your response
specifically identifying each and every trade secret and all confidential or
proprietary information that you contend Iceland Express disclosed.

Objection:  Plaintiff objects to this interrogatory as being
premature.  Discovery is ongoing.  Plaintiff reserves the
right to supplement its answers to this Interrogatory as
more information becomes available.

Response:  Iceland Express began using Ticket.net after
Sutra terminated its use of the AirKiosk System.
Ticket.net, in early 2003, lacked certain features and
functionality found in the AirKiosk System.  The features
and functionality included those provided by the Control
Agent and Reservation Control interfaces and modules,
which were the subject of the attack by the external script
in June 2003.  Shortly thereafter, Ticket.net included such
features and functionality which appeared similar to at least
one consultant familiar with both systems. . . .  The trade
secrets and confidential and proprietary information include
the operation, appearance, features and functionality of the
Control Agent and the Reservation Control interfaces and
modules of the AirKiosk System.  These modules are only
accessible by authorized customers of Sutra who have
agreed to maintain the confidentiality of the AirKiosk
System.  Security for access to these modules is controlled
through the use of IDs, passwords, and Internet address
verification.  These security measures were thwarted by
Iceland Express in its operation of the AirKiosk System.

**Response:**    Sutra does not dispute paragraph 41.

42.    During its deposition, however, Sutra admitted that it is "impossible [for

Sutra] to say" whether Iceland Express retrieved any data other than PNRs by means of

the script.

**Response:**    Sutra does not dispute paragraph 42.

14

43.     Although Sutra testified that it may have in its possession log files that would show that Iceland Express retrieved information about the manner in which data is structured and stored in the Air Kiosk System, Sutra failed and refused to produce log files and/or other relevant documents in response to Iceland Express's document requests.

**Response:**     Sutra disputes the facts in paragraph 41.  Iceland Express admitted that the script retrieved information PNR data files.  Novak Niketic testified that the PNR data files, as retrieved by Iceland Express include not only data, but the structure of the data as well.  Zayotti Aff. Ex. F at page 31, lines 11-21.  Mr. Niketic testified that the log files, if they still existed, might show whether Iceland Express accessed or attempted to access other parts of the AirKiosk System with a script.  *Id.*  Sutra has never refused to produce any documents properly requested.

44.     Sutra admitted that it is unable to identify what aspects of the operation, appearance, features and functionality of the AirKiosk System were allegedly misappropriated by Iceland Express and incorporated into Ticket.net.

**Response:**     Sutra disputes the facts of paragraph 44.  Stephanie Niketic and Novak Niketic testified that they were unable to identify the portions of the AirKiosk System usedin ticket.net.  They have had no access to or knowledge of the details of the Ticket.net system.  Zayotti Aff. Ex. F at page 40, lines 11-16.  Iceland Express has improperly withheld information regarding the design, operation and functionality of the Ticket.net system.  A Third Motion to Compel production of additional documents relating to the features and operation of the Ticket.net system is currently pending.  Nevertheless, Sutra has produce an expert report outlining the similarities between the confidential portions of the AirKiosk System and Ticket.net.  Zayotti Aff. Ex. R.

46.     Sutra admitted that is unable to say to what extent other airline reservation systems on the market may have features similar to the AirKiosk System.

**Response:**     Sutra does not dispute paragraph 46.

47.     Sutra admitted that it is not familiar with the features, functionality, operation or appearance of the GoodJet System, the Qust System or the Ticket.net System.

**Response:**     Sutra does not dispute paragraph 47.

48.     Sutra admitted that its allegation that its trade secrets are incorporated into the Ticket.net system is bases solely on the statements of a Swedish company known as Aton and/or an individual named Peter Nimerius to the effect that "ticket.net had substantially different and expanded functions than it had when it was a reservation system at GoodJet.  According to Sutra, Aton and/or Nimerius assert that the expanded features and functionality of the Ticket.net system were in the administrative area of the reservation system.  Aton never explained to Sutra which specific functions and features of Ticket.net were supposedly similar to the AirKiosk System or how they were supposedly similar.

**Response:**     Sutra does not dispute paragraph 48.

49.     Sutra failed and refused to provide any formal response or objection to Iceland Express's Request for Inspection of the AirKiosk System.  Informally, Sutra stated through counsel that "Sutra cannot allow access to the data of any other airline. Use of the system without data will not show anything."

**Response:**     Counsel for Sutra further stated that Sutra was willing to allow the requested inspection.  Zayotti Aff. Ex. L.

50.    Sutra objected to Iceland Express's request for the AirKiosk System

source code as follows:

> Plaintiff objects to this request as being irrelevant, overly
> broad, unduly burdensome, and unlikely to lead to
> admissible evidence.  Iceland Express only had access to
> the AirKiosk System from January to July 2003.  The
> AirKiosk Systems for all other time periods, both before
> and after, including all changes and modifications, is
> irrelevant.  Furthermore, Iceland Express never had access
> to the source code or documents relating to the source code.

**Response:**    Sutra does not dispute paragraph 50.

51.    Sutra admitted that it copied a portion of the publicly available website of

a competitor and incorporated such material into the AirKiosk System.  Specifically,

Sutra accessed a site use terms and conditions page on a publicly available portion of the

website of Sabre, a Sutra competitor, and Sutra copied the Sabre site use terms and

conditions and incorporated them into the AirKiosk System.

**Response:**    Sutra does not dispute paragraph 51.

52.    Apart from the site use terms and conditions that Sutra copied from the

website of its competitor, Sabre, Sutra testified that it does not know whether the

AirKiosk System incorporates any open source code or whether any other portions of the

AirKiosk System were derived from a publicly available source.

**Response:**    Novak Niketic testified that Sutra has tried not to incorporate any

open source software in the AirKiosk System and that he doesn't think there is any open

source software incorporated into the AirKiosk System.  Zayotti Aff Ex. F at page 15,

lines 11-20.

53.     Sutra failed and refused to respond or object in any fashion whatsoever to the following document requests set forth in Iceland Express's Fourth Request for Production of Documents: …

**Response:**     Sutra does not dispute paragraph 53.

54.     On July 5, 2006, Sutra belatedly objected and responded, in relevant part, to Iceland Express's Second Set of Interrogatories, served on May 31, 2006, as follows: …

**Response:**     Sutra does not dispute that paragraph 54 properly quotes Sutra's Objections and Responses to Iceland Express's Second Set of Interrogatories.  Sutra disputes that the responses were belated.

55.     On July 5, 2006, Sutra belated objected and responded, in relevant part, to Iceland Express's Second Request for Documents, served on May 31, 2006, as follows: ….

**Response:**     Sutra does not dispute that paragraph 55 properly quotes Sutra's Objections and Responses to Iceland Express's Second Request for Documents.  Sutra disputes that the responses were belated.

56.     Although a Stipulated Protective Order was entered by this Court on January 5, 2007, Sutra failed to supplement its responses to Iceland Express's second sets of interrogatories and document requests and a failed to supplement its document production, as required, including but not limited to failing to produce copies of confidentiality agreements supposedly signed by Sutra employees.

**Response:**    Sutra has fully responded to Iceland Express's discovery requests.

Iceland Express has never suggested that Sutra has failed to fully respond to any

discovery requests nor sought to compel discovery by Sutra.

57.  Sutra objected and responded to Iceland Express's expert witness

interrogatory as follows:

> INTERROGATORY NO. 16:
>
> Please identify each person you expect to call as an expert witness at trial and for each person state:
>
> a)    his/her name;
>
> b)    address;
>
> c)    the subject matter upon which he/she is expected to testify;
>
> d)    the substance of the facts and opinions to which he/she is expected to testify; and
>
> e)    fully and completely the substance of the grounds for each opinion.
>
> Objection:  Plaintiff objects to this Interrogatory as being premature.  Plaintiff further objects to this Interrogatory as requiring more than Rule 26, Fed. R. Civ. P.  Plaintiff will supplement its answer regarding experts expected to testify at trial at the times as required by the court.
>
> Response:  Plaintiff has not yet determined whom it expects to call as an expert witness or the substance of the testimony to be given.

**Response:**    Sutra does not dispute paragraph 57.

58.    Pursuant to the Court's Scheduling Order dated April 30, 2007, the Court

ordered as follows:

> Fact discovery completed by 4/30/07; Plaintiff expert disclosure by 5/25/07; defendant's expert disclosure by 6/22/07; expert depositions completed by 7/15/07; dispositive motions due 8/17/07 with responses due 9/17/07. Parties shall notify court by 8/17/07 if no dispositive motions are anticipated. No further extensions of discovery schedule will be entertained.

**Response:**    Sutra does not dispute paragraph 58.

59.    On August 9, 2007, more than two months after the deadline for Plaintiff's expert disclosures and only 8 days before the deadline for filing dispositive motions, Sutra produced a Report on Comparison between Sutra AirKiosk System and Iceland Express System signed by Peter Nimerius. Sutra did not seek to extend the deadline for making its expert disclosures.

**Response:**    Sutra does not dispute paragraph 59. However, Sutra had previously identified Mr. Nimerius as a technical expert. Furthermore, counsel for Sutra had discussed with counsel for Iceland Express the difficulties the technical expert was having with the report in view of the deficiencies of the responses of Iceland Express regarding operation of the ticket.net system. Iceland Express has improperly withheld documents regarding operation of the ticket.net system. Sutra has filed a Third Motion to Compel Discovery to obtain information regarding operation of the ticket.net system.

60.    The Report on Comparison between Sutra AirKiosk System and Iceland express System purports to compare four items in the area of administrative functions of the GoodJet, AirKiosk and Ticket.net airline reservation systems and draws certain conclusions, but the report includes no information or facts concerning the basis of and reasons for Mr. Nimerius's opinions, or the data or other information considered by Mr. Nimerius in forming his opinions.

**Response:**    The Report on Comparision between Sutra AirKiosk System and Iceland Express System by Peter Nimerius (Zayotti Aff. Ex. R) does include information and facts concerning the basis of and reasons for the opinions and the data and information considered in forming the opinions.

61.    According to Mr. Nimerius's report:

> In the Goodjet system from late 2002 and early 2003 there is a small set of administrative functions.  Most of the administrative work has been done directly into the system database.
>
> Notably, in the Goodjet system very little airline business terminology is used.
>
> A court order in Sweden 2007 decided that the [Ticket.net] system was a copy of the Goodjet system, so therefore it is fare [sic] to conclude that the [Ticket.net] system had a very limited set of administrative functions from the start.

**Response:**    Sutra does not dispute paragraph 61.

62.    Mr. Nimerius's report does not include copies of the documents upon which he relies, including the court order in Sweden 2007, nor does it include the bases for Mr. Nimerius's conclusions regarding the administrative functions of the Goodjet system or the Ticket.net system.

**Response:**    Sutra does not dispute that the Nimerius report does not include the court order in Sweden 2007.  The Nimerius report does indicate the bases for the administrative functions of the GoodJet system and ticket.net system.  See Zayotti Aff. Ex. R.

63.    With regard to the first item of comparison, route and fare management functions, Mr. Nimerius concludes: …

**Response:**    Sutra does not dispute paragraph 63, except that the quoted portion of Mr. Nimerius's report includes emphasis and editorial changes.

64.    The concepts of fare functions and that handle seat assignments, class, child discounts, infant discounts and different currencies are readily ascertainable from the websites of Sutra AirKiosk customers, including Jet2.com, Aero and Tobago Express.

**Response:**    Mr. Nimerius's report indicates that he compared the administrative functions of the Ticket.net and AirKiosk systems.  Zayotti Aff. Ex. R.  On the other hand, the websites of Sutra's customers included in Zayotti Aff. Exs. S and T, show public access interfaces.  They do not include any administrative functions. Furthermore, the websites copied in Zayotti Aff. Exs. S and T were accessed in August 2007.  They do not show the status or content of any websites in 2003 when Iceland Express used the AirKiosk System and misappropriated Sutra's trade secrets.

65.    With regard to the second item of comparison functions relating to load factor, alerts, inventory and yield management, Mr. Nimerius concludes: …

**Response:**    Sutra does not dispute paragraph 65, except that the quoted portion of Mr. Nimerius's report includes emphasis and editorial changes.

66.    With respect to the third item of comparison, a system configuration tool, Mr. Nimerius states as follows: …

**Response:**    Sutra does not dispute paragraph 66, except that the quoted portion of Mr. Nimerius's report includes emphasis and editorial changes.

67.    Finally, with respect to the fourth item of comparison in Mr. Nimerius's report, bookings and block space functions, Mr. Nimerius states as follows: …

**Response:**    Sutra does not dispute paragraph 67, except that the quoted portion of Mr. Nimerius's report includes emphasis and editorial changes.

68.    The concept of group bookings and block space is readily ascertainable from the publicly available airline reservation websites, such as the website of Sutra customer Jet2.com.

**Response:**    Mr. Nimerius's report indicates that he compared the administrative functions of the Ticket.net and AirKiosk systems.  Zayotti Aff. Ex. R.  On the other hand, the websites of Sutra's customers included in Zayotti Aff. Exs. S and T, show public access interfaces.  They do not include any administrative functions.  Furthermore, the websites copied in Zayotti Aff. Exs. S and T were accessed in August 2007.  They do not show the status or content of any websites in 2003 when Iceland Express used the AirKiosk System and misappropriated Sutra's trade secrets.

69.    Sutra advertises most if not all of the foregoing administrative functions in the Frequently Asked Questions page of Sutra's website: …

**Response**:    While paragraph 69 includes an accurate copy of the Frequently Asked Questions page from Sutra's current website, it does not advertise any of the administrative functions discussed in Mr. Nimerius's report.

Respectfully submitted,

Date:  August 31, 2007

_s/   Brett N. Dorny_____
Brett N. Dorny
Law Office of Brett N. Dorny
386 West Main Street, Suite 12A
Northborough, Massachusetts  01532
Tel.  508-709-0501
Fax.  508-519-9185

Attorney for Plaintiff

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 31, 2007.


  s/  Brett N. Dorny
Brett N. Dorny