```
              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS


SUTRA, INC.,                    )
     Plaintiff,                 )
                                )       CIVIL ACTION NO.
     v.                         )       04-11360-DPW
                                )
ICELAND EXPRESS, EHF,           )
     Defendant.                 )
```

MEMORANDUM AND ORDER
July 10, 2008

Plaintiff Sutra, Inc. ("Sutra") filed this case against defendant Iceland Express, ehf ("Iceland Express") alleging breach of contract and misappropriation of trade secrets in violation of Massachusetts General Laws Chapter 93, §§ 42 and 42A and common law.  Iceland Express has moved for summary judgment.

## I. BACKGROUND

Sutra, a Massachusetts software company, developed a computer software system known as AirKiosk ("AirKiosk System") that helps airlines automate control of their flight operations including reservations, passenger check-in, flight control, and revenue collection.  In December of 2002, Sutra and Iceland Express, an airline company, entered into an AirKiosk System Application Service Provider Agreement ("Service Agreement") to provide Iceland Express with access to and rights to use the AirKiosk System.  Iceland Express agreed to pay a fee of $20,000 for the implementation of the AirKiosk System and a monthly user

fee thereafter.  Pursuant to the Service Agreement, Iceland Express was subject to certain trade secret and confidentiality provisions.

- Section 9.2 states: "Iceland agrees to protect and keep confidential the trade secrets of Sutra."

- Section 9.3 states: "Iceland shall not, and shall prevent its employees to, use, transmit, modify or reproduce for the benefit of third parties any information which is stored in the documentation, programs or databases of AirKiosk, if such heretofore mentioned acts are not necessary in the use of AirKiosk as provided in this Agreement."

Problems with the Service Agreement started early on. Iceland Express sent two employees to be trained by Sutra on how to use the AirKiosk System properly.  The training lasted a total of three days.  Sutra contends this training was inadequate and that it had requested Iceland Express send three people for five days of training.  After the AirKiosk System was implemented, Iceland Express began experiencing problems extracting accurate ticket sales data from the system.  Sutra contends that the problems were due to inadequate training as a result of the decision of Iceland Express to send only two employees for three days of training.

According to Iceland Express, after several months without being able to obtain accurate ticket sales data for accounting purposes, in June of 2003, its employee Gunnar Nielsson wrote a computer script, which he used to download approximately 4,000 passenger name records ("PNRs") from the AirKiosk System in hopes

of incorporating this information into Iceland Express's bookkeeping system.  Although the script saved the files, it also corrupted the PNR files in the AirKiosk System, causing some to be damaged or become irretrievable.  Upon detection of the script, Sutra contacted Iceland Express.  Nielsson first denied knowing anything about the script, after which Sutra promptly terminated Iceland Express's access to the AirKiosk System.  Once access was terminated, Iceland Express admitted to accessing the AirKiosk System using the script and agreed to pay a $5,000 fee to repair the damaged PNR files.

Following this incident, Iceland Express indicated its intention to switch to another airline reservation system called "Ticket.net" developed by Tommy Wiberg.  Iceland Express had been in contact earlier with Wiberg about creating an airline reservation system, and it claims it provided Wiberg with several hundred PNR files to see if his system could import the data successfully.  Iceland Express entered into a licensing agreement in November of 2003 for the use of Ticket.net.  Once Iceland Express started using the new system, it claims it stopped having ticket sales data problems and its "books added up."

Sutra alleges the unauthorized accessing of the AirKiosk System by the Iceland Express script was a breach of contract. Iceland Express disputes this allegation, because it claims it had the right to access the information in each PNR, which

included passenger reservation information proprietary to Iceland Express.  According to Sutra, however, each PNR is not just raw data on reservations but a formatted file that revealed "the structure of the data as stored internally in the AirKiosk System."

Novak Niketic, the President of Sutra, was asked during his deposition, "What information does Sutra have which indicates that Iceland Express retrieved information about the way the data is stored and structured in the AirKiosk System?"  He responded that Sutra had log files that showed "[a] trace of the activities on the AirKiosk System."  These log files were requested by Iceland Express during discovery.  Although Iceland Express claims Sutra failed to respond or object to the request for log files, Iceland Express did not pursue a motion to compel their production.  In any event, Niketic conceded during his deposition that it is "impossible [for Sutra] to say" whether Iceland Express retrieved any data other than PNRs by means of the script.

Sutra has identified its trade secret as "the operation, appearance, features and functionality of the Control Agent and Reservation Control interfaces and modules" of its AirKiosk System.  The modules are said by Sutra to include the following security features:

- They "are only accessible by authorized customers of Sutra who have agreed to maintain the confidentiality of the

  AirKiosk System."
- Access is "controlled through the use of IDs, passwords, and Internet address verification."

## II. ANALYSIS

Iceland Express has moved for summary judgment on both counts in the Complaint. For the reasons discussed below, I will grant the motion for summary judgment as to Sutra's misappropriation of trade secrets claim and deny the motion for summary judgment as to Sutra's breach of contract claim.

**A.    Standard of Review**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and affidavits show that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Where, as here, the moving party does not have the burden of proof at trial, that party must make a showing that the evidence is insufficient to support the nonmoving party's case. *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 90 (1st Cir. 1993) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party makes this showing, the burden shifts to the nonmoving party to demonstrate that a genuine issue of material fact exists. *Id.*

**B.    Legal Claims**

The context for my decision will be clearer if I address the question of trade secrets before turning to the breach of contract question. Consequently, I take up Count Two before

5

addressing Count One.

    *1.   Count Two - Misappropriation of Trade Secrets*

Count Two of Sutra's Complaint alleges misappropriation of its AirKiosk trade secrets in violation of Mass. Gen. Laws ch. 93, §§ 42 and 42A and common law. Except for the provision of double damages and injunctive relief, the statutes essentially represent a codification of the common law of trade secrets. *See Burten v. Milton Bradley Co.*, 763 F.2d 461, 462 (1st Cir. 1985); *Harvard Apparatus, Inc. v. Cowen*, 130 F.Supp.2d 161, 165 (D. Mass. 2001). Hence, the liability analysis of the statutory and common law claims will be the same here.

Under Massachusetts law, misappropriation of trade secrets comprises three elements: 1) the existence of a trade secret; 2) reasonable steps taken by the plaintiff to preserve the secrecy of its trade secret; and 3) the defendant's use of improper means in breach of its confidential relationship with the plaintiff to acquire and use the trade secret. *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Ltd.*, Civil Action No. 02-12102-RWZ, 2006 WL 1766434, at *8 (D. Mass. June 28, 2006); *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 825 F.Supp. 340, 357 (D. Mass. 1993).

> a.   The Trade Secret

A misappropriation of trade secrets by definition begins with a trade secret.  Massachusetts has adopted the Restatement of Torts definition, which states that "[a] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it."  *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736 (1970) (citing Restatement of Torts, § 757, comment b).  The protected information must be kept secret.  *Id.*  Hence, "[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret."  *Id.*

It is hornbook law that "the parties and the court cannot accurately decide the question of whether a trade secret exists without first understanding what precisely is asserted as a secret."  Charles Tait Graves and Brian D. Range, *Identification of Trade Secret Claims in Litigation: Solutions for a Ubiquitous Dispute*, 5 Nw. J. Tech. & Intell. Prop. 68, 69 (2006).  A trade secret is by definition only information that is secret or unknown to the trade, since a trade secret claim "based on readily observable material is a bust."  *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) (affirming a district court's decision to grant summary judgment because the

plaintiff failed to describe its trade secret sufficiently). Analysis becomes difficult, however, when a plaintiff is unable or simply refuses to identify its alleged trade secret adequately. Iceland Express claims that Sutra's misappropriation of trade secrets claim should be dismissed because Sutra has failed to identify its trade secrets adequately.

Sutra asserts that its trade secrets are "the operation, appearance, features and functionality of the Control Agent and Reservation Control interfaces and modules" of its AirKiosk System. I find this description far too open textured to meet the test for an identifiable trade secret. "A plaintiff has no cognizable trade secret claim until it has adequately identified the specific trade secrets that are at issue." *Cambridge Internet Solutions v. Avicon Group*, No. 99-1841, 1999 WL 959673, at *2 (Mass. Super. Sept. 21, 1999). The description must be made "with clarity that can be understood by a lay person . . . and distinguish what is protectable from that which is not." *Staffbridge, Inc. v. Gary D. Nelson Assocs., Inc.*, No. 024912BLS, 2004 WL 1429935 (Mass. Super. June 11, 2004). In determining what is an adequate description of a trade secret, courts have required specificity, although that specificity is highly fact dependent. *Compare TouchPoint Solutions, Inc. v. Eastman Kodak Co.*, 345 F.Supp.2d 23, 28 (D. Mass. 2004) (holding that the source code, implementation, and overall design of a distributed

computing system could all be trade secrets); *Data Gen. Corp.*, 825 F.Supp. at 358-359 (determining that a jury could properly infer that software contained trade secrets even though the plaintiff never identified specific sections of source code in its software as trade secrets); *with Staffbridge, Inc.*, 2004 WL 1429935, at *3 (holding that a description including "the source code as a whole, the database schema, and the customer databases" did not adequately distinguish what part of the software was protectable from that which was not protectable) *and IDX Sys. Corp.*, 285 F.3d at 583-584 (holding that "a 43-page description of the methods and processes underlying and the interrelationships among various features making up [plaintiff's] software package" was insufficient because it failed to "separate the trade secrets from the other information that goes into any software package").

The issue of adequacy of identification often turns on whether the trade secret description includes some aspect that is valuable and not known to the particular trade. *See Dickerman Assocs., Inc. v. Tiverton Bottled Gas Co.*, 594 F.Supp. 30, 35 (D. Mass. 1984) (stating that a "[p]laintiff need only show that the particular architecture of its program is valuable [and] that it is not a matter of common knowledge or readily duplicated"). "A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain,

but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 174 (2d Cir. 1990). To be sure, aspects of the AirKiosk System are presumptively valuable since Iceland Express was willing to pay $20,000 up front to implement the system. And although many parts of the AirKiosk System are accessible to the public either through airline reservation websites or through Sutra's own website, access to the Control Agent and Reservation Control modules, according to Sutra, is restricted to authorized customers. But on this record there has been no specific description of these presumptively valuable features to which access is controlled. Sutra's description of its alleged trade secret is overly broad and this lack of specificity is fatal to its claim. Consequently, there is not adequate evidence for a reasonable jury to find that Sutra has a valid trade secret.

    b.   <u>Secrecy</u>

The second element necessary for a misappropriation of trade secrets claim is secrecy. Sutra must show that it took reasonable steps to preserve the confidentiality of its alleged trade secret. Sutra easily meets this test since it only allows authorized customers to access the AirKiosk Control Agent and Reservation Control modules. In addition, the customers must

have "agreed to maintain the confidentiality of the AirKiosk System.  Security for access to these modules is controlled through the use of IDs, passwords, and Internet address verification."  Iceland Express is not moving for summary judgment based on this element of the misappropriation of trade secrets claim nor would such an argument be successful.

    c.   <u>Improper Means</u>

The last element that Sutra has the burden of proving in its misappropriation of trade secrets claim is that Iceland Express used improper means in breach of its confidential relationship with Sutra to acquire and use Sutra's trade secrets.  This element is quite problematic for Sutra.  It is undisputed that Iceland Express employee Gunnar Karl Nielsson wrote a script to access the AirKiosk System without Sutra's knowledge or permission.  Using that script, Iceland Express copied approximately 4,000 PNR files from the AirKiosk System.  According to Sutra, these PNRs contain both passenger reservation data as well as the structure of the data as stored internally in the AirKiosk System.

The problem for Sutra is that it has failed to show any evidence linking the PNR download to Sutra's inadequately alleged trade secrets:  the "operation, appearance, features, and functionality of the Control Agent and Reservation Control interfaces and modules."  When Novak Niketic, the President of

Sutra, was asked during his deposition, "What information does Sutra have which indicates that Iceland Express retrieved information about the way the data is stored and structured in the AirKiosk System?", he responded that Sutra had log files that showed "[a] trace of the activities on the AirKiosk System."  But Niketic conceded that it is "impossible for [it] to say whether Iceland Express retrieved any data other than PNRs by means of the script."  Based on the record before me, Sutra has not established that a genuine issue of material fact exists regarding the third element required for a misappropriation of trade secrets claim.

In an effort to introduce evidence that a misappropriation did in fact occur, Sutra seeks to admit into the record an expert report by Peter Nimerius.  Sutra submitted his inordinately delayed expert report on August 9, 2007.  I had ordered that fact discovery be completed by April 30, 2007, that expert disclosure occur by May 25, 2007 and that expert depositions by completed by July 15, 2007.  In doing so, I stated that "no further extensions of discovery schedule will be entertained."  Although Sutra claims it identified Nimerius as an expert before discovery was completed, it did not make its Rule 26(a)(2) disclosure of expert testimony until well past the deadline established.  Fed. R. Civ. P. 37(c)(1) "enforces Rule 26(a) by providing that '[a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such

failure is harmless, permitted to use as evidence . . . any witness or information not so disclosed.'" *Poulis-Minott v. Smith*, 388 F.3d 354, 358 (1st Cir. 2004) (quoting Fed. R. Civ. P. 37(c)(1)). The First Circuit has held that the Rule 26(a) discovery directives are "mandatory since the adoption of Rule 37(c)(1) . . . clearly contemplates stricter adherence to discovery requirements and harsher sanctions for breaches of this rule." *Id.* Given the circumstances, I will exclude the Nimerius report. *See Lohnes v. Level 3 Communications, Inc.*, 272 F.3d 49, 60-61 (1st Cir. 2001) (upholding the district court's decision during the summary judgment phase to disregard a plaintiff's belatedly proffered expert witness affidavit since the plaintiff failed to comply with the Rule 26(a)(2) disclosure provisions); *Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1007-09 (8th Cir. 1998) (affirming the district court's exclusion of the plaintiff's expert report when deciding summary judgment due to the plaintiff's untimeliness in submitting the report). Because the Nimerius Report goes to the heart of the trade secret issue, its unjustifiably late disclosure after the discovery period had ended and just 8 days before summary judgment motions were due cannot be said to be harmless. I view the objections raised by Sutra in its summary judgment pleadings effectively to seek exclusion of the report.

    Even were I to admit and consider the Nimerius report, Sutra is still unable to show that a genuine issue of material fact

exists regarding whether Iceland Express improperly acquired and used Sutra's trade secrets. The First Circuit requires an expert to "include the factual basis and the process of reasoning which makes the conclusion viable in order to defeat a motion for summary judgment." *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993). "Where an expert presents nothing but conclusions - no facts, no hint of an inferential process, no discussion of hypotheses considered and rejected, such testimony will be insufficient to defeat a motion for summary judgment." *Id.* In its summary, the Nimerius report states that "Iceland Express built up a set of user requirements and work practices. When they moved from Sutra AirKiosk to the current Iceland Express system in the summer of 2003, the established user requirements and work practices formed the basis for further developing the Iceland Express system". But the development of user requirements and work practices do not, without more, constitute trade secret misappropriation.

The report goes further and concludes that "as indicated in Item 1-4 below . . . parts of the administrative functions from Sutra Airkiosk were directly copied into the Iceland Express system". But the report does not substantiate this conclusion with any of the facts and reasoning required by the First Circuit. For Item 1, the report states that "the Iceland Express system is not a clean and full copy of Sutra AirKiosk in this respect, rather influenced by." For Item 2, the report states

14

that "the Iceland Express system is strongly influenced by the functions from the Sutra AirKiosk system, but that the Iceland Express system has chosen a different approach to handling this functionality." For Item 3, the report states that "the Iceland Express system has been strongly influenced by the Sutra Airkiosk system." However, the report also states that "[t]erms like UM and WC is part of the general airline lingua, but must have been brought into the Iceland Express system influenced and possibly copied from the Sutra Airkiosk system." This statement does not make sense and appears to be completely contrary to the requirements of a trade secret - that the secret not be known to the trade. For Item 4, the report states "[w]hether this comes from the Sutra AirKiosk system directly or from the requirements from Iceland Express after they had been using the Sutra AirKiosk system is hard to establish." The findings throughout the report do not support the conclusion that "parts of the administrative functions from Sutra Airkiosk were directly copied into the Iceland Express system". After reviewing the Nimerius expert report, I find that it fails to provide factual support for its conclusion that portions of Iceland Express's current reservations system were copied directly from the AirKiosk System.

   Even viewing the facts in the record - including the Nimerius expert report - in the light most favorable to Sutra, as

I am required to do during the summary judgment stage, Sutra has failed to show that a genuine issue of material fact exists regarding the claim that Iceland Express improperly acquired and used Sutra's trade secrets.  Sutra has shown no link between the downloaded PNR data and its inadequately described trade secret, the Control Agent and Reservation Control modules.

Given this record, I conclude as a matter of law that no reasonable jury could find that Sutra has placed an adequately described trade secret at issue nor adequately established misappropriation of any trade secret, acquisition or use of Sutra trade secrets falling broadly within the open textured - but inadequate - description Sutra has provided.  Thus, I will grant Iceland Express's motion for summary judgment on Count Two.

   2.   *Count One - Breach of Contract*

In Count One of its Complaint, Sutra raises a breach of contract claim against Iceland Express.  Iceland Express has moved for summary judgment based on the argument that this claim duplicates the misappropriation of trade secrets claim.  The Service Agreement memorialized the terms of the service provider arrangement between Sutra and Iceland Express.  Two sections of the Service Agreement, 9.2 and 9.3, are relevant in analyzing the duplicative claims argument.  Based on these sections, I will deny the motion for summary judgment because I find that the language in Section 9.3 does not duplicate the misappropriation

16

of trade secrets claim.

Turning first to Section 9.2, I note the language in Section 9.2 states: "Iceland agrees to protect and keep confidential the trade secrets of Sutra."  Sutra agrees that "[t]o the extent that Iceland Express breached this term, the claim is the same as for the misappropriation of trade secrets."  Since I will grant the motion for summary judgment on the misappropriation of trade secrets claim, I need not analyze the breach of contract claim under Section 9.2 any further.

The breach of contract claim under Section 9.3, however, may not be avoided so easily.  The language states: "Iceland shall not, and shall prevent its employees to use, transmit, modify or reproduce for the benefit of third parties any information which is stored in the documentation, programs or databases of AirKiosk, if such heretofore mentioned acts are not necessary in the use of AirKiosk as provided by this Agreement."  Unlike Section 9.2, this section does not raise the issue of trade secrets.  Rather it focuses on the information stored in the AirKiosk System.  Thus, a breach of contract contention pursuant to Section 9.3 presents a claim that is distinct from the claim of misappropriation of trade secrets.  Both sides agree that Iceland Express's employee Nielsson created a script that accessed the AirKiosk System and copied PNR files.  Iceland Express admits giving the information to a third party, Wiberg.

17

There is a factual dispute, however, over whether the information accessed was proprietary to Iceland Express or to Sutra. Sutra maintains, on the basis of the record before me, that portions of the PNRs were not proprietary to Iceland Express, and hence, that Iceland Express had no right to pass the information to Wiberg. I find this dispute raises a genuine issue of material fact; thus, summary judgment is inappropriate as to Count One.

### III. CONCLUSION

For the reasons stated more fully above, I GRANT Defendant's Motion for Summary Judgment as to Count Two, the misappropriation of trade secrets claim, and I DENY Defendant's Motion for Summary Judgment as to Count One, the breach of contract claim. The Clerk shall set this case for trial on Count One to commence September 8, 2008.

                                    */s/ Douglas P. Woodlock*
                                    DOUGLAS P. WOODLOCK
                                    UNITED STATES DISTRICT JUDGE